IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA


PINNACLE PROPERTIES, LLC, *
      Plaintiff,    *  23-CV-198
                     *  August 13, 2025
vs.                *  Mobile, Alabama
                     *  9:00 a.m.
GUARANTEED RATE, INC.,   *
      Defendant.    *
****************************


TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE TERRY F. MOORER
UNITED STATES DISTRICT JUDGE


<u>FOR THE PLAINTIFF</u>:

NICHOLAS C. PATTI, ESQ.
James B. Pittman, JR., P.C.
P.O. Box 2525
Daphne, AL  36526
251-626-8202


JAMES B. PITTMAN, ESQ.
James B. Pittman, JR., P.C.
P.O. Box 2525
Daphne, AL  36526
251-626-8202

<u>FOR THE DEFENDANT</u>:

MR. GRANT PREMO, ESQ.
Bradley, Arant, Boult, Cummings, LLP
1819 5th Avenue North
Birmingham, AL 35203
205-521-8850


<u>COURT REPORTER</u>: MELISSA J. EICKEN, RPR, FCRR

  Proceedings recorded by OFFICIAL COURT REPORTER, Qualified pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.  Transcript produced by computerized stenotype.


***MELISSA J. EICKEN, RPR, FCRR***
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

<u>**I N D E X**</u>

| <u>**EXAMINATION**</u> | <u>**PAGE**</u> |
|---|---|
| <u>**SCOTT UBERSOX**</u> | |
| DIRECT EXAMINATION BY MR. PATTI | 7 |
| CROSS-EXAMINATION BY MR. PREMO | 17 |
| REDIRECT EXAMINATION BY MR. PATTI | 44 |
| RECROSS-EXAMINATION BY MR. PREMO | 74 |
| <u>**JAMES PITTMAN**</u> | |
| DIRECT EXAMINATION BY MR. PATTI | 79 |
| CROSS-EXAMINATION BY MR. PREMO | 139 |
| REDIRECT EXAMINATION BY MR. PATTI | 193 |
| RECROSS-EXAMINATION BY MR. PREMO | 197 |

| <u>**EXHIBITS RECEIVED IN EVIDENCE**</u> | <u>**PAGE**</u> |
|---|---|
| Defendant's Exhibits A-Q | 6 |
| Plaintiff's Exhibits 1-16 | 7 |
| Plaintiff's Exhibit 17 | 197 |

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

**P R O C E E D I N G S**

(In open court.)

THE COURT:  Calling for trial the case of Pinnacle Properties versus Guaranteed Rate, Inc., Case Number 23-CV-198.  Are the plaintiffs ready to proceed?

MR. PATTI:  Yes, Your Honor.  Good morning.  I'm Nick Patti --

THE COURT:  Good morning.

MR. PATTI:  -- on behalf of Pinnacle Properties.  I'm here alongside with James Pittman who will be serving as court representative of the company.  We've got a few housekeeping matters we'd like to take up with Your Honor after some initial introductions.  At this time I'll let the defendants introduce themselves and we can take up those housekeeping matters.

THE COURT:  Okay.  And are the defendants ready?

MR. PREMO:  The defendants are ready, Your Honor.  Grant Premo for Guaranteed Rate.  I have with me Wil LeCompte, who is representative on behalf of Guaranteed Rate.

THE COURT:  Okay.  Thank you.  If you'll give me just one second.  All right.  Go ahead.

MR. PATTI:  Your Honor, before trial today, we've communicated with the defendants and have stipulated to the admissibility as to each side's exhibits.  Admissibility being authentication.  So you have binders from both sides.  One of them will be Exhibits 1 through 16.  That's Pinnacle's

exhibits, and then defendant's exhibits marked A through Q.  I hope the differentia in numerical exhibits and alphabetical isn't an issue.  If it is, we can clear that up.

So as far as the admission of exhibits, I think we're all on the same page.  I do believe that each side wants to preserve rights for specific objections and for anything that's embedded within those exhibits, but generally speaking, the authentication and admissibility of those exhibits, the parties have stipulated to that.

In addition, we did discuss in this pretrial conference among counsel waiving the opening statements.  Your Honor is very familiar with the issues at hand.  We want to streamline this case.  We want to be mindful of your time and the Court's time as well, so I think we can go ahead and get right into the testimony here today.

In line with that part of this trial, there's a lot of arguments that you're going to hear today and testimony you're going to hear today that's circular in nature.  We're going to put up the same evidence that they're going to put up.  There's a lot of testimony that is going to be the same.  There's counterclaims.  Our hope is that we can call each witness, cross, direct, cross, direct, excuse each witness, and move along.  Instead of us calling our witnesses, resting, defendants calling the same exact witnesses and resting.  So if Your Honor is okay with that, I think that's how we prefer to

proceed.

THE COURT:  That works for me.

MR. PATTI:  Okay.  Great.  Grant, I think that's all I have from a housekeeping standpoint.

MR. PREMO:  Yes.  And the only other issue that I wanted to raise was Guaranteed Rate has a claim for attorney's fees as part of its damages on counterclaim.  We would prefer, if it's agreeable, to present that claim for attorney's fees either by bifurcating the trial and -- and submitting briefs and having a hearing after, if the Court does grant those damages for attorney's fees, rather than putting on the evidence today, just as a matter of efficiency, and -- and because we also have some additional time that is on the clock right now, that we would include in that, so.  If that's agreeable to bifurcate, allow us to present that via briefing and then a hearing after trial, if the Court does award those damages, but we'd request a bifurcation to the damages on attorney's fees.

THE COURT:  Any objections to that?

MR. PATTI:  Your Honor, yes.  The only concern that we have with that is we haven't seen those attorney's exhibits. It was marked as an exhibit in the defendant's binder as Exhibit R and I did take this issue up with Mr. Premo pretrial. One of the questions that we would have as to the attorney's fees would be the reasonableness of them.  It's hard for me to

defend against the reasonableness of attorney's fees that I haven't seen.  So I do think they should put on that evidence here today.  I would think they can elicit testimony around that.  That's how we intend on getting in the issue of attorney's fees because we, too, do have an attorney fee provision and claim here today.  And, so I would object to the bifurcation of that issue.  They've disclosed or said they disclosed those invoices as an exhibit, but we've never received those before trial today.

THE COURT:  Well, it seems to me that fees does depend upon who prevails.  And, so it make sense for me to decide who prevails, then we can hear what needs to be presented by whomever needs to be the prevailing party.  So I'm going to decide the attorney's fees at a different point.

MR. PATTI:  Yes, Your Honor.

THE COURT:  Anything else?

MR. PREMO:  No, Your Honor, except pursuant to the stipulation on the exhibits, I would like to go ahead and move to admit Defendant's Exhibits A through Q, if we could.

THE COURT:  And as I understand it, there's no objection.  So those will be admitted.

(Defendant's Exhibits A-Q were admitted.)

MR. PATTI:  We would ask for the same thing, our Exhibits 1 through 16 be admitted at this time.

THE COURT:  They're admitted.

(Plaintiff's Exhibits 1-16 were admitted.)

MR. PREMO:  Thank you, Your Honor.

THE COURT:  All right.  Does that conclude all of the housekeeping before we get down to the business of hearing the case?

MR. PATTI:  Judge, that's all we have right now at this time.  We're ready to proceed with our first witness.

THE COURT:  Call your first witness.

MR. PATTI:  Pinnacle would call Mr. Ubersox to the stand, who I believe is telephonically today.

MR. PREMO:  Can we have five minutes to get him ready to go?  We just need to call him and get him on the screen.

THE COURT:  Uh-huh.

**SCOTT UBERSOX**

was sworn and testified as follows:

**DIRECT EXAMINATION**

**BY MR. PATTI:**

**Q**  Good morning, Mr. Ubersox.  Can you hear me?

**A**  I can.  Good morning.

**Q**  Good morning.  And are you able to see me on the screen?

**A**  Yes, I am.

**Q**  Okay.  Where are you currently located at?

**A**  I'm in Chicago, Illinois, at our headquarters office.

**Q**  Is anybody else in the room right now?

**A**  No.

**Q**   Now, getting right into why we're here today, you did not sign the lease agreement with Pinnacle on behalf of Guaranteed Rate?

**A**   Correct.

**Q**   That lease was actually signed by John Ellis?

**A**   John Elias, correct.

**Q**   Elias.  But you're here to testify about the lease?  I'm sorry, I didn't catch that.

**A**   Yes, I am.

**Q**   And Guaranteed Rate's attempts to terminate the lease as well?

**A**   Correct.

**Q**   Now, do you recall executing an affidavit in connection with this case?

**A**   An affidavit?

**Q**   Yes.

**A**   In the form of what?

**Q**   A written sworn statement that was attached alongside a motion for summary judgment submitted on behalf of Guaranteed Rate in this case?

**A**   I think so, yes.

**Q**   Okay.  Then do you recall in that affidavit that you stated on January 23rd, 2023, the defendant exercised its termination right by setting -- sending written termination notice to plaintiff via e-mail?

**A**   Yes.

**Q**   So then you would agree with me that Guaranteed Rate did not send this termination notice to Pinnacle on January 20th of 2023?

**A**   Can I reference my exhibits here?

**Q**   I'm just asking you if you can recall the affidavit, and if you do, my question was very simple, and I quoted your affidavit in which you state, on January 23rd of 2023, defendant exercised its termination right by sending written termination to plaintiff via e-mail.

**A**   Yeah.  I -- as best as I recall, the e-mail was sent on the 23rd for termination.

**Q**   And that leads me to the next question.  This termination notice was sent via e-mail; correct?

**A**   Correct.

**Q**   It was not sent via overnight courier as required by the lease.

**A**   It was not sent overnight courier, initially was sent e-mail, based on the previous communications that we had had with the building representation.

**Q**   Okay.  Now, let's talk about some of those previous conversations and some of the people that were at the center of them.  Michael Lewis is the real estate transaction manager for Guaranteed Rate; correct?

**A**   Correct.

Q    He works in the Chicago office with you?

A    He does not.  He -- he works remotely.

Q    Okay.  Well, did you and Michael Lewis communicate regularly about the real estate transactions for Guaranteed Rate?

A    Yes.

Q    And it's your opinion that Mr. Lewis was doing some communications on behalf of Guaranteed Rate with Pinnacle?

A    Correct.

Q    But you don't have firsthand knowledge of those communications; correct?

A    Nothing that was not over e-mail.

Q    Okay.  But even with the e-mails, you weren't CC'd on any of these e-mail communications between Guaranteed Rate and Pinnacle; correct?

A    Correct.

Q    All right.  Now, talking about another gentleman that works for Guaranteed Rate, Noah Brant, he's the director of real estate for Guaranteed Rate?

A    That's correct.

Q    Where does Noah Brant work?

A    Noah also works remotely.

Q    Okay.  And do you and Noah communicate regularly about Guaranteed Rate's real estate properties?

A    Yes.

**Q**   And you're aware that Noah Brant communicated with Pinnacle about the property that we're here for today?

**A**   Correct.

**Q**   But you don't have firsthand knowledge of those communications; is that fair to say?

**A**   That is fair to say.

**Q**   All right.  The last name that I've seen through some of the e-mails that we'll talk about throughout the course of the day is Jamie Bauer, and I understand Jamie Bauer is the project manager for construction and design for Guaranteed Rate; is that correct?

**A**   That is.

**Q**   Where does Jamie work?

**A**   Jamie is also remote.

**Q**   Okay.  Do you and Jamie communicate regularly about the construction and design for Guaranteed Rate branches across the country?

**A**   Not as much as I do with Noah and Michael.

**Q**   Okay.  As far as the communications that we'll see from Jamie Bauer throughout trial today, you don't have firsthand knowledge of those communications; is that fair to say?

**A**   That is fair to say, yes.

**Q**   Okay.  But you are aware that Ms. -- that Bauer and Brant had communications with Mr. Pittman throughout the term of the lease; correct?

**A**   Correct.

**Q**   So they would have had Mr. Pittman's e-mail address throughout the course of the lease?

**A**   At some point, correct.

**Q**   All right.  I want to switch back to the affidavit.  I have a few more questions for you on that.  In your affidavit, you relied on an e-mail that Michael Lewis sent on February 13th, which he states in part, there are no adjustments that would change these plans unfortunately.  Do you recall that portion of your affidavit?

**A**   Yes.

**Q**   And the adjustments that's referenced in that e-mail, that's adjustments to the monthly rent of the property that we're here to talk about today; correct?

**A**   That is my understandings, correct.

**Q**   That statement, however, Mr. Ubersox, was not true.

**A**   I disagree with that.

**Q**   Well, let's talk about that for a minute.  You had several representatives of Guaranteed Rate that were actively trying to renegotiate the terms of the lease in an attempt to adjust it downward, so that they can stay at the premises; correct?

**A**   Those were unauthorized employees that had no authority to negotiate anything on Rate's behalf.

**Q**   I'm glad you mentioned unauthorized employees that don't have the authority to bind companies.  We'll talk about that in

a few minutes.  But those unauthorized employees that you're referencing, that would be Shannon Reville.  That's one of the unauthorized employees, Mr. Ubersox?

A   Yes.

Q   And then Joe Mosley?

THE COURT:  Joe who?

THE WITNESS:  Yes.

MR. PATTI:  Mosley.

**BY MR. PATTI:**

Q   Now, Shannon Reville was communicating with Mr. Pittman.  Have you seen those e-mails?

A   I have.

Q   And throughout those e-mails, she's referring to instructions she's taking from corporate in an attempt to negotiate down the terms of this lease.  You're familiar with those e-mails, too; right?

A   That's not how I read those e-mails.  They were given a directive that we were closing the office and in an effort to consolidate with the mobile office.  So we were not trying to renegotiate anything.  We terminated the lease in an effort to close the office and consolidate into the mobile office.

Q   Respectfully, Mr. Ubersox, I think you guys attempted to terminate the lease, but we'll talk about that, too.  Let me direct your attention to Exhibit 9 in the binder that we've sent with our exhibits.  And let me know when you've got the

tab for Exhibit 9, please.

A    Yeah.  I'm here.

Q    Okay.  If you'll flip to the second page of that exhibit.

A    Okay.

Q    Do you see the e-mail at the bottom of the page that's numbered 7 from Shannon Reville on February 3rd of 2023?

A    February 3rd, you said?

Q    Yes.  Of '23.

A    Yes.

Q    Okay.  So the second to last full sentence there says, do you think you could give me a number I could start with to send to corporate, question mark?  I would really appreciate that. Did I read that correctly?

A    Yes.

Q    Okay.  And if you will, follow along with me to the last page of Exhibit 9, Mr. Ubersox.  Let me know when you've gotten to the last page, please.

A    Yes.

Q    All right.  And are you looking at an e-mail on Friday, February 24th, 2023, from Shannon Reville?

A    Yes.

Q    And the subject line says, Bay Point follow up?

A    Yes.

Q    And in this e-mail Shannon says, the only way we can stay is if you agree to $1,500 a month.  And if we skip down to the

last sentence there, it says, I'm only the messenger.  So no, I'm not trying to insult you by any means.  Did I read those two sentences correctly, Mr. Ubersox?

A    Correct.

Q    But it's your opinion and testimony here today that Guaranteed Rate was not trying to actively renegotiate and adjust the terms of this lease?

A    In no way we were trying to renegotiate.  The local employees may have been, but in 2022 and in 2023, the mortgage industry drastically went into the gutter, and as a company, we made decisions across the country to close offices, and this was one of the offices that fell under that category.  So there was no attempt to renegotiate by us, as the corporate office.

Q    But as you just said, there was attempts by local branch managers and executives?

A    Unknowingly to me, yes.

Q    And I think you testified earlier that those -- they were unauthorized and did not have authority to negotiate on behalf of Guaranteed Rate?

A    Correct.

Q    But I believe as we go through the course of this trial, Guaranteed Rate is going to attempt to impute authority on a part-time property manager with respect to accepting the termination notice that was sent to Pinnacle Rate -- Pinnacle Properties; is that fair to say?

**A**  In addition to requesting an amortized amount of landlord's costs, yes.

**Q**  Okay.  Now, you are familiar that the contract, the lease agreement that we're all here for today, contained a notice provision, Mr. Ubersox?

**A**  Correct.

**Q**  Okay.  Will you flip to Exhibit 11, please, in the binder you have in front of you?

**A**  Sure.

**Q**  And let me know when you've got there.

**A**  I'm there.

**Q**  All right.  This is the April 3rd, 2023 letter from Guaranteed Rate; correct?

**A**  Yes.

**Q**  Okay.  This April 3rd letter, it references the termination notice that was allegedly sent on January 20th of 2023?

**A**  Was that a question, I'm sorry?

**Q**  Yes, it was.  My understanding in reading this, Mr. Ubersox, is that there's an attempt to try to relate back to the alleged January 20th, 2023 notice of termination that was sent.

**A**  Yeah.  Referenced in January, yes.

**Q**  Okay.  But on April 3rd of 2023, that was the first time that Guaranteed Rate had actually issued a check for the three months' rent that was owed pursuant to the termination

provision in the contract?

**A**   After numerous attempts to work with the landlord and obtain with what the unamortized costs were, we got to a point where we wanted to show that, you know, we were working on this in good faith, so that's why we sent the check for the amount that we knew what we owed outside of the unknown amount that we also knew that we owed.

**Q**   And I believe there was some tracking information that was sent with this letter; do you recall that?

**A**   Yes.

**Q**   There's no tracking information for the alleged January 20th, 2023 letter that Guaranteed Rate has represented to this Court, it was -- it sent to Pinnacle Properties via overnight courier delivery?

**A**   Correct.

MR. PATTI:  Your Honor, I'm going to pass the witness at this time.  I will have several more questions to follow up with after Mr. Premo finishes his questions.

### CROSS-EXAMINATION

**BY MR. PREMO:**

**Q**   Mr. Ubersox, can you tell us, you're employed by Guaranteed Rate; correct?

**A**   Correct.

**Q**   What's your title?

**A**   Executive vice president.

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

**Q**   Okay.  And what are your duties as the executive vice president?

**A**   I'm responsible for a few different areas within the company.  One, real estate, facilities, workplace services, human resources, vendor management, and also heavily involved in our foundation, Rate foundation.  I'm a board member of that as well.

LAW CLERK:  Mr. Premo, I'm sorry to interrupt.  If you're okay with it, we're going to toggle back and forth so we can see him as he's testifying until you actively need the Elmo.

MR. PREMO:  That's fine.  I'm sorry.

LAW CLERK:  No problem.  Didn't want you to get caught off guard.

MR. PREMO:  And if I can see it on the small screen, we can leave it small, I think.

COURTROOM DEPUTY:  You'll be able to see it.  It'll be just very small.

MR. PREMO:  That's fine.

**BY MR. PREMO:**

**Q**   Mr. Ubersox, as it relates to this matter, can you describe some of your job responsibilities that have to do with Guaranteed Rate's physical office locations?

**A**   Yes.  I've been with the company for 13 years, and when I started, my primary role was lease negotiations, opening new

branches, and maintaining those branches from a lease administration standpoint, making sure rent is paid, all that fun stuff.  So since then, we've grown to, you know, approximately a thousand licensed locations around the country.

**Q**   And do you have personal knowledge as it relates to Guaranteed Rate's prior office location that's the subject of this lawsuit that was down in Daphne, Alabama?

**A**   Vaguely at the time, yes.  I've learned more about it over the last month or so.

**Q**   How did you learn more about it over the last month or so?

**A**   Just in the e-mail communications, reading exhibits.

**Q**   Okay.  Are you familiar with Guaranteed Rate's recordkeeping practices?

**A**   I am.

**Q**   Okay.  And are Guaranteed Rate's records for -- for this location that you've reviewed, were they kept in the regular course of business?

**A**   Yes.

**Q**   And were they prepared by persons with knowledge of the information that was contained in those records?

**A**   Yes.

**Q**   And many of those records were e-mails that are included as exhibits here today; correct?

**A**   That is correct.

**Q**   You've reviewed all of those e-mails prior to today?

**A**   I have.

**Q**   Okay.  Mr. Patti asked you about a few individuals. Michael Lewis was one of those individuals.  Have you had conversations with Mr. Lewis about this matter in the last several weeks?

**A**   I have.

**Q**   Have you had conversations with Noah about this property in the last several weeks?

**A**   Yes.

**Q**   All right.  If you would, Mr. Ubersox, turn to Defendant's Exhibit A.  Can you identify that document for the Court?

**A**   Yes.  It's the lease that we had with the landlord in Daphne, Alabama for the Daphne office.

**Q**   When did this lease begin?

**A**   January 1st, 2022.

**Q**   Are you familiar with the process through which this lease was drafted and negotiated?

**A**   Yes.

**Q**   Can you explain how -- how the lease was drafted and negotiated?

**A**   My team worked with building represent -- representative, I think her name was Lindsey in negotiating some of the terms and conditions within the document.

**Q**   Is that typical for leases that Guaranteed Rate enters into?

**A**   Yes.

**Q**   Okay.  And this lease includes a termination provision; correct?

**A**   Correct.

**Q**   Is it typical that Guaranteed Rate includes termination provisions in your leases?

**A**   In the vast majority of our leases, we do have a termination right.

**Q**   Why do you include termination provisions in leases that Guaranteed Rate enters into?

**A**   The mortgage industry, as I think we have all seen, is a pretty volatile industry and to make long-term commitments on office space is not a fiscally responsible decision as far as we're concerned.  So we try to maximize the flexibility within all of our office leases.

**Q**   Is it fair to say that having a termination provision in the lease is important to Guaranteed Rate?

**A**   It was one of the first things our CEO told me when I met with him.  Yes.

**Q**   If you will look at the termination provision that is included in this lease, and I'll try to bring it up on screen as best I can.

COURTROOM DEPUTY:  Are you trying to zoom in?  There you go.

**BY MR. PREMO:**

**Q**   Do you have that termination provision in front of you, Exhibit A?

**A**   I do.

**Q**   Okay.  This -- in this termination provision, what is required to terminate the lease for this location?

**A**   Providing landlord with 90 days prior written notice, and we would also issue the landlord with a termination fee equal to three months of the tenant's in effect gross rent plus unamortized landlord costs that were associated with the lease.

**Q**   Okay.  In -- in your experience, how would you calculate the amount of unamortized landlord costs that's included in this lease?

**A**   In the instances where there is an amortized portion of the fee, we reach out to the landlord, let them know that we are terminating the lease and ask for them to provide us with what that unamortized portion is, so we can add that to the three months of rent and cut them a check for the full amount.

**Q**   Can Guaranteed Rate calculate the amount of unamortized costs on its own?

**A**   No.

**Q**   Why not?

**A**   Because we weren't privy to what the landlord spent in getting the lease up and any work that was being done to the space and any invoices that were received, and then having to

kind of determine what the unamortized portion of what those fees were.

**Q**   Other than the landlord providing the amount of unamortized costs, is there any way Guaranteed Rate can calculate that amount?

**A**   Not that I know would know of.

**Q**   Okay.  And Guaranteed Rate exercised the termination provision in the lease with Pinnacle Properties; right?

**A**   Correct.

**Q**   Why was that lease terminated?

**A**   In 2022 and 2023, our company went through some financial distress, and we were tasked with reducing costs wherever we could.  Our company had grown tremendously over the previous few years, and one of the areas that we could really drive down cost was eliminating offices around the country and exercising lease terminations, consolidating offices, closing offices, which we did over a -- a two-year period.

**Q**   And, so was the Daphne office selected as one of the offices that needed to be closed pursuant to that consolidation plan?

**A**   It was.

**Q**   Okay.  If you would, turn to Defendant's Exhibit B.

THE COURT:  B or delta?

LAW CLERK:  Bravo.

MR. PREMO:  B as in boy.

**BY MR. PREMO:**

**Q**   Do you have Defendant's Exhibit B up in front of you?

**A**   Yes.

**Q**   All right.  Can you identify that document for me?

**A**   Yes.  It's an e-mail from Michael Lewis to the building representative referencing our 90-day written notice and also acknowledging that there's a termination fee and that we recognize what the three months' gross rent would total out to but asking for help in understanding what the unamortized portion of the landlord's costs would be.

**Q**   Okay.  What date was this e-mail sent?

**A**   January 23rd, 2023.

**Q**   And to what e-mail address was this sent?

**A**   remgr@jbplaw.com.

**Q**   Okay.  Why did Guaranteed Rate send it to that e-mail address?

**A**   Because previously that was the e-mail address that we worked with in negotiating the lease.

**Q**   All right.  In this e-mail, there's a bolded paragraph near the bottom; do you see that?

**A**   Yes.

**Q**   And that paragraph says, could you please, one, confirm the total amount of the termination fee owed including any unamortized costs, and two, confirm the best address for us to mail a check for this fee.  Did I read that correctly?

**A**    Yes.

**Q**    And why was Guaranteed Rate requesting this information?

**A**    Because we would have no way of knowing what the unamortized portion was, and we recognize that that is part of the overall early termination fee.  So in, you know, good faith, we reached out asking for what that amount is, so we could have a check cut to the landlord and -- and make them whole as far as a termination fee was concerned.

**Q**    Did Guaranteed Rate receive any response to this e-mail?

**A**    No.

**Q**    Please turn to Defendant's Exhibit C.  Can you identify that document for the Court?

**A**    Yes.  It's an e-mail from Michael Lewis to remgr@jbplaw on January 31st following up on the request for the unamortized portion.

**Q**    And why was this e-mail sent?

**A**    Because we hadn't received a response to the initial e-mail.

**Q**    Okay.  If you would, please, turn to Defendant's Exhibit F. Do you have that up?

**A**    Yes.

**Q**    Okay.  Can you identify that document for me?

**A**    This is an e-mail stating the 90-day termination for Guaranteed Rate's lease at Suite 4 in -- on Main Street in Daphne.  Also referencing that there was a check included for

the amount that we knew, which was the $13,089.36, and then following up again asking what the unamortized portion was so we could also pay that and the best address to send the check, if there was one.

Q   Prior to this e-mail being sent on February 10th, 2023, had Pinnacle responded at all to the prior request for the amount of the unamortized landlord cost?

A   No.

Q   Please turn to Defendant's Exhibit G.  All right.  Do you see the e-mail in the middle of this page dated February 13th, 2023?

A   Yes.

Q   Who was -- who is that e-mail from and to?

A   From Michelle Gore, the real estate manager for Pinnacle Properties, and it was to Michael Lewis.

Q   What does Michelle say in this e-mail?

A   That she had forwarded Michael's e-mail to the owner who is out of town and as soon as she has confirmation on the amount, she would forward to us.

Q   Confirmation on the amount of what?

A   The unamortized portion of landlord's costs associated with the lease.

Q   Okay.  Pinnacle says here through their employee, Michelle Gore, that they're going to get confirmation of the amount of the unamortized landlord cost.  Did they ever provide that to

Guaranteed Rate?

**A**   No, they did not.

**Q**   If you'll look at the e-mail dated February 13th, 2023, at 11:37 a.m., can you identify that e-mail for us?

**A**   Yes.  It's an e-mail response from Michael Lewis to Michelle thanking her and basically stating what the reason of the termination was which was relocating our employees to another office and that there was no need for the space anymore.

**Q**   Prior to this e-mail being sent on February 13th, 2023, are you aware of any attempts at the corporate level to try to renegotiate this lease?

**A**   No.

**Q**   As of February 13th, 2023, did Guaranteed Rate on the corporate level have any intention of renegotiating this lease?

**A**   No.

**Q**   Please turn with me to Defendant's Exhibit H.  Will you identify that document?

**A**   This is Michael following up with Michelle on the termination notice and asking for confirmation of the termination fee and the address to send the check.

**Q**   Okay.  What date was this e-mail sent?

**A**   February 24th, 2023.

**Q**   Was this e-mail sent in response to the prior e-mail chain that we looked at that was marked as Defendant's Exhibit G?

A   Yes.

Q   Did Pinnacle Properties respond to this February 24th e-mail by providing the amount of the unamortized cost?

A   No.

Q   Please turn to Defendant's Exhibit I.  Can you identify that document for me?

A   Yes.  It's an e-mail from Tuesday, March 7th, from Michael Lewis to Michelle, again, following up asking for the fee amount as soon as possible.

Q   Did Pinnacle Properties respond to this e-mail by providing the amount of unamortized landlord costs?

A   No.

Q   Okay.  If you would please turn with me to Defendant's Exhibit J.  Can you identify this document?

A   Yeah.  It's a letter from James B. Pittman addressed to me and Guaranteed Rate referencing an effective lease termination.

Q   And when was this letter sent or what is the date of the letter?

A   March 20th, 2023.

Q   Did Guaranteed Rate receive this letter?

A   Yes.

Q   If it's dated March 20th, 2023, Guaranteed Rate must have received this sometime after March 20th, I suspect; is that correct?

A   Yes.

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

**Q**   And that would have been close to or more than two months after the initial termination e-mail and communication was sent in January 23rd, 2023?

**A**   Approximately, yes.

**Q**   What does Pinnacle state in this letter?

**A**   That they're in receipt of our letter dated January 20th, 2023rd {sic}, then it references the lease termination provision within the lease, and that the termination fee did not accompany the letter; therefore, the termination notice is invalid and ineffective, then there's demand that is made that Guaranteed Rate continue to make monthly payments of the base rent cam charges totaling the $4,360.12 per month until lease termination.  So it states if Guaranteed Rate would like to discuss a lump sum lease buyout or a modification to the lease, whereby, the lease rate is discounted in consideration for a longer term, Pinnacle and Pritchett-Moore would be willing to consider that.  It also states that the space is also being marketed for lease.  And that we -- it was recommended to us to potentially find a suitable sublessee.

**Q**   At any point prior to receiving this letter did Pinnacle Properties inform Guaranteed Rate that Pinnacle believed that the termination was ineffective?

**A**   No.

**Q**   Does Pinnacle state anywhere in this letter that it believes the termination is invalid because some of the

communications about the termination were conducted over e-mail?

**A**   No.

**Q**   Does Pinnacle Properties say anything in this letter indicating that it did not receive the January 20th termination letter?

**A**   No.

**Q**   Looking at this letter and specifically the line saying, I'm in receipt of your letter dated January 20th, 2023, did Guaranteed Rate understand at this point that Pinnacle had received the termination letter and was aware of the termination?

**A**   Yes.

**Q**   Okay.  You mentioned that this offer or this letter offers to discuss several alternatives to termination including a lump sum buyout of the lease, a modification or -- or a novation, did Guaranteed Rate consider any of those alternatives?

**A**   No, we did not.

**Q**   And why didn't Guaranteed Rate consider any of those alternatives?

**A**   Because we had already submitted a termination fee and had already made the decision to consolidate that operation into the Mobile, Alabama office.

**Q**   I'm going to show you what's marked as Defendant's Exhibit K.  Can you identify that letter for me?  Or e-mail for me,

excuse me.

**A**   Yes.  It's from Michael Lewis dated March 29th, 2023, to Mr. Pittman and amelia@jbplaw, lindsey@jbplaw, and the real estate manager at -- assuming JBP Law, copying Noah Brant referencing that they've been trying to get into contact with someone from JBP Law regarding the attached letter referencing termination notice.  And also stating that Michelle Gore is no longer with the firm.  And that there had been attempts to -- multiple attempts to obtain confirmation of the termination fee, the unamortized portion that have gone unanswered and that we have yet to obtain confirmation of the amount owed referencing -- not referencing, but in regards to the unamortized portion of landlord's costs.  Also stating since we did not know the amount of the fee, we could not issue simultaneous payment, accurate simultaneous payment, with the termination notice that was sent in January.

**Q**   There's a bolded section?

**A**   Go down to --

**Q**   I'm sorry.

**A**   I'm sorry.  Go ahead.  I was going to say it goes on to confirm receipt and asking how we would -- we are to proceed asking for confirmation of the amount of the fee owed again, and again, just, you know, asking for the amount of money that we owe so we can provide them with a check in that amount.

**Q**   Yes.  And there's a bolded portion of this e-mail at the

end.  Can you read that?

A   It's -- it asks, could you please, one, confirm the total amount of the termination fee owed including any unamortized costs, and two, confirm the best address for us to mail a check for this fee.

Q   And is that the same information that Guaranteed Rate had requested of Pinnacle in the January 23rd e-mail?

A   Yes.

Q   And in between January 20th, 2023 and March 29th, 2023, had Pinnacle Properties provided that information to Guaranteed Rate?

A   No.

Q   In the letter that we looked at previously marked as Exhibit J that Pinnacle sent to Guaranteed Rate, did that letter include the amount of the unamortized landlord cost?

A   No, it did not.

Q   Please turn to Exhibit L, Defendant's Exhibit L, if you would.  And when you're there, identify that document for us.

A   This is a follow-up e-mail from Michael Lewis to the same group previously mentioned with JBP Law copying Noah Brant asking for receipt of the e-mail from Wednesday, and let us know what needs to be done to resolve the situation requesting, again, confirmation of the fee amount to proceed with any payment.

Q   Did you receive a response from Pinnacle to this e-mail?

**A**   No.

**Q**   Please turn to Exhibit M, Defendant's Exhibit M.  Can you identify that document for us?

**A**   Yes.  It's another e-mail from Michael Lewis dated April 3rd referencing the lease and the letter that was sent, that Guaranteed Rate is mailing a check to Mr. Pittman equal to three months' gross rent which was part of the termination fee. The part that we knew.  The payment was associated with termination notice that was sent in January earlier in the year.  Also states we've been trying to reach you regarding this matter but been unable to confirm the fee associated with, in quotes, unamortized landlord costs associated with the lease, end quote, despite our best efforts.  Please contact us to confirm the remaining amount.  And confirm the final day of our lease is indeed April 24th as outlined in the January notice.

**Q**   What date was this e-mail sent?

**A**   April 3rd, 2023.

**Q**   And I think you may have referenced earlier that, that a check had been sent, but as this e-mail indicates, did Guaranteed Rate send a check for the rental portion of the termination fee, the $13,089.36, on or around April 3rd, 2023?

**A**   Yes.

**Q**   And that's the first time that Guaranteed Rate sent the check; is that right?

**A**   Correct.  Yes.

**Q**   And why hadn't Guaranteed Rate sent a check for the termination fee until April 3rd?

**A**   We exercise a lot of termination options, and in our experience, landlords are willing to provide us with the unamortized amount at -- and -- because of that, we will send one check that reflects three months' gross rent, any unamortized portion, so we're not sending multiple checks for both amounts.

**Q**   Prior to April 3rd and even on April 3rd, did Guaranteed Rate know the amount of the unamortized landlord cost?

**A**   No, we did not.

**Q**   Please turn to Exhibit N, Defendant's Exhibit N.  Can you identify that document for us?

**A**   Yes.  It's an e-mail from Michael Lewis dated April 7th, 2023 to the team from JBP Law copying Noah Brant stating that a check for the $13,089.36 was delivered yesterday, asking for a receipt, and let us know what more is needed.

**Q**   Did you receive or did Guaranteed Rate receive any response from Pinnacle to this e-mail?

**A**   I don't think so.

**Q**   Did Guaranteed Rate receive any response from Pinnacle to the prior e-mail we looked at sent on April 3rd, 2023?

**A**   No.

**Q**   All right.  Please turn to Defendant's Exhibit O.  All

right.  I want to direct your attention to an e-mail in this dated Tuesday, April 11th, from Jamie Bauer.  Can you find that e-mail?

THE COURT:  This is Exhibit O?

MR. PREMO:  This is Exhibit O.

THE WITNESS:  Yes.

**BY MR. PREMO:**

Q   Okay.  If you'll look at this e-mail, it's dated April 11th, 2023, from Jamie Bauer.  Who is that e-mail sent to?

A   Sent to the e-mail referenced earlier remgr@jbplaw.com, but that is going to a different person at this point, Stephanie Jenkins-Vordermark.

Q   Is it sent to anyone else?

A   Copying James Pittman.

Q   All right.  And what is Jamie saying in this e-mail?

A   She reached out, left a voicemail and left a message the day before as well asking for maybe she doesn't have the correct e-mail address but was hoping somebody could respond regarding the security deposit for the office that we had leased at -- on Main Street in Daphne, Alabama.

Q   And if you would turn back one page to an e-mail dated Thursday, April 13th, from Shauna Mosley.  Do you see that e-mail?

A   Yes.

Q   Okay.  Was this e-mail received in response to Jamie

Bauer's e-mail that we just looked at?

A   I believe so, yes.

Q   And this e-mail says, per the attached letter, Guaranteed Rate's termination notice was invalid and the lease remains in effect until December 31st, 2024.  Do you see that?

A   Yes.

Q   Does this e-mail provide a reason for the notice being invalid?

A   No, it does not.

Q   You'll see in here it references the attached letter.  Do you see that reference?

A   Yes.

Q   Was there letter -- a letter attached to this e-mail?

A   I can't tell based on this.  Does not look like there's an attachment.

Q   We looked at a letter earlier, the March 20th letter. Other than that letter, are you aware of any other letters that Pinnacle Properties had sent to Guaranteed Rate prior to April 13th, 2023?

A   No.  No.

Q   All right.  If you would please turn to Defendant's Exhibit P, and if you'll look at the e-mail dated April 18th, 2023. Can you identify that e-mail for us?

A   Yes.  It's an e-mail from Michael Lewis to Noah Brant, Jamie Bauer, Shauna Mosley, copying James Pittman, and Andrew

Rogowski.  Andrew is the head of our construction and design team, project management team, if you will.  And the e-mail is to Shauna asking if she can confirm receipt of our letter with the termination fee.

Q    Did you receive a response to this e-mail?

A    No.

Q    Okay.  Up to this point of April 18th, 2023, did Pinnacle ever provide to Guaranteed Rate the amount of the unamortized landlord costs?

A    No.

Q    Did Pinnacle ever indicate to Guaranteed Rate up to that point in April 18th, 2023, that it believed the termination was invalid because it had not received a hard written copy of the termination notice?

A    No.

Q    Did Guaranteed Rate vacate the leased location?

A    We did.

Q    When did Guaranteed Rate vacate that location?

A    I think it was a few days after this e-mail.  I think it was later April.

Q    And what e-mail are you referring to when you say a few days after this e-mail?

A    I'm sorry, the 18th.  So I think we started, and it was -- you know, it wasn't all in one day, but I think it was over a few days in late April.

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

**Q** Okay. If you would look for me in Defendant's Exhibit P, an e-mail on the second to last page of that exhibit, and the e-mail is dated March 29th, 2023.

**A** I got it.

**Q** Do you see that e-mail dated March 29th, 2023?

**A** I do. Yeah. It was late in March, that we were vacating the office, not late April.

**Q** Mr. Ubersox, according to this e-mail, does it indicate that sometime around or before March 29th, 2023, Guaranteed Rate had moved out some of the furniture that was in the office?

**A** Yes.

**Q** And is it your understanding that Guaranteed Rate also removed some other equipment, network equipment, on or around April 3rd, 2023?

**A** Yes.

**Q** Is it your understanding that Guaranteed Rate turned over the keys to that office location to Pinnacle around that time --

**A** Yes.

**Q** -- in April of 2023?

**A** Yes.

**Q** Okay. When -- strike that.

If you would please turn to Defendant's Exhibit Q. Can you identify that document for me?

**A**   Yes.   It's an e-mail from Jamie Bauer to Michael Lewis, Noah Brant, Shauna Mosley copying James Pittman, and Andrew Rogowski.   Directed to Shauna.   Left you a quick voicemail.   I was checking to see if you had saw Michael's e-mail below regarding the UPS delivery of the termination fee for the Guaranteed Rate office vacated and located at -- on North Main Street in Daphne, Alabama.

**Q**   Did you receive an e-mail response from Pinnacle to this letter or from this e-mail?

**A**   No.

**Q**   Okay.   And this is dated April 24th, 2023?

**A**   Correct.

**Q**   Did -- prior to April 24th, 2023, did -- had Pinnacle Properties provided the amount of the unamortized landlord costs?

**A**   No.

**Q**   Did Pinnacle ever provide the amount of the unamortized landlord costs to Guaranteed Rate?

**A**   No.

**Q**   Okay.   From your perspective and from Guaranteed Rate's perspective, what caused the issues that we've looked at in all of these e-mails with the termination of the lease?

**A**   The unwillingness of the landlord to respond with what the unamortized portion of the termination fee was.

**Q**   Do you have other leases that include similar termination

fees or termination provisions?

**A**   We do.

**Q**   Has Guaranteed Rate ever had similar issues in trying to terminate a lease?

**A**   We've executed hundreds of early termination options over the last few years, and to be candid, this is the first time I've had to sit in court regarding one.

**Q**   Have you ever encountered a situation in your experience as a -- the manager of some of these leases, have you ever experienced a situation where a landlord refused to provide an amount needed to provide a check to terminate a lease?

**A**   No.

**Q**   All right.  Do you think that Pinnacle Properties treated Guaranteed Rate fairly with regard to the termination?

**A**   No.  I don't.

**Q**   Why not?

**A**   I feel -- I feel as though there was a lot of effort to put into negotiating with authorized individuals, you know, providing correspondence that they didn't recognize our early termination, offering to renegotiate in that letter when it was a -- in my opinion, a very simple ask of an unamortized amount of the termination fee, and -- and trying to act in good faith.

**Q**   You mentioned some of the employees, the local employees, and some of the efforts that were taken between Pinnacle and those local employees, Shannon Reville and Joe Mosley, were the

two local employees at this branch for Guaranteed Rate; is that correct?

**A**   Correct.

**Q**   What was Shannon Reville's job title?

**A**   I think she was a loan officer, possibly branch manager at the time.

**Q**   And what was Joe Mosley's job title?

**A**   Loan officer as well.

**Q**   For either one of those employees, Shannon or Joe, did any part of their job duties include negotiating leases?

**A**   No.

**Q**   Had Guaranteed Rate ever authorized Shannon or Joe to renegotiate lease terms?

**A**   No.

**Q**   Who is responsible at Guaranteed Rate for negotiating lease terms?

**A**   Myself and the real estate team.

**Q**   Anyone other than those individuals you listed able to renegotiate lease terms for Guaranteed Rate?

**A**   Unless our CEO got on the phone, no.  It would be myself and my real estate team.

**Q**   Now, you -- Mr. Patti asked you about some e-mails earlier. We looked at some of those e-mails between Shannon and Joe and Mr. Pittman.  Was Guaranteed Rate aware on the corporate level that Shannon and Joe were having conversations with Mr. Pittman

Q    about renegotiating the lease terms?

A    No.

Q    Have you seen any information in Guaranteed Rate's records that would indicate that anyone at the corporate level of Guaranteed Rate was aware that Shannon and Joe were having these conversations?

A    No.

Q    Did anyone on the corporate level provide any information or guidelines for renegotiating the lease to Shannon or Joe?

A    Not to my knowledge, no.

Q    From your perspective, did the corporate level of Guaranteed Rate have any intention of renegotiating the lease with Pinnacle?

A    No.

Q    All right.  Has Guaranteed Rate incurred any costs, expenses or other damages as a result of Pinnacle's conduct that we've been discussing here today?

A    Yes.

Q    Okay.  Can you please describe that -- the type of expenses, costs, damages that Guaranteed Rate has suffered?

A    We've had employees that have had to spend hours, additional hours, of time doing research, digging back into our business records, you know, personally, prepping for this trial has taken hours of my time, and in addition to that, there are legal fees that, that come into play as well.

**Q**   Okay.  Can you go into the amount of time that the employees have spent having to deal with this issue; is that time above or not normal for a termination process?

**A**   I would say not normal, yes.

**Q**   Okay.  And, so that additional time, how -- can you please describe how much additional time and -- and what employees have incurred having to spend extra time dealing with this termination due to the issues we've talked about here today?

**A**   Yeah.  I mean, there's been, you know, various conversations and meetings.  I -- you know, I -- I really kept it to a short list of people, and that being Michael Lewis, Noah Brant, and Jamie Bauer.  Could I add other people to that?  Sure.  But I think that they were the ones that were most inconvenienced, myself included.

**Q**   How many extra hours did those employees have to spend dealing with this termination because of the issues we've seen here with Pinnacle?

**A**   My estimate for Mike and -- and Noah and Jamie were, you know, around five, maybe six hours.  Of additional time.

**Q**   Okay.  And how much has that cost the company, Guaranteed Rate, that extra time?

**A**   They are salaried employees.  I'm a salaried employee.  So backing that out, came out to around 27, $2,800.

**Q**   You said Guaranteed Rate had incurred attorney's fees?

**A**   Correct.

Q    Do you know the amount of those attorney's fees that has been billed to date?

A    Based on what I've read, it's approximately $50,000.

Q    And are those fees continuing to accrue?

A    My understanding is, yes.

Q    When you mentioned the hours for the employees earlier, I know you mentioned several employees.  Does that amount include the time that you yourself have spent?

A    The 27, $2,800 does include the time that I spend, and I estimated that at approximately 10 hours of time.

Q    Thank you.

I'll pass the witness.

THE COURT:  All right.  I'll tell you what.  We've been going for a minute.  We'll take a brief recess.  We'll be in recess for about 15 minutes.

(Short recess.)

THE COURT:  Okay.  You may inquire.

MR. PATTI:  Thank you, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. PATTI:**

Q    Mr. Ubersox, can you still hear me?

A    Yes.  Thanks.

Q    So at the outset of the question you were asked a little bit about the lease termination provision in the contract.  Do you remember that line of questioning from Mr. Premo?

**A**   Yes.

**Q**   There was several provisions of the lease agreement that Guaranteed Rate sought to alter or change; is that correct?

**A**   Yeah, I think so.

**Q**   Okay.  The lease termination language was in addition to the lease that Guaranteed Rate requested Pinnacle add?

**A**   Correct.

**Q**   That language was drafted entirely by Guaranteed Rate?

**A**   Yes, it was.

**Q**   And Pinnacle properties incorporated that language without alteration into the contract; correct?

**A**   It's my understanding, yes.

**Q**   Okay.  Mr. Ubersox, will you flip to our Plaintiff's Exhibit 3?  I'll try and place this here as well.

**A**   Sure.

**Q**   Did you get there, Mr. Ubersox?

**A**   Yes.  Thanks.

**Q**   Kind of in the bottom quarter of the page, do you see the provision that says, lease termination?

**A**   Yes.  On the second page?

**Q**   Yeah.  I'm sorry.  The first page of the lease.  The second page of Exhibit 3.

**A**   Yes.  Thank you.

**Q**   On your direct examination with Mr. Premo you were asked to detail the requirements for termination.  Do you remember that

line of questioning from Mr. Premo?

**A**   I do.

**Q**   And as you explained that, I noticed that you left out probably the most important portion of that provision. Specifically, you did not state that the termination option shall simultaneously issue landlord with a termination fee.  Do you remember how you excluded and did not include that simultaneously-issued language when you explained the requirements for termination earlier?

**A**   If I missed it, that was an oversight, but yes, it's there.

**Q**   And it is there, and that's the language that Guaranteed Rate requested; correct, that the termination fee is simultaneously issued alongside the termination option or notice; correct?

**A**   Correct.

**Q**   And again, that was Guaranteed Rate's proposed language for this lease agreement?

**A**   Yes.

**Q**   Guaranteed Rate didn't request that the unamortized cost be provided to Guaranteed Rate within 30 days; does it?

**A**   No, it does not.

**Q**   So it would be fair to assume that if you were to comply with this lease termination option and provision, Guaranteed Rate would need to know what the unamortized costs was before they ever exercised that option?

A   Yes.  I -- if we could rewrite this, I would.

Q   Now, if we could, as hypothetically speaking we can't, as we sit here today and the language is what the language is, would you agree with me, Mr. Ubersox?

A   Yes.

Q   And it requires the termination option and notice be simultaneously issued with the termination fee?

A   Based on this language, yes.

Q   Now, if you will flip with me to the -- it'll be the third page of the lease at the bottom, there's numbers, if you'll flip to page 3.  Let me know when you get there.

A   Page 3 of the lease?

Q   Yes, sir.

A   Yep.

Q   Do you see the section that references notices?

A   Yes.

Q   And it looks like there was -- the first portion of that notice provision was struck; do you see that?

A   Yes.

Q   And then it looks like there's an addition about midway through that provision that allows for notices to be delivered by overnight courier service; do you see that?

A   Yes.

Q   And that was in addition that Guaranteed Rate wanted in this lease; correct?

**A**   Yes.

**Q**   There is nowhere in this notice provision that would allow either party to issue a notice via e-mail?

**A**   Does not reference e-mail, no.

**Q**   It says that it may be served or delivered in person?  Is that a yes, Mr. Ubersox?

**A**   It -- is that a question?

**Q**   Yes.  It says that you could --

**A**   Yes.

**Q**   -- deliver notices in person?

**A**   Yes.

**Q**   Or by prepaid U.S. registered or certified mail?

**A**   Correct.

**Q**   Or by overnight courier service?

**A**   Yes.

**Q**   And it goes on to say, to the address of the party intended as the recipient thereof?

**A**   Yes.

**Q**   And that address that's being referred to, if you will flip to the last page -- technically, it's page 7 of the lease. There's a provision in this contract that tells us the address for the notifications; correct, Mr. Ubersox?

**A**   Correct.

**Q**   And the address for the lessor, Pinnacle Properties and Pritchett-Moore was 2206 Main Street, Daphne, Alabama 36526; do

you see that?

**A**   Yes.

**Q**   Is there anywhere in this address for notification that references the remgr@jbplaw.com e-mail address?

**A**   No.

**Q**   Is there anywhere in this address for notification that references Mr. Pittman's personal e-mail address as an address for notification?

**A**   No.

**Q**   Okay.  There were a few other changes that Guaranteed Rate sought to make to this lease, and I'd like to talk through those with you here.  If you will, flip back to page 3 of the lease agreement, and I am referring to the numbers at the bottom of the lease.

**A**   Okay.

**Q**   Let me know when you've got there, Mr. Ubersox?

**A**   Yep.

**Q**   Specifically I'm going to reference you to the default section.  Do you see that at the top of this page?

**A**   Yes.

**Q**   It looks like there was a few different places where some language was struck in the actual base -- the body of the provision; do you see that, as agent of lessee, whether it matured by acceleration or otherwise, do you see those two references of the language struck?

**MELISSA J. EICKEN, RPR, FCRR**
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

A   Yes.  Yep.

Q   And it looks like one of the, you know, basis for default, subsection B was also struck here?  Do you see that?

A   Yes.

Q   Okay.  Now, the default provision that we're looking here at page 3 of Exhibit 3, this default provision in its subsections only cover Guaranteed Rate's, the lessee's defaults; correct?

A   That seems to be the case, yes.

Q   It does not reference Pinnacle's defaults?

A   Yes.

Q   Now, just below that, it looks like the entire provision for acceleration was struck by Guaranteed Rate.

A   Yes.

Q   It even references it was intentionally deleted.  Do you see that, Mr. Ubersox?

A   Correct.  Yes.

Q   So this was to prevent that if the lease was terminated that Pinnacle Properties couldn't accelerate the balance that was owed under the lease?

A   Correct.

Q   Now, if you will flip with me to page 4, the next page, and I'm going to direct you to the attorney's fee section.  Let me know when you get there, Mr. Ubersox.

A   I'm there.  Thanks.

Q   Do you see how the bottom portion of that provision has been struck in its entirety?

A   Yes.

Q   And that was the language that was originally in the lease that Pinnacle provided Guaranteed Rate; correct?

A   Correct.

Q   Guaranteed Rate then proposed its own attorney's fees provision which is what we see here that's underlined in the attorney's fee section of the contract.

A   Yes.

Q   Now, if you will, follow along with me in the middle of the page where it starts, the defaulting party shall be responsible for; do you see where I'm referencing you to?

A   The defaulting party shall be responsible for, yes.

Q   Yes.  So let me read that real quick.  The defaulting party shall be responsible for and shall promptly pay to the non-defaulting party the reasonable value of said collection cost, attorney's fees and expenses, court costs, and any and all other expenses incurred by the non-defaulting party as a result of such default.  Did I read that portion of the provision correctly?

A   Yes, you did.

Q   And just to confirm what we had just talked about, the only party under the default provision in this contract that could have defaulted was, in fact, Guaranteed Rate?

MR. PREMO:  Objection.

THE COURT:  I'm sorry, say again?

MR. PREMO:  Objection to asking a non-lawyer legal question to interpret the contract.

THE COURT:  I'll overrule it.

MR. PATTI:  You can answer my question, Mr. Ubersox.

THE WITNESS:  Based on the language, yes.

**BY MR. PATTI:**

**Q**   And this language for the attorney's fees provision was language Guaranteed Rate proposed to be included in this contract?

**A**   Yes.

**Q**   So in reality, Guaranteed Rate can't even recover attorney's fees in this case?

**A**   Yeah.  If there are -- if there was a potential default, that may be the case, yes.

**Q**   Okay.  Mr. Ubersox, if you will flip to Exhibit 1, please, of the Pinnacle exhibit book that you have.  Are you on page 1 of Exhibit 1, Mr. Ubersox?

**A**   Yes.

**Q**   This is the e-mail from Noah Brant requesting the language in there for the termination provision; correct?

**A**   Yes.

**Q**   He also provided Guaranteed Rate's notice language for the attention to BTU; correct?

**A**    Yes.

**Q**    Okay.  Now, ultimately, Guaranteed Rate ended up executing the lease that we've talked a little bit about here today?

**A**    We did.

**Q**    And Guaranteed Rate moved into the property sometime in early January 2022?

**A**    Correct.

**Q**    Guaranteed Rate stayed in the property for the entirety of 2022?

**A**    Yes.

**Q**    Now, during that time, there were some things that came up and requests that were being made by local representatives of the company to Pinnacle Properties.  Are you generally aware of what I'm referring to?

**A**    Not specifically.

**Q**    Well, let me direct your attention then to Exhibit 7 in that binder in front of you, Mr. Ubersox.

**A**    Okay.

**Q**    Let me know when you get there.

**A**    Okay.

**Q**    Are you looking at an e-mail from James Pittman to Jamie Bauer on or about May 13th, 2022?

**A**    Yes.

**Q**    And it looks like this is a quote for Window Genie to apply tint to a portion of the building.

**A**   Correct.

**Q**   Okay.  So Guaranteed Rate was making a request to Pinnacle to do certain things to the property, and this is Pinnacle's attempt to try to do that.

**A**   Yes.

**Q**   Okay.  Now, are you aware that the first $1,500 of any cost associated with work being done at the property was actually to be carried by Guaranteed Rate in accordance with the lease agreement?

**A**   I -- I would have to look back at it.  Off the top of my head, no.

**Q**   Okay.  Mr. Ubersox, I want to go ahead and direct your attention now to Exhibit 8 in that binder, so the next exhibit, please.

**A**   Yes.

**Q**   All right.  This appears to be a letter sent on January 20th of 2023 and it appears you, in fact, signed this letter; is that correct?

**A**   I did.

**Q**   And it says that this letter was delivered via electronic and overnight delivery.  Do you see that?

**A**   Yes.

**Q**   It says that it was delivered to Pinnacle Properties, LLC, Pritchett-Moore, attention James Pittman, Junior, 2206 Main Street, Daphne, Alabama, as well as the e-mail address,

R-E-M -- or remgr@jbplaw.com.  Do you see that section of the letter?

A    Yes.

Q    You previously testified, though, that this letter was never, in fact, issued overnight delivery to the address that's detailed here.

A    That's my understanding, correct.

Q    Okay.  But three days later it was e-mailed to the e-mail address that we see here.

A    Yes.

Q    Now, Mr. Ubersox, I know you said you spent some time preparing for this trial here today.  Anywhere in your time spent reviewing the lease agreement at issue in this case, have you even seen reference to the remgr@jbplaw.com e-mail address as to be a sufficient or adequate place of notification of something such as a termination notice?

A    Not based on the lease, but based on our previous interactions in the lease negotiations.

Q    And while you don't want to impute authority on some of your unauthorized representatives on the local level, you do want to impute that authority on Mr. Pittman's unauthorized employees that just so happen to work for his company.

A    They were the individuals that we worked with in finalizing the lease.

Q    Okay.  But again, I just want to be clear here, on one

hand, you're saying that this Court should not hold the statements that Shannon Reville and Joe Mosley were making to Mr. Pittman about negotiating adjustments to the lease with any weight, but on the other hand, you're trying to suggest that a part-time employee of a company with no authority to bind said company is a sufficient place to notify them of Guaranteed Rate's intent to terminate the lease.

**A**   I didn't know, and I don't know what the appointment is for that individual, but that was the e-mail address with the individual that we worked with in negotiating the -- the lease and I don't see how Shannon and Mr. Mosley have anything to do with the person that we negotiated the lease with.

**Q**   Well, I did show you some e-mails earlier where they were activity trying to get quotes and rates in an attempt to renegotiate the lease so they could stay in the Daphne location.

**A**   But they were not part of the original lease negotiation.

**Q**   And I understand that, Mr. Ubersox, but to direct you back to my question, you did have local representatives of Guaranteed Rate that were attempting to renegotiate the terms of the lease; yes?

**A**   Not on my behalf or the company's behalf, no.

**Q**   So they were freelance trying to negotiate the terms of the lease to stay in Daphne?

**A**   They were local employees that were being inconvenienced by

a -- an office consolidation and an office closing that were taking what looks like to me a last ditch effort to try to do something to stay in the space.

Q   Okay.  Now, I've already pointed out that this letter was not, in fact, sent on January 20th of 2023.  I want to point something else out in this letter that also, in my opinion, is not true.  Do you see in this letter in the last full paragraph that it says, pursuant to this lease, enclosed is an early termination payment, parenthesis, quote, termination fee, parenthesis, closed quote, equal to three months' gross rent plus unamortized landlord costs.  Do you see that section of this letter?

A   I do.

Q   There was no check enclosed with this letter.

A   There was not.

Q   There was not a check in there that had three months' rent?

A   No.

Q   There was not a check in there that included unamortized landlord costs?

A   I don't know how that would have been possible, no.

Q   Well -- and I think that kind of leads me to where my next point here is going to be, which is since you guys are the drafters of the -- of the term, the lease termination provision, what does unamortized landlord costs include?

A   Well, if the landlord spent legal fees in structuring the

lease or any sort of work that was done to the lease, any work that was done to the space prior to us moving in, I don't know if there were any commissions associated in-house for the landlord and -- and finding a tenant for the space.  It could be a variety of things that -- that the landlord spent money on in getting us as a tenant into the office.

Q   Getting you into the office, keeping you into the office, and then addressing things once you've left the office, that would be a fair summarization of the total unamortized costs that a landlord may carry.

A   I -- I would say more up front than later on.

Q   So if these costs, then, Mr. Ubersox, were upfront costs, would you not have known the totals?

A   No.

Q   And had you ever requested the totals prior to issuing this termination notice?

A   No.

Q   Okay.  Mr. Ubersox, if you'll turn to the next page of that Exhibit 8, please.

A   Okay.

Q   Do you see in the second full paragraph there that starts in line with the existing lease?  It goes on to state, we will be paying a termination fee equal to three months' gross rent plus unamortized cost?

A   Yes.

Q   So this confirms what we just discussed which is that there was not, in fact, a check enclosed simultaneously with the termination notice that Guaranteed Rate issued to Pinnacle Properties?

A   Correct.

Q   And then you were asked questions about the bolded section of this e-mail earlier, but I do want to reiterate a few points from it.  You asked, one, to confirm the total amount of the termination fee owed including any unamortized costs; is that correct?

A   Yes.

Q   And it's your testimony here today that those are upfront costs that would have been carried by Pinnacle properties?

A   Yes.

Q   Okay.  You also -- or I'd say you.  Michael Lewis requested confirmation of the best address to mail the check for the fee; do you see that?

A   Yes.

Q   Guaranteed Rate had the address that the fee needed to be e-mailed or delivered to; did it not?

A   Yes.

Q   It would have been in the lease agreement under addressee for notifications; correct, Mr. Ubersox?

A   Yes.

Q   Now, Mr. Ubersox, if you'll flip to the last page of this

Exhibit 8.  Does that appear to be nothing more than the same e-mail that we were just referencing there on -- in Exhibit 8 from Michael Lewis?

**A**   It seems to be, yes.

**Q**   Now, are you aware that this document was filed alongside a summary judgment motion on behalf of Guaranteed Rate in this case?

**A**   No.

**Q**   You did not know that?

**A**   No.

**Q**   Did you not also submit an affidavit alongside that summary judgment motion?

**A**   I -- I can't recall those.  It was some time ago.

**Q**   Okay.  Well, if you will, look at the top portion of this document where it starts by saying from Michael Lewis to remgr@jbplaw.com.  Do you notice that there's not a date on this e-mail?

**A**   I do.

**Q**   Do you notice that the sender, at least the signature block from the sender, has been scrubbed from this e-mail?

**A**   I -- I can't speak to that.

**Q**   You don't have to speak to it.  I just want you to look at it and tell me whether or not there's a signature block.  If you want to, you can flip back to the page before, see the exact same e-mail, and you'll notice there is no date on the

second e-mail, that I'm just showing you.  There's also no signature block; is that correct, Mr. Ubersox?

**A**   It seems to be the case.

**Q**   Now, the only date that I do see in this last page of Exhibit 8 is the date in the attachment which is this purported January 20th, 2023 letter; do you see that?

**A**   Yes.

**Q**   But as we've already established, this letter was not sent to Pinnacle Properties on January 20th of 2023?

**A**   No, it was not.

**Q**   And that was done under the guise to try and persuade and convince this Court that Guaranteed Rate had properly noticed its termination to Pinnacle Properties on or about January 20th of 2023; was it not, Mr. Ubersox?

**A**   I don't agree with that language, so.  I'm going to say no to that.

**Q**   That's fine.  All righty.  Mr. Ubersox, if you will flip with me to page Exhibit 9, please.

**A**   Sure.

**Q**   Are you there, Mr. Ubersox?

**A**   I am.  Thanks.

**Q**   Directing your attention to the second page -- I'll be brief through this because I already did touch on it briefly earlier.

This e-mail that we're looking at here on February 3rd of

2023 from Shannon Reville is her attempt to try to negotiate a new lease at a much lower price; do you see that?

**A**   I do.

**Q**   She even asks for Mr. Pittman to give her a number that I can start with to send to corporate; do you see that?

**A**   Yep.

**Q**   Okay.  If you'll flip with me to the next page, Shannon says, we would love to stay.  Thank you for your consideration, and looking what you can do.  Do you see that?

**A**   Yes.

**Q**   Now, about 10 days later, on February 13th, if you'll flip with me to the next page, Joe Mosley is also asking Mr. Pittman, are you able to give us an offer to extend our current lease at a better rate?  I'm trying to avoid having to consolidate based on corporate directives.  Do you see that?

**A**   I do.

**Q**   Now, you made a lot of points during the examination with Mr. Premo about Guaranteed Rate attempts to terminate this contract in good faith.  How do you think Mr. Pittman feels in this entire situation when on one hand there's this belief that there's been a termination notice sent while on the other hand, he's getting contacted by local representatives simultaneously trying to renegotiate the terms of a new lease?

**A**   I can't speak for Mr. Pittman, but if I was in a position where I was confused about it, I would probably call someone

and ask.

**Q**   Okay.  Well, hopefully, we'll hear from Mr. Pittman about his thoughts on that in a little while.

Now, I just want to jump to -- let's see what this will be.  This is the fifth to last page in Exhibit 9.  There's a number 2 at the bottom of the page.

**A**   Okay.

**Q**   And I'm referring you specifically to you from James Pittman on February 14th at 11:23 a.m.

THE COURT:  Okay.  Wait.  Where --

THE WITNESS:  Yes.

THE COURT:  Where is it now?

MR. PATTI:  It's fifth to the last page of that exhibit, Your Honor.  It's got number 2 at the bottom and it's the February 14th e-mail from Mr. Pittman.

THE COURT:  Okay.  Got it.

MR. PATTI:  Thank you.

**BY MR. PATTI:**

**Q**   This appears to be an e-mail from James to Shannon Reville on February 14th of 2022 where he's referencing a conversation that he had with Joe Mosley; do you see that?

**A**   Yes.

**Q**   Mr. Pittman at that point said that he could reduce the fixed rent from $25 a square feet to $20 a square feet which equates right at about $750 per month rent reduction; do you

see that?

**A**   I do.

**Q**   Now, as of February 14th, 2023, Mr. Pittman is actively trying to renegotiate the terms of this lease, all be it with a few of your local representatives in Daphne, Alabama.

**A**   Yes.

**Q**   Okay.  Now, if you will, flip with me two pages from there, and this is going to be the e-mail on February 24th, 2023 from Mr. Pittman at about 4:07 p.m.  Do you see that, Mr. Ubersox?

**A**   Yes.

**Q**   It looks like this was a follow-up e-mail from Mr. Pittman to Joe and Shannon, because he had not heard back from them from the February 14th e-mail.  He says, I apologize for following up on a Friday afternoon, and I realize it takes some time to go through corporate channels, but I'm following up to see if you have any word on a proposed lease amendment to keep GR in the existing space until the end of the original lease term.  I'm receiving inquiries with interest in the space, but it is my preference to keep you guys, rather than lease it to a new tenant, if possible.

If you will flip with me to the very next page, and it looks like this is the response to that e-mail from Mr. Mosley shortly thereafter where he says, hi, James, thanks so much for offering to help us stay.  It appears we are stuck with having to move.  I have movers scheduled for March 23rd.  I will get

with you first of the week to make sure you are in touch with the right people at corporate.  Have a great weekend.  See you Monday or Tuesday.  Did I read all of that correctly, Mr. Ubersox?

A    Yes.

Q    And if you will flip with me to the last page of Exhibit 9, this appears to be an e-mail from Shannon Reville two and a half hours after Joe Mosley just said that you -- that they have to move, where she says, the only way we can stay is if you agree to $1,500 a month; do you see that?

A    Yes.

Q    Now, Mr. Ubersox, you had testified earlier that the reason for needing to get out of this lease was for some pressure that was being placed on Guaranteed Rate and the need to consolidate commercial office spaces; is that correct?

A    Yes.

Q    And the employees in Daphne were going to be asked to consolidate and work across the bay in Mobile, Alabama?

A    That is correct.

Q    What was the rate for that building over in Mobile per month?

A    I can't speak to that.  Off the top of my head.

Q    Was it less than $1,500 a month?

A    I -- I don't know.

Q    Okay.  Well, Shannon goes on to say, I'm only the

messenger. So, no, I'm not trying to insult you by any means. Do you see that?

A   I do.

Q   Who was she the messenger for, Mr. Ubersox?

A   It's a great question. I couldn't tell you.

Q   At least on its face, Mr. Ubersox, it appears that Guaranteed Rate's local representatives were trying to renegotiate the terms of this lease up and until at least February 24th of 2023; is that correct?

A   It looks to be the case, yes.

Q   Now, as of that date, February 24th, 2023, Guaranteed Rate had not complied with its own lease termination by issuing a termination notice simultaneously with the termination fee.

A   We did provide correspondence stating our interest in terminating the lease. And asking for the unamortized portion of the landlord's costs, so we could execute the termination fee and send them a check, so we could vacate the space.

Q   And just to be clear, let me parse through everything you just said there. You did -- Guaranteed Rate did not issue a termination notice with the termination fee even three months of the unpaid rent that's required under the termination fee.

A   We acknowledged that there was three months that we owed, and we also asked for the unamortized portion so we could provide a check in the full amount to which we never received a response.

**Q** But to -- to direct you back to the question I'm asking you, specifically, there was -- as of February 24th of 2023, Guaranteed Rate had not issued a termination notice simultaneously with even a portion of the termination fee being the three months' unpaid rent; correct?

**A** We eventually did.

**Q** You did eventually?

**A** I don't know whether a -- if a portion would have mattered at that point given where we're at.

**Q** Well, that's a great point, Mr. Ubersox. And I think you answered my question without answering my question, by saying that eventually you did issue a termination fee for the unpaid rent of three months; right?

**A** After numerous requests for the unamortized portion to which we were never given.

**Q** Okay. If you will let's turn to Exhibit 10, please. Are you looking at the March 20th, 2023, letter from James Pittman?

**A** I am.

**Q** And you received a copy of this letter, Mr. Ubersox?

**A** I did.

**Q** And after receiving a copy of this letter that is with respect to the ineffective lease termination, did Guaranteed Rate actually cure what Mr. Pittman details here as the ineffective termination of the lease?

**A** The gross rent portion, yes.

**Q**   And that was done for the first time, I believe, on or about April 3rd, and it wasn't received until April 7th.

**A**   Correct.

**Q**   And we've got that -- and this is what I was referencing earlier and I couldn't put my finger on it, but I do have it now.  And I can show you if we can -- how do I project from here?

COURTROOM DEPUTY:  Should be coming up.

MR. PATTI:  Thank you.

**BY MR. PATTI:**

**Q**   This is the delivery receipt that we have for the letter that was sent to Pinnacle Properties with the check; correct?

**A**   Correct.

**Q**   And this was on or about April 7th of 2023?

**A**   Is this in the exhibit book?

**Q**   Yes.  I'm sorry, I should have referenced you to the portion of the exhibit.  It's Exhibit O in the Guaranteed Rate exhibit book.

**A**   Okay.  Yes.

**Q**   And we haven't seen this for the first letter that Guaranteed Rate has represented to this Court was sent to Pinnacle Properties on or about January 20th, 2023?

**A**   Correct.

**Q**   The first time there's any receipt of delivery, the overnight courier service is on April 3rd or April 7th,

technically, of 2023?

**A**   Correct.

**Q**   Okay.  Now, Mr. Ubersox, if you will turn to Exhibit 11 in the Pinnacle binder.

**A**   Okay.

**Q**   This appears to be a letter that was sent by Michael Lewis on April 3rd of 2023 appears to be in response to the March 20th letter?

**A**   Yes.

**Q**   And in this letter, it states, pursuant to the lease, enclosed is an early termination payment -- termination fee -- equal to three months' gross rent or $13,089.36; do you see that?

**A**   I do.

**Q**   And there's no reference to unamortized cost in this letter on April 3rd, 2023; is there?

**A**   Yes, there is, in the next sentence.

**Q**   So as far as this check was concerned, though, it doesn't reference that it includes the unamortized costs?

**A**   Well, for clarity purposes, it -- it's the amount that reflects the three months.

**Q**   Correct.  And it doesn't reflect anything for unamortized costs?

**A**   Correct.

**Q**   Now, if you go on to the next sentence there, it states,

this payment is associated with the termination notice sent January of this year; do you see that?

**A**   I do.

**Q**   So this check that was sent to Pinnacle Properties on or about April 3rd of 2023 was not simultaneously issued with the termination notice back in January of 2023?

**A**   It was not, in an effort to try to send one check to reflect the total payment.

**Q**   But to the point I made earlier, Mr. Ubersox, if you were going to invoke the termination option in this contract based on the -- your own language, Guaranteed Rate's own language, would you not need to know the unamortized cost before the option is exercised?

**A**   Yeah.  It's standard language, and the majority of leases that we are involved in do not have unamortized portions associated with them.  So it's, obviously, easier for us to send the check simultaneously, so that language was unfortunately left in with the unamortized portion as well, so. Could have been written differently, but you know, we had no knowledge of what the unamortized portion, and you know, in an effort of good faith reaching out to landlord and asking for that amount so we could make them whole and the cost that they had.

**Q**   Well, respectfully, Mr. Ubersox, you didn't reach out to the landlord.  You were reaching out to a property manager for

the landlord; correct?

A    The same person that we were working with in structuring the lease, yes.

Q    That same person who is nowhere to be found as a addressee for the lessor as far as notices related to this contact are concerned.

A    Correct.

Q    Now, I understand that Guaranteed Rate vacated the property on or about April 24th, 2023; does that sound about right, Mr. Ubersox?

A    Yes.  Vaguely.

Q    Now, when Guaranteed Rate vacated the property, they did not move all of their property out of the unit; did they?

A    We left the property that the landlord was interested in us leaving.

Q    And what do you mean by that?

A    There was furniture that was my understanding that the landlord requested to keep in the space.  And, so we removed the items outside of that.

Q    And where do you -- where are you getting this from?  Where do you -- what can you base that opinion on, that testimony, Mr. Ubersox, that the landlord wanted you guys to leave furniture at his unit?

A    Jamie Bauer, project manager, was working with the local team, Joe Mosley, on moving items out.

Q   Okay.

A   And I think Joe may have spoken with Mr. Pittman on if there were any items within the space that he would like to remain that he would leave it there.

Q   So Mr. Mosley had the authority to discuss items that could be left at a property, but he didn't have the authority to discuss renegotiating terms of the lease?

A   Those are two very separate things.

Q   Well, part of the contract calls for you guys to surrender the property in the same condition that you received it in. Are you familiar with that provision in the contract, Mr. Ubersox?

A   Yes.

Q   Now, one of the things that I understand Guaranteed Rate did when they moved into the property was that they painted the property; are you familiar with that?

A   Yes.

Q   Guaranteed Rate has kind of its standard color schemes?

A   It does.

Q   And Guaranteed Rate painted this property with its red and Navy and grey color scheme that it uses?

A   I -- I can't speak to the exact colors, but.  Yes.

Q   It also placed signage on the outside of the building?

A   Yes.

Q   As well as the inside of the building?

**A**   Correct.

**Q**   But upon vacating and surrendering the property back to the property owner, Guaranteed Rate did not return the property to the condition that it was in before it began leasing the property?

**A**   I -- I wasn't there, so I don't know exactly the condition that it was left in.

**Q**   Well --

**A**   I haven't received anything speaking to that.

**Q**   Let me flip you, then, to Exhibit 15, please, of our binder.  Let me know when you get there, Mr. Ubersox.

**A**   Yep.

**Q**   Understanding you've never been there and you may not recognize this, but I'll purport that this is a photograph that was taken from inside the Guaranteed Rate unit in Daphne, Alabama; does that look like a standard Guaranteed Rate office space?

**A**   It could be, yes.

**Q**   Got your Guaranteed Rate red on the wall over there?

**A**   Yes.

**Q**   Guaranteed Rate signs?

**A**   Yes.

**Q**   And you're not going to testify here today that when Guaranteed Rate vacated the premises that it returned the premises to what it looked like before Guaranteed Rate came in

and painted the walls?

**A**   I -- again, I wasn't there, can't -- can't speak to that.

**Q**   Okay.  Or put its own signs up?

**A**   I -- there's no date on this photo.

**Q**   Okay.  Well, we'll talk about the date of these photos and when they were taken and who took them in a minute, but I just wanted to kind of orient you to the facility there.  If you will flip to the third picture in that exhibit.  It's a close-up of the sign with a hand; do you see that?

**A**   I do.

**Q**   Do you see that how when the lettering from the sign is being pulled off of the wall that the drywall is coming apart?

**A**   That looks to be the case, yes.

MR. PATTI:  Your Honor, if I may confer with my client for a minute or two.

THE COURT:  Yes, sir.

MR. PATTI:  Nothing further from Pinnacle.

THE COURT:  Any further cross?

MR. PREMO:  Just a bit more, Your Honor.

<u>**RECROSS-EXAMINATION**</u>

<u>**BY MR. PREMO:**</u>

**Q**   Mr. Ubersox, if you could, please, turn for me to Plaintiff's Exhibit -- or Defendant's Exhibit O.

**A**   Okay.

**Q**   And if you would turn to the last page of that exhibit to

an e-mail dated March 29th, 2023.

**A**   Okay.

**Q**   This e-mail is from Jamie Bauer to the R-E-M-G-R e-mail address; correct?

**A**   Yes.

**Q**   And the second sentence of this says, according to Joe, the furniture that we are keeping has been moved out, and the landlord is good with keeping the leftover furniture in his building; do you see that?

**A**   Yes.

**Q**   You testified earlier that you understood that the landlord had agreed to keep some of the furniture that was there in the building; right?

**A**   Correct.

**Q**   And was that understanding based in part on this e-mail?

**A**   Yes.

**Q**   Mr. Patti asked you some questions about the -- the terms of the lease.  Mr. Ubersox, are you an attorney?

**A**   No.

**Q**   Have you been to law school?

**A**   I have not.

**Q**   Received any formal legal training?

**A**   No.  I have not.

**Q**   If you could, please, turn with me to Plaintiff's Exhibit 3.

THE COURT:  Did you say Exhibit 3?

MR. PREMO:  Yes, Your Honor.  Plaintiff's Exhibit 3.

THE WITNESS:  Okay.

**BY MR. PREMO:**

Q   All right.  Mr. Patti was asking you some questions about how this lease was negotiated between the parties.  And is Plaintiff's Exhibit 3 some of the e-mails related to the negotiation of that lease?

A   Yes.

Q   Okay.  And who was sending the -- and receiving these e-mails on behalf of Pinnacle Properties?

A   Lindsey Gilthorpe.

Q   At what e-mail address?

A   remgr@jbplaw.com.

Q   And that's the same e-mail address, then, that you used later to direct the -- some of the communications regarding the termination to; correct?

A   Correct.

Q   Please turn to Plaintiff's Exhibit 4.

A   Okay.

Q   And this is another e-mail in which Pinnacle is communicating through the remgr@jbplaw e-mail address; correct?

A   Correct.

Q   Turn to Plaintiff's Exhibit 5.

A   Okay.

**Q**   This is another e-mail chain in which Pinnacle is communicating through the remgr@jbplaw e-mail address; correct?

**A**   Correct.

**Q**   Prior to some of the letters that we've looked at, the March 20th letter that Pinnacle Properties sent to Guaranteed Rate, another letter that Pinnacle Properties sent in April, did Guaranteed Rate and Pinnacle Properties ever communicate via mail?

**A**   No.

MR. PREMO:  No further questions at this time.

MR. PATTI:  Nothing further.

THE COURT:  Thank you.

MR. PATTI:  Judge, it's almost 12:00 o'clock.  We can get started with Mr. Pittman and break for lunch, we can break for lunch now, whatever Your Honor's preference is.

THE COURT:  How long do you think Mr. Pittman's testimony will take?

MR. PATTI:  Hopefully, not as long as Mr. Ubersox did. But I can only speak for my questions, Your Honor.

THE COURT:  Well, I need to have some time to meet with the probation officer in my case that I've got later, so. What I think I'm going to do is, I'm going to take a break.  I won't be able to start my hearing until noon, my next hearing. That'll probably last -- I'm going to give you an hour and a half for lunch.

MR. PATTI:  That's fine.

THE COURT:  All right.

MR. PATTI:  Judge, before we break, so as we understand it, Mr. Ubersox was here to testify today.  He's here virtually.  There's also a corporate representative here in person so we would invoke the rule of sequestration, ask Mr. Ubersox be excused and/or sequestered for the remaining portion of the trial.

THE COURT:  Any objection?

MR. PREMO:  No objection.  We actually ask that Mr. Ubersox can be excused and move on and not be on call any longer.  We don't have -- we don't intend to call him again.

THE COURT:  All right.  Then he'll be excused.

(Witness excused.)

MR. PATTI:  Thank you.

THE COURT:  Thank you.

MR. PATTI:  That's all I've got.

THE COURT:  We'll be in recess for an hour and 30 minutes.

COURTROOM DEPUTY:  Thank you, Mr. Ubersox.

(Lunch recess.)

THE COURT:  All right.  Counselors, I'm sorry to keep you all waiting.  You may inquire.

MR. PATTI:  Do you want to swear Mr. Pittman in?

THE COURT:  Yes.

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

**JAMES PITTMAN**

was sworn and testified as follows:

**DIRECT EXAMINATION**

**BY MR. PATTI:**

**Q**   Mr. Pittman, will you please introduce yourself to us and just us give a brief background of yourself?

**A**   Yes.  My name is James Pittman, born and raised in Baldwin County, lived there most of my life other than college and law school, lived in Mobile for a couple of years after getting out of graduate school and moved back home.  My wife, Caroline, and I have three children, two daughters and a son, Susan 19, Parker 17, Jim 15.

**Q**   Now, Mr. Pittman, what do you do for a living?

**A**   I'm a lawyer by trade.  I'm a lawyer full-time.  Probably 75 percent of my practice is courtroom-related stuff and probably half of that's civil work and half of that would be federal and state criminal defense work, and then the rest of my practice would just be kind of a broad general practice.

**Q**   Now, aside from being a lawyer, do you have any other jobs?

**A**   I've got some other things I do.  A wise fellow told me one time that to get ahead you've got to work more than 40 hours a week.  I'm a real estate broker.  I've got a title company, you know, and then I try to -- where I can do some real estate investing and other things like that.

**Q**   And for that real estate investment ventures that you have,

is that through a property that you -- or a company that you own?

**A**    Yes.  My wife Caroline and I own Pinnacle Properties, and that's kind of a company through which over the years we've tried to acquire some property.  We chose for better for worse to kind of focus our retirement savings towards real estate with the hopes that it would kind of pay for itself, and then when we hit retirement age, maybe it'll -- the rent and the appreciation would be kind of alternative standard to a 401 (k) or something like that.

**Q**    Does Pinnacle have any employees?

**A**    No.  It does not.  But my firm has, you know, employees. It's -- we've got some rental houses, my wife and I do.  We've got a mixed use building with some couple retail spaces downstairs and apartments up, and then with a guy I went to law school with, he and his company, we own some stuff together. So this Bay Point building is half owned by Pinnacle which is Caroline and my company and the other by my friend.

To answer your question, we don't have enough to have a full-time real estate person.  We don't have enough to be able to afford to pay, like, a professional real estate management company.  So I've just always hired people through my law firm that help the law firm, typically, most of the time, and then they help with the real estate stuff as needed.

**Q**    Now, you mentioned the property that we're here for today

which is the Bay Point Shopping Center located in Daphne.  Can you just tell us generally about that property?

**A**   Sure.  I mean, when we started investing maybe 15, 20 years ago we would buy, you know, a little rent house here and there, so at the time we started moving towards a little nicer properties.  This property is located at the intersection of Scenic 98 in Daphne which is the two-lane, the old road where it crosses the four lane, 98, and it's kind of up on a hill.  So, you know, it's a -- the nicest property that we have a part of and it's in, you know, a high profile, highly visible spot in Baldwin County.

**Q**   How many units are at that property?

**A**   Five.

**Q**   Okay.  And how many tenants does that property home?

**A**   Up to five.

**Q**   Okay.  Now, which unit of those five properties is the one we are here for today?

**A**   I think it's unit four.

**Q**   Now, do you know about how big unit four is?

**A**   I think it's right at about 1,800 square feet.

**Q**   Okay.  And as far as the lease agreement that we're here for today, do you know about how much you were charging per month gross to rent that property?

**A**   It was $25 a square foot.  And, so I think it came out to be 33, $3,400 -- a base rent is what you typically charge on a

commercial at least, I learned, and then you would have what they call kind of passthroughs which are your common area, maintenance, your taxes, and insurance, so.  That would be an additional amount that would add up to what they call your gross rent.

Q   So there's kind of two buckets.  There's the principal base amount, plus this passthrough that, you know, the charges, insurance, common area, and maintenance, that gives you a total gross amount for the property rent?

A   Yes.

Q   Okay.  The lease term that we're going to talk about here today, what was the term of that lease?

A   It was a three-year or a 36-month term.

Q   Okay.  Now, can you just give us a general background as far as what's the process for you in renting a commercial property owned by Pinnacle?

A   You know, again, we don't -- we're not big enough to hire professional folks.  So when we market our space online, we have signage that we put up that says for lease.  And, so often times they will call the number that comes into my law firm and then either I or one of the, you know, folks in the office that's available will kind of give information, just kind bare bones information.  Typically, then they would want to go see it, if they're interested, and then somebody would meet the person there, let them into the space, and that if they're

interested, we take next steps with the lease.

**Q**   Those next steps, describe that for a little bit for us.

**A**   So what we did here, we bought an existing building from somebody that was an operator that had tenants in it, so we inherited this lease.  This wasn't something that I came up with, and then we typically try to just keep using the lease that's there because then you've got the same lease with different tenants.

So as it relates to this, someone from Guaranteed Rate would have reached out to us, and then gone and seen the space, and then would have, you know, taken next steps which would be asking for a draft of the lease or saying, hey, we want to, you know, move forward with getting a lease from you guys.

**Q**   Ms. Pittman, if you'll turn to your binder with Plaintiff's Exhibit 1.

**A**   Okay.

**Q**   What is this that we're looking at Plaintiff's Exhibit 1?

**A**   This is an e-mail from Guaranteed Rate to a lady that was employed by my law firm at the time Lindsey Gilthorpe, who was actually our receptionist.  She had background as a legal assistant where he said, you know, that -- I guess, they obviously talked on the phone.  The team or the people from Guaranteed Rate had looked at it, liked the space, and then, you know, he provided some language that they would like included regarding termination into, you know, the lease draft

that we would have sent them.

Q   And did Pinnacle incorporate this termination language that Guaranteed Rate requested on December 8th of 2021?

A   Yes.  Lindsey would have, you know, forwarded this to me or printed it.  I would have taken a look at it, read it, you know, if I didn't see anything that, you know, gave me pause.  And, so I would have instructed her to incorporate that into our standard lease form and send it to the -- whoever she was dealing with at Guaranteed Rate.

Q   Taking a look at that termination language here, did Guaranteed Rate request a termination option which placed an obligation on Guaranteed Rate to issue a 90-day notice of its intent to terminate the lease?

A   Yes.

Q   Did Guaranteed Rate also request that in addition to the termination notice that it, quote, shall simultaneously issue landlord with a termination fee?

A   Yes.

Q   Okay.

A   Of three months.  Then, in effect, gross rent.  You know, sometimes there was over the course of the lease.  Not this one.  But you'll have like escalation clauses that say, in year one, in two, the lease rate will be this, and it'll go up.  Cost of living adjustment 2 or 3 percent, something like that.

Q   Okay.  I was just about to ask you.  What did that

termination fee include in this provision, Mr. Pittman?

**A**   It included three months of then, in effect, gross rent, plus unamortized landlord costs associated with the lease.

**Q**   Now, Mr. Pittman in preparation for this trial, have you reviewed the lease that's the subject that's the case?

**A**   Yes.  A lot.

**Q**   In reviewing the lease that's the subject of this case, have you found anywhere where the term, unamortized landlord costs, is defined?

**A**   I have not.

**Q**   Okay.  What is your definition of that term?

**A**   So a good question.  You know, the time, I think I would have thought, and since drilled down is this, you know, when a tenant moves into a space or signs a long-term lease, as a landlord, you have an expectation that they're going to stay for the entire term.  As a landlord, you may incur expenses getting the space ready for them, and then you're going to have expenses that come up from time to time maintaining their space or systems available to the whole building that would benefit their space, you know, that are costs.  So if they leave early or they default, then unamortized costs would be costs that you incur during the term of the lease, but you didn't get the rent to offset.

**Q**   Now, you mentioned one kind of bucket or category for amortized costs being costs getting ready for the lease.  Did

Pinnacle have any costs to get ready for the lease with Guaranteed Rate?

**A**   It did not.  There was -- you know, we'll look at the lease, but they took the space, you know, as is, where is, you know, sometimes tenants will say we want you, landlord, to paint it, modifications, that kind of thing.  You know, they were trying to get in pretty quickly, I think the beginning of that year.  So there was some correspondence where they were asking a questions, you know, you know, you have a sign company you recommend, you have an electrician, that kind of stuff.  But per the lease, all of the pre-move-in costs and expenses were their responsibility, not the landlord's which is different from time to time, so.

**Q**   You also mentioned some amortized costs being, you know, incurred, if you will, with respect to the maintenance during the term.  Do -- are you familiar with some of the maintenance costs that were incurred during the term of this lease?

**A**   Yeah.  I mean, one thing that we've produced through discovery and that's kind of a recitation of is there's -- I learned the hard way.  There's a grinder pump system instead of a gravity flow sewer which means that the pump has got to pump, you know, waste product outside of the building.  So that's something that with this building just fairly regularly seems to have issues.  It would be cost prohibitive to convert it.  That would be some kind of stuff that we have to be fixed from

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

time to time that -- that they would -- they would pay for out of their rent.  There was charges to an air conditioning company.  One of their employees called pretty regularly complaining about the air condition.  So those some of the things that we incurred from time to time.

Q   Mr. Pittman, if you will turn with me to Exhibit 3.  Then I'm going to ask you to flip to the second page which is the first page of the commercial lease in the red line version.

A   Obviously, this is a red line that a Guaranteed Rate individual we would have sent -- I think the prior page is, we sent them a copy of that draft lease in a Word where they can change it.  This is where he sent back to Lindsey the red line version of their changes to our standard form lease that already had their termination language in it.

Q   So any edits that we see in the lease that's attached to Exhibit 3 would be changes that were made by Guaranteed Rate to your standard contract?

A   Yeah.  The only thing that is in that termination provision, they didn't -- there's a sentence at the bottom that says -- the very last one -- this option shall be reciprocal in nature.  You know, they wanted the right to terminate early. So when Lindsey would have given me their language, I would have added that as an option for the landlord that we wouldn't do unless somebody came along and wanted to pay a fortune for the space which unfortunately never happens.

**Q**   I don't want to re-till a bunch of old ground.  We did touch on some of these things with Mr. Ubersox.  So flip with me to the second page, and I'm going to direct you to the section referring to alterations.

**A**   Okay.  So one thing that -- that at the top, as it says, landlord's work.  So it just says that they're accepting the space as is in its as is condition.

**Q**   And that's what you mentioned earlier to judge.

**A**   That means we weren't incurring any expense for Guaranteed Rate to have the space ready for them.  So they knew -- we weren't paying for anything before they moved in.

**Q**   There were no unamortized costs before they moved in the building?

**A**   That's right.  And sometimes that may say landlord work will -- landlord would pay to make this modification or to do whatever they would require, and then if so, typically, we would amortize that back into the rent rate or find some other way to do it that would say that we'll make change, but at the conclusion of the lease term they have to put it back the way it was at their cost at our option, something like that.

**Q**   Okay.  Now, look into the alterations provision, will you just quickly read that provision to us, and I'm going to ask you a couple of questions about it.

**A**   Yeah.  This is pretty standard in most leases.  Lessee -- them -- will make no alternation in or to the premises and will

not paint any part of the improvements, thereon, without the written consent of the lessor or agent except as otherwise herein provided, and in no event, shall lessee paint sprinkler heads, if a sprinkler system exists.

**Q**   Mr. Pittman, did Pinnacle ever give written consent for Guaranteed Rate to paint inside the building?

**A**   No.  They did not ask, so we did not consent.  We try to paint everything we have a pretty standard, neutral color. We've got one paint that we put in there, and it's kind of off white, and everybody seems to be happy with it.  No.  They didn't ask.  So we didn't give them that permission.  Had they, we would have probably collected a higher damage deposit so that if they didn't, then we could just pull it out of the damage deposit when we had to put it back.

**Q**   And put the property back in the condition it was before they took possession?

**A**   Correct.

**Q**   Okay.  Let's look at the additional lessee's duties, and specifically in the second paragraph there, do you see the portion -- it's -- I guess, technically, it will be the second to last sentence in there that starts with, lessee will not be responsible.  Can you read that for us?

**A**   Yes.  Lessee will not be responsible for any single tenant item in excess of $1,500 in regard to HVAC replacement or repair or other maintenance and repair items.  Should ticket

item be in excess of $1,500, then tenant will be responsible for initial $1,500.

Q   So of those items, you know, for maintenance, repair, and HVAC stuff, do we have any, you know, itemization or invoices that would show payments that have been made by Pinnacle for certain items that were maintained or repaired while Guaranteed Rate was at the property?

A   Yes.  There's a few that we've ultimately produced through discovery, I think.

Q   Okay.

A   You know, it was -- I learned when I got this lease that, you know, that puts in there and then that way, there's kind of a threshold for the -- to -- where the tenant is not calling you all the time about fix this, fix that, you know, little -- replacing an air filter, a light bulb, that kind of stuff that they typically look to in a commercial lease to be able to handle themselves.

Q   And typically, when you would get contacted by Guaranteed Rate to make repairs or just general maintenance of the property, who was that communication coming to you from?

A   Shannon Reville was one of the ladies in the Guaranteed Rate office.  It's my understanding she was the assistant branch manager, and she chose the office up front, so.  She was there, I think, you know, quite a bit.  So she would call and probably speak with Lindsey or one of the other ladies in the

office -- later, Michelle.  You'll see some different names that were law firm employees either full or part-time that would kind of help as needed and then I think I talked to her a few times.

**Q**   And Jamie Bauer, the project manager for construction and design from the corporate office, would Jamie ever reach out to you guys and request these maintenance and repair issues?

**A**   Ms. Bauer did.  Ms. Reville was calling pretty regularly complaining by the air condition, saying her office -- and it's a west-facing building so in the afternoon sun, it can get warm in there, but the prior tenant, River Bank & Trust had been there for four or five years.  We never had any complaints. She said air conditioner wasn't working.  We sent a contractor that we've got a lot of faith in, and I talked to him.  He said, James, the air conditioner is working fine.  It's just a little warmer up there.  You know, we turned it down some. Then she said the people in the back office would freeze.  You know, she said that the air didn't blow, so he -- it was blowing.  He took the register down.  So then when that didn't work, she started asking for us to put in a -- there were blinds and solar shades already in the space that we had installed for a prior tenant and she asked that we add more of that stuff.  She had gotten a pretty sporty quote that was -- you know, the whole front of the building's from me to that first chair in the back row.  It's a not very wide space.  She

gotten a 3 or $4,000-dollar quote.  My wife was working on a quote and got one that, I think, was a little over $1,500.

Ultimately, I had a call from Ms. Bauer or Bauer saying this lady in the branch is not happy.  You know, if she hadn't -- she's been following up for a few days or maybe a week or two and trying to help her out.  I told Ms. Bauer -- I directed her to this provision, and I said, you know, technically, anything up to $1,500 is Guaranteed Rate's responsibility.  You know, I try to make tenants happy.  So we had been spending some money.  It was a few hundred dollars here and a few hundred dollars there.  She said, do you have that information?  And, so I forwarded it -- Guaranteed Rate's quote, their local person's quote, our quote, and said, if you'll send us $1,500, we'll have or commit to reimbursing it. You know, we'll just have the work done and maybe that'll, you know, placate her.

Q   I don't want to jump around, I think the section in the stuff you're referring to, if you will flip quickly to Exhibit 7, Pinnacle's exhibit binder.

A   Right.

Q   Is this the e-mail correspondence from you to Jamie Bauer about everything you were just discussing with the tenant and the $1,500?

A   Correct.  She called and spoke to me or asked for me.  I explained that, you know, that -- that was technically their

responsibility and forwarded her the quotes.  So you know, she was at the home office.  She had my e-mail address, and she said that they were going to -- I can't remember -- I think they were going to issue us a check, and then we were going to have the work done.  We never got the payment from Guaranteed Rate, and the lady was -- was complaining and wanted something done and so we just paid to have it done, which is the second page there.  I said 15 or 1,600.  It was $1,750.  You'll see up above where my wife forwarded me that with their quote and ours, and I told her our quote was -- you know, was 1,750, and you know, it was their responsibility if they pay the $1,500, we'd certainly pay the rest.  We just paid the whole cost.

Q   Now, turn it back to Exhibit 3, page 3, of the lease.  The top section of that page is the default provision.

A   Yes.

Q   Were any changes made to the default provision in the lease?

A   They did.  They red lined or -- you know, they struck some stuff.  One of which was the acceleration language.  Interestingly, they removed the provision that would say if they took stuff out of the space that that would be a default provision.  It says, you know, in the event lessee removes -- attempts to remove or permits to be removed from the premises except in the usual course of trade, the goods, furniture, effects or other property the lessee brought thereon.

Sometimes tenants will do a bunch of work to the space. That stays with the space, but obviously their furnishings and their trade fixtures, all their stuff, they take that with them when they leave.

Q   Now, in this default provision we're looking at, whose default is contemplated in this provision?

A   The lessee only.  Again, I didn't draft this.  It was -- you know, it's a -- I inherited it from the seller, but it defines default as only things that the tenant can do or not do.  It's used as lessee.  I always say tenant, I'm sorry.

Q   Now, below the fault provision, there's the provision related to acceleration.  Was that struck from this contract?

A   That was struck -- you know, that's pretty standard that if there's a default, at least in a commercial lease, I learned the balance of the rent gets accelerated.  So they removed that.  You know, I didn't have a problem with that.

Q   Now, looking at the notice provision below there at the bottom of page 3, were there any changes to the notice provision, James?

A   Yes.  They struck -- I think the -- a preamble, and then they added to our standard language an acceptable means of providing notice by overnight currier service to the address, you know, herein, below that's down at the bottom of the lease.

Q   Does this notice provision contemplate e-mail notice as a proper notice under this lease?

**A**   It does not.

**Q**   Okay.  If you will, flip with me to page 4, the next page, the provision surrender.  Can you just briefly read it and describe it for us?

**A**   Yes.  It requires an outgoing tenant to return the space to its pre-lease condition.  You know, it says, at the expiration of the tenants, herein, lessee shall surrender the premises in the same condition of cleanliness, repair, and cycling as is the premises were in as of the commencement of the lease.  Ordinary wear and tear accepted.  You know, if there's a nail hole in the wall where they had a picture hanging, that's not something that they necessarily have to fix, but put it back like it was before they moved in.

**Q**   So if the property was painted a separate color than that the off white you were talking about earlier, would they need to go and paint it the off white originally?

**A**   Yes.  First, they'd have to ask to paint it differently, and if we would have given them permission, we -- typically, we would make that accommodation, though, again, we may have an additional damage deposit associated with it.  We know they're going to put it back to a neutral color when they leave.

**Q**   Okay.  Anything else that would typically need to be returned to the previous state upon the surrendering of the property?

**A**   I mean, yeah.  Just the repaint, the wall, you know.  We

talked about it before, typically, they would get all their furnishings out of the space. One would -- might think that it would be of benefit, but to my experience, that tenants want to move into a space empty, you know, and that's ready to move into. Doesn't have stuff in it.

Q They don't want somebody else's furniture in there?

A Correct.

Q And what about signage? Do signages need to be removed and the building put back in the original state it was when the property owner or the tenant took possession?

A Yes. You know, that's another kind of standard thing. The lease requires them to have exterior signage. And, so typically, when somebody moves out, they would take that signage down, but they would, you know, seal -- this building's got a sheetrock facade. So there's penetrations in the exterior of the building, there's wiring that energizes as the sign. So they would move out, but they would repair those holes and everything in the exterior of the building. I don't think I ever had a tenant put in an interior signage, but here they had their Guaranteed Rate sign glued to the wall that -- that remained after they left.

Q Why would it be important to fill those stucco holes that were left in a wall after signs removed?

A Because rain, particularly like the kind we had last night, you know, it gets in the exterior wall, whether it's metal

studs or wooden framing, obviously, moisture has obvious implications. They -- they didn't do that here. And, so I had a contractor go and just kind of do a temporary fix of putting those with some kind of silicone or something like that. Typically, you would actually really fix it because the next tenant's signage is probably a different size, then you've got these holes in the exterior facade that looks -- you know, doesn't look good.

Q   Now, we already talked about the attorney's fee provision. I won't spend much time here, other than just to simply ask, were the attorney's fee provisions that were originally in the lease changed by Guaranteed Rate?

A   Yeah. They -- they struck the entire attorney's fee provision that we had in the lease and replaced it with their own.

Q   And their provision contemplates the defaulting party paying the non-defaulting party's attorney's fees?

A   Yeah. Ironically, since I looked into it, I think our original language would have been more beneficial to them. Their replacement language only allows attorney's fees to be collected from the defaulting party. It's a defined term. You go back to that default section that we just looked at that says, only the lessee can have an instance of default.

Q   There looks like there was an addition to the indemnity language. But just briefly explain what that addition was in

the indemnity provision.

**A**   Yeah.  I mean, you know, the indemnity means that if they do something that somebody gets hurt, and then they come after me, as the landlord, but it was their responsibility.  They would indemnify us for any claims against us that were their responsibility or their fault, so to speak.  They wanted that claim -- that indemnity provision to be reciprocal in nature, and I was -- I thought that was a reasonable request.  And, so I was fine with it.  In fact, I think I accepted all of their changes without any changes back other than making the termination provision reciprocal.

**Q**   Okay.  Now, if you will, flip to the next page, page 5 at the bottom, and I'm going to refer you to the lessor's rights cumulative.

     Mr. Pittman, will you read that to us, and just explain the importance of that section to this case in particular.

**A**   Yeah.  It's at the top of my page 5, the red line, the failure of the lessor to insist in any one or more instances upon a strict performance of any of the covenants of this lease or to exercise any option, herein, contained shall not be construed as a waiver or a relinquishment for the future of such covenant or option, but the same shall continue and remain in full, force, and effect.

**Q**   And why is that important in a case like this, Mr. Pittman?

**A**   Well, it's real important in this case.  It just means that

the -- both parties have the right to insist on the strict language of the lease. And -- well, actually, here it just says, the lessor's rights cumulative. Again, it wasn't my language, but we have the right to expect them to comply with the lease, even if -- if it was done differently another time, so. Here, obviously, e-mails they rely on. They had some e-mails. The lease says that they have got to provide notice, you know, as, herein, contained, and it had to come to me, mail or overnight. Not e-mail.

Q   Okay. Let's flip to page 6, and I'm going to refer you to the limitation of liability, and if you will, would you just read that first sentence for us, please?

A   Again, something I inherited, but you know, it says what it says. Lessee agrees that there shall be absolutely no personal liability on the part of the lessor or agent with respect to any of the terms, covenants, and conditions of this lease. Obviously, lessee is Guaranteed Rate, and lessor was Pinnacle and Pritchett-Moore.

Q   If you would, flip to the next page, please, and specifically, looking towards the addresses for notification section. Now, what was the address for the lessor? Pinnacle, in this case?

A   Our physical address in Daphne, 2206 Main Street, 3 -- Daphne 36526.

Q   Mr. Pittman, in preparing for this trial and reviewing this

lease agreement, do you see anywhere in this lease agreement where your e-mail address is referenced as an addressee for notifications under the lease?

A   It is not.

Q   What about the remgr@jbplaw.com e-mail address that we heard a lot about when Ms. Ubersox was on the stand?

A   It is not a valid means of providing notice in the lease or termination notice in the lease.

Q   And arguably, the same can be said about Guaranteed Rate; right?  There's no e-mails in here that would have been proper to send notices to Guaranteed Rate; is that fair?

A   That's correct.  It had to go same means of transition, to Mr. Ubersox's, who I had never dealt with, you know, up to the lease execution at their Ravenswood Avenue, Chicago, Illinois address.

Q   Mr. Pittman, if you will turn to Exhibit 4, please.  And if you will just briefly tell us what this e-mail is that we're looking at.

A   Yes.  You know, the -- the thing was moving fairly quickly. We were at Christmastime.  This is just where Mr. Brant e-mailed the -- the executed -- fully executed lease back to Ms. -- Ms. Gilthorpe.  I -- it says it has three attachments. I'm not sure -- I see.  W-9, it's got the lease agreement, an electronic ACH, and the -- a blank W-9 for us to send back to them, so they can pay the rent that way.

Q   Okay.  All right.  Let's turn to Exhibit 5, please.

A   Okay.

Q   What is this?

A   This is e-mail exchanges between Mr. Brant that Mr. Lewis was copied on.  The local branch manager, Joseph Mosley, was copied on, that were with Ms. Gilthorpe and my office.  I'm -- and then also some e-mails between them and the outgoing tenant branch manager.  The name escapes me.  He was at River Bank & Trust.  Doug Thomas, where they were interested -- River Bank & Trust were moving to a branch they built right down the street.  They were trying to get in by January 1st.  Thomas was -- didn't need their furniture.  So I think he was going to dispose of it or give it away or throw it away.  And, so they wanted to buy River Bank & Trust's furniture, so they did, in fact, work something out, and we helped facilitate that, and Guaranteed Rate bought it from River Bank & Trust.  I'm in these e-mail threads that are back and forth at one point between Mr. Brant and Mr. Thomas, so.  Mr. Brant and Mr. Lewis, and you know, Mr. Mosley all had my e-mail address from, you know, I guess, two -- two plus weeks before they moved into the space when they were trying to buy the furniture.

Q   And when did Guaranteed Rate eventually move into the space that we're talking about here?

A   I think they moved in, like -- because there's some e-mail traffic here where the bank was trying to get out.  I think

they moved in very early January of 2022.

Q   And we talked about this a minute ago, and I'll just briefly touch on it once more.  Were there things that were done during the first year of the term of the lease by Pinnacle to repair and maintain the property?

A   Yes.  I mean, you know, in -- in my personal life or personal business life, I try not to think like a lawyer.  You know, sometimes when somebody like Ms. Reville calls and has got a complaint, rather than pointing her to the lease or arguing with her or trying to get corporate involved, I just try to get it done and, you know, it was a few hundred dollars here, a few hundred dollars there, the blinds were, you know, 16, $1,700, but yes, when she would make a request, we were trying to be responsive to her because we wanted her and the staff comfortable and happy.

Q   Okay.  If you will turn to Exhibit 6, please.  And James, is this a copy of the fully executed lease between Pinnacle Properties and Guaranteed Rate?

A   Yes.  And you know, you'll see where I put the initials P.P. for Pinnacle Properties as the landlord or lessor.

Q   Okay.

A   It's electronically signed by Mr. Ubersox which is how Mr. Brant told us in the very first exhibit they wanted it signed -- excuse me, was the intention -- I'm sorry, I misspoke.  It has Ubersox as the person to provide notice to,

but it had the John Elias, who was going to be the signatory to it, and then in the second to last page or page 7, I signed as manager, and then Mr. Elias signed on -- I signed on December 29th, and he signed on December 30th, and then they were in and operating the next week.

Q   Okay.  Now, during the 2022 lease year, did Guaranteed Rate make all its lease payments -- monthly lease payments to Pinnacle?

A   Yes.

Q   Okay.  What about in January of 2023?

A   Yes.  It paid the January rent.

Q   Okay.  Let's look at Plaintiff's Exhibit 8, please.  What is this letter that we're looking at here at Plaintiff's Exhibit 8?

A   This is the purported or the January 20th, 2023 termination notice showing it was being sent overnight delivery to my attention exactly like the notice provision that they added, the real estate manager at JBP Law, and then it, you know, goes on to set out that pursuant to the lease enclosed is an early termination payment equal to three months' gross rent plus unamortized landlord costs.

Q   So let's break this down a little bit, Mr. Pittman.  Did Pinnacle Properties receive this letter on or about January 20th, 2023 at the 2206 Main Street address that's identified at the top of the letter?

**A**   It did not.

**Q**   Okay.  It refers to a check being enclosed.  Did Pinnacle Properties around January 20th of 2023 ever receive a check enclosed with this letter?

**A**   It did not.  And just -- you know, I found out later about all of this and that the payment had not been received, but it was not received via overnight delivery on the following day, January 21st.

**Q**   Let's talk briefly about finding out about all this later. I think earlier the property manager that was doing some of the communications from that R-E-M-G-R e-mail address was somebody by the name of Lindsey Gilthorpe, but then at some point that changes to Michele Gore; correct?

**A**   Correct.

**Q**   So that was kind of a position that you had some turnover in?

**A**   It was.  You know, been blessed.  My law firm staff has been with me for -- for a long time.  You know, we're not big enough to -- for it to be a full-time job.  So it's either been somebody that's typically had a law firm background that we've tried to get to do some real estate stuff here and there, as is needed or somebody with a -- with a real estate background that's a firm employee that we expect to do it.  So I think that the -- the double duty has just been hard.  Ms. Gilthorpe had a lot of law firm experience.  And, so she filled in that

position.  Her child had some health issues, and she had to move back to Mobile to be with him.  Ms. Gore had more real estate background, less law firm.  Lindsey was a full-time law firm employee.  Michele was a part-time law firm employee.  I think she worked two or three days a week.

Q   Okay.  And if you will flip to the second page of Exhibit 8, please.

A   Okay.

Q   And what is this that we're looking at here on the second page of Exhibit 8?

A   This is an e-mail three days later from Mr. Lewis to the real estate manager address.  At this time this was Ms. Gore copying Mr. Brant.  You know, both of whom had my e-mail address, but did not copy me.

Q   And that was my next question.  Mr. Pittman, were you CC'd anywhere on this e-mail?

A   I was not.

Q   And if you were to receive any notices under the lease, would that even have been proper to transmit that notice to you via e-mail?

A   No.  You know, unless -- I just want to make this clear.  I mean, you know, if Ms. Reville's calling about air conditioner not being -- working good, you know, we're trying to facilitate solutions to the problem.  You know, stuff as important as signing the lease or terminating the lease, that's why we have

the notice provision is because I want to make sure it comes to me, who's one of the owners, and you know, ultimately, making the -- the decisions regarding all this, unless it's just some minor day-to-day thing.

**Q**   Okay.  So at the end of that e-mail that we're looking at here on Plaintiff's Exhibit 8, the bolded section, it asks two questions, one, for you to confirm the total amount of the termination fee owed including unamortized costs, and then, two, it asks to confirm the best address for us to mail a check for this fee.

To the first question, Mr. Pittman, what would you have needed to do to determine the unamortized costs?

**A**   You know, at the time that that was all added, I really didn't think a lot of it.  I've learned there's a -- a fair amount to that.  Because what it requires you to do is to go back through your correspondence, go back through your invoices, and go back through your check register, you know, and we've got another property or two that we have with Pritchett-Moore.  So we've got multiple properties that rent's flowing in and invoices are being paid.  So it would take somebody going through all of that during the -- the lead up to the lease, and then up to that point in the lease to start coming up with that.  It's also a moving target because the unamortized cost has worked in for the entire balance of the lease.  So really, those costs potentially accrue all the way

up to December 31st, 2024 when the three-year lease term would have been up, because if you incur expense for the center, it was a benefit to this space that they had moved out of.  That was an expense that we didn't get their rent to offset, so.  I hope that answers your question.

Q   Yeah.  And you had an expectation that you would have had that rent to offset those costs; fair?

A   You know, absolutely.  And, you know, like I said, this is -- this is retirement nest egg.  I mean, so this stuff matters to me and my family.  So, yeah.  Absolutely.  We -- we expected them to pay the rent, and you know, if somebody leaves, that -- that hurts.

Q   Okay.  Now, the second question that was asked in bold there asks about the proper address to send the fee to, but wasn't that spelled out specifically in the lease agreement, Mr. Pittman?

A   It was.  And, again, I wasn't copied on this e-mail, and I was not forwarded this e-mail.  So I didn't see this at the time.  But, yes.  It asks for a -- confirm the best address, and the notice provision and the provision that they made changes to that we adopted says, the address is overnight or regular mail to the company, my attention, 2206 Main Street.

Q   Okay.  Let's go to Exhibit 9, please.  Specifically, on the second page of Exhibit 9, it says, page 7 at the bottom of that page.

**A**   Okay.

**Q**   James, what are we looking at here in Exhibit 9?

**A**   The first thing -- and I know it's kind of cumbersome because it's the way e-mail threads work, but I received an e-mail from Ms. Reville, who I had communicated with before from time to time on the phone, and I think via e-mail, you know, with Ms. Bauer and all of those things.  You know, hey, James, Shannon here from Suite 4, Guaranteed Rate.  Do you think we can negotiate a new lease at a much lower price so that we're not having to vacate?  We'd like to stay, if possible especially those of us on the eastern shore, but our company can't justify the rent at what it is currently.  Do you think you can give me a number I can start with to send to corporate?  I would really appreciate it.

**Q**   As of that February 3rd, 2023 e-mail address, had you received Guaranteed Rate's termination notice?

**A**   I had not.  This was the first I had ever heard about their desire to leave.  And, so you'll see she sent it during the lunch hour.  I think I got it shortly afterward, was surprised, to say the least, and would have immediately, you know, gone out of my office and asked -- probably been Shauna Mosley, who is my right-hand lady, and unfortunately, for her, the closest one to me that, hey, I just got this e-mail.  What's going on?  Do you know anything about this?  She did not.  I said, would you look into it?  And then she brought me a copy of the

January 20th letter that says it was overnighted to me, and then after that, shortly thereafter, I called and spoke to Ms. Reville.

**Q**   If we could, I'm going to pop this on the screen.

COURTROOM DEPUTY:  It's going to take it just a second to come up.  Yep.  There it was.

**BY MR. PATTI:**

**Q**   James, can you see the e-mail from Michele Gore on February 13th, 2023?

**A**   Yes.

**Q**   And it looks like this was the first response from anybody at Pinnacle to the termination notice that was sent by Guaranteed Rate via e-mail on January 23rd, 2023; is that correct?

**A**   Correct.

**Q**   And it looks like here she states, I have forwarded this e-mail to the owner; you see that?

**A**   Correct.

**Q**   Which confirms the point I think you were just trying to make, which is as of February 3rd, at least, you had not received anything with respect to the termination notice.

**A**   Unfortunately, no.  I had not, as of -- you know, I never received any forward from Ms. Gore.

Now, when I got Ms. Reville's e-mail, that was 10 days before that.  So I went and said, what's going on, ladies?

Shauna would have brought me -- not this e-mail.  I never got this e-mail, but the letter that's the -- the other page that we've looked at.

Q   And I think you just said it, but to confirm, you've never received an e-mail forwarded from you from Michele Gore with the termination notice?

A   That's correct.

Q   You were --

A   I never received any of these e-mails from Ms. Gore, unfortunately.

Q   And you were asked to produce e-mails in this case; correct?

A   Correct.

Q   And had you had an e-mail forwarded to you from Ms. Gore with the termination notice, you would have produced it in this case; correct?

A   Yes.

Q   You did not produce any such document?

A   No.  We didn't have it, so we didn't produce it.  It never came, unfortunately.

Q   Okay.  All right.

A   You know, I would say that when I talked to Ms. Reville, you know, she -- she drilled down.  She said, everybody that works at this branch lives in Baldwin County, and we don't want to drive to west Mobile.  You know, you were sent some notice

from corporate saying that we're getting out.  We all want to stay.  You know, they've dispatched us to try to work out a better deal that will allow us to all stay here in the space. And, so then that's why I sent my -- my e-mail --

MR. PREMO:  Objection, Your Honor.

THE WITNESS:  -- later on in the afternoon.

MR. PREMO:  This is a lot of hearsay that he's saying about what he heard from an employee, and it's not responsive. I don't think there's a question on the table.

THE COURT:  I'll hear you in response, counsel.

MR. PATTI:  Yes, Your Honor.  I mean, one, these e-mails speak for themselves.  They've been admitted. Mr. Pittman has been discussing conversations as did Mr. Ubersox.  I think it's for your benefit to hear the full story here.  As to the nonresponsive objection, I'm happy to ask him a question about the issue.

MR. PREMO:  Your Honor, I don't have any objection to talking about what's in the e-mails.  That was not what Mr. Pittman was discussing.  He was discussing phone conversation that we don't have any record of, and he's relaying something that was told to him by an employee, an out-of-court statement, that he's offering for the truth of the statement.  I think that's hearsay and that it's objectionable.

MR. PATTI:  Your Honor, if I may add one more thing.

THE COURT:  Go ahead.

MR. PATTI:  It's an opposing party statement.  He's the representative of their company.  So, you know, it's a statement against their own interest, and it's an opposing party statement which is an exception to the hearsay rule.

MR. PREMO:  This is not a manager, officer, director.  This is a -- a local employee speaking.  So I don't think that's binding on Guaranteed Rate.

THE COURT:  I'll overrule the objection.

**BY MR. PATTI:**

**Q**   Okay.  So turning your attention, Mr. Pittman, back here to Exhibit 9.  We just talked a little bit about the e-mail that you got from Shannon Reville on February 3rd, then it looks like there was a second e-mail that was sent by Joe Mosley on February 13th where he asked, are you able to give us an offer to extend our current lease at a better rate?  I'm trying to avoid having to consolidate based on corporate directives.  If you will, will you tell us how you responded?  And I believe it starts actually on the next page, and then trickles back to the top of this page.

**A**   Yeah.  And let me first -- so when I got the letter from Shauna -- I believe that it had been overnighted to me.  You know, I don't open the mail, and I don't look at the check, so.  In my mind's eye, on February 3rd, when I talked to her, I understood that they had overnighted the letter to my attention with the check that says, it's enclosed, and that the language

says that it would be paid simultaneously with the notice.  So then I responded to her, would love to work something out for you.  So I thought they had given proper termination notice.

**Q**   I was going to ask, you were under the impression at this point that proper termination notice with the termination fee had actually been delivered to Pinnacle?

**A**   I thought -- because the letter I got says via overnight delivery.  And I had never seen anybody send a letter that says it was overnighted and not -- to me saying, enclosed is the check for three months' rent or whatever the amount was.  So I thought he had given proper termination notice per the language that they asked to be in the lease.  So I said, love to work something out for you guys to stay.  Let me pull some other rent figures.  Because she just -- you know, she said, what can you do?  And I said, well, I need to look at the other tenants in the space, got to be sensitive to -- you know, they talk, so.  You don't want tenants to say, well, gosh, they just dropped our rent by X, and then the other people have got hurt feelings or angry.  So let me pull that, let me pull some kind of neighboring property data that I can get from a friend of mine, and I'll circle back with you.

So to answer your question -- and she said, thank you.  You know, and she had said, get us something to send to corporate.  So then he followed up on the 13th.  Mr. Mosley, who was the branch manager, as I understood it, are you able to give us an

offer to extend our current lease at a better rate?  I'm trying to avoid having to consolidate based on corporate directives.

Q   And how did you respond to that, Mr. Pittman?  I think you just described it, but.

A   Yes.  You know, then I e-mailed to him, I am and can discuss with you and Shannon tomorrow if there's a good time. Like I said before, I've been pulling together the rates of the other tenants in the building and other similar properties, so I needed those to be able to discuss what I -- I'm going to flip back a page, I think -- what I and my partners can do. Hopefully, it will be enough of a move for you to be able to stay.  How is your schedule at 11:00 tomorrow?

Q   You had a conversation with Joe Mosley the next day; correct?

A   I did.  Mr. Mosley responded late that night.  I should be fine.  I have a meeting at 12:00.  So I called -- then above that, this is what's shown as page 3, if you keep flipping, but it's not the page 3 of the exhibit.

Q   You mean page 3 at the bottom of the --

A   Yes.  It says page 3 at the bottom, but it's the -- you know, it's in the exhibit.  One, two, three, four, five -- I think it's the sixth page of the exhibit.  Calling you now on the 648 number.  Please let me know if you want me to call you on another, and then I called and spoke to Mr. Mosley. Ms. Reville was not on the call.  He gave me the same

information that we've been dispatched to negotiate a better rate.  You've gotten this prior letter, but we and Guaranteed Rate want to stay.  We're just trying to renegotiate the lease.

**Q**  And it looks like the next e-mail you send was to Shannon, who you referenced wasn't on the phone call.  You kind of spell out exactly what you tell Joe Mosley; correct?

**A**  I did.  I -- I gave this all to him on the phone at our 11:00 o'clock call.  And then, you know, I guess, because she had not been in the loop, and quite frankly, she had just -- you know, through our prior dealings with her, she just was not as easy to deal with.  We'd had the issues with the blinds and the air condition.  And, so, you know, I talked to Mr. Mosley, but then she sent that follow-up e-mail.  And, so I told her exactly what I had told Ms. -- Mr. Mosley a few minutes before, which is, we would be willing to reduce from the $25 a square foot to $20 which was -- equates to $750 per month rent reduction, which was, you know, close to 20 percent, and I thought that was a pretty significant move.  And I said, I hope we can work it out as I would love for you all to stay, you know, to the end of the original term in December, and hopefully, after that.

I think in one of those conversations they said, hey, we want to be there longer than December 2024.  And I said, I'd love for you to be, if we can work through this.  So it was with the spirit of trying to find some middle ground for them

to stay.

Q   Now, did you get a response to that February 14th e-mail where you explained the reduction in rent to Shannon?

A   I did not, and they told me, you know, we've got to follow back up with corporate, and you know, so I knew it was going to take them at least a few -- a few days.  So then I didn't hear from them for, I think, it was 10 days.  And, so then I sent a follow up to them.

Q   And what do you say in the follow-up e-mail that you send to them on January 24th?

A   Joe and Shannon, I hope you're both well.  I apologize for following up on a Friday afternoon.  I realize it takes some time to go through corporate channels, but I'm following up to see if you have any word on the proposed lease amendment to keep Guaranteed Rate in the existing space until the end of the original lease term.  I'm receiving inquiries with interest in the space, but it's my preference to keep you guys rather than lease to a new tenant, if possible.  Please provide an update at your convenience and have a good weekend.

There was some adjacent space next to them that was already vacant, so we had a sign up.  So after I talked to them, at some point, after the February 3rd e-mail, you know, I would have told the ladies in the office, if you get any inquiries, you know, mention this.  A lot of times what will happen is somebody says, we need 4,000 square feet, and I've only got

1,800.  Sometimes you say, we've got 1,800, and they say, oh, we really need more space than that.  So you know, as soon as I learned that from Mr. Reville, then -- and saw their letter that I thought they had, you know, overnighted and paid the fee, and we started going ahead and putting the word out.  You know, we typically will let tenants out if we can find another suitable tenant, and of course, try to get them to help carry some of the water and find a replacement.

**Q**   Were you still under the impression as of February 24th of 2023 that Guaranteed Rate had properly issued the termination notice simultaneously with the termination fee?

**A**   All I had seen was the January 20 letter saying it was overnighted and enclosed is a check, and then I had talked to Reville and Mosley, who, you know, had said you've gotten a letter.  So it all, you know, aligned.

You know, this was by February 24th.  Michele Gore was no longer there.  I mean, we had a -- a mutual parting of ways.  And, so, yes, at that time I still believed that they had provided the proper termination notice.  And we're just trying to renegotiate the stay.

**Q**   And Michele Gore, she was the one tasked with the monitoring the remgr@jbplaw e-mail address?

**A**   Yes.  And like any staff person, you know, if it's something you feel comfortable handling, then -- then handle it, please.  If it's something important, then -- let me know,

and I may be out of the office a fair amount or I may be in court, but if they need to get in touch with me, they can get in touch with me.

Q   Right.  Now, it looks like Joe Mosley followed up to that e-mail that you sent on February 24th a few minutes later, actually, and says, thanks so much for offering to help us stay.  It appears we're stuck with having to move.  I have movers scheduled for March 23rd.  I will get with you first of the week and make sure you are in touch with the right people at corporate.

James, why was he wanting to make sure that you were in the right -- in touch with the right people at corporate?

A   You know, a -- a few things.  One, he mentioned the movers here.  When we previously talked, he said -- well, you know, what do we do if we can't work it out?  And I said, well, while we're working it out, don't worry about moving your stuff.  Leave it there.  You know, we'll -- hopefully, we'll work it out.  So then he was telling us, hey, I've got the movers coming to get our stuff.  You know, I -- I understood it for me to get in touch with them about the mechanics of the lease dissolution or what-have-you.

Q   Okay.  And then, if you will, flip with me to the very next page.  It looks like about two and a half hours later you get an e-mail from Shannon Reville.  She says, hey, Jim, the only way we can stay is if you agree to $1,500 a month.  I know

that's a lot lower than you get now, but at least you wouldn't have two vacancies.  I'm only the messenger.  So, no, I'm not trying to insult you by any means.  James, was that insulting?

A    You know, she sent it after hours.  I would have gotten it at home or on the phone.  You know, it was a little insulting.  I was hurt.  I felt like, you know, they had told me -- this termination notice was sent, but this is business.  We're trying to stay.  We're trying to renegotiate, and I think by either e-mail or one from Mosley said, can you get us a starting figure?  And I thought a 20 percent, roughly, rent reduction was pretty -- pretty good.  It's to a rate that's as low as anybody's paying in the center, even places that have got a lot more square footage that would usually be less.  So I thought that was a good faith move, and I anticipated, if not an acceptance, at least a counteroffer that would have not been a -- you know, close to 75 percent reduction, you know, for a prime location commercial space.  I mean, they're not mine, but two-bedroom, two-bath apartments in Daphne rent more than $1,500 a month.

Q    James, as of February 24th, 2023, had Michael Lewis ever e-mailed you about unamortized cost?

A    No.

Q    Had Noah Brant?

A    No.

Q    Had James --

A    They had my e-mail, but they had not.

Q    Right.  They've -- we've -- as we've seen, there's some correspondence from you before the termination ever arose where they had your contact information.

A    Right.  They all did.

Q    And Jamie Bauer didn't e-mail you and tell you about the termination notice or the unamortized cost?

A    Correct.

Q    And neither did Scott Ubersox?

A    That's correct.  I don't think I ever saw an e-mail sent to me until, like, March 28th or 29th after I sent my letter, even though they had my personal e-mail address.  Though, again, legal notice as per the lease have got to be sent -- or per the notice provision, but they didn't e-mail me.

Q    Now, you just mentioned that March 20th letter.  So let's flip to Plaintiff's Exhibit 10, please.  What are we looking at here, James, in Plaintiff's Exhibit 10?

A    At some -- this is my letter on behalf of the landlord's pointing out the fact that they had not -- had not paid the termination fee.  At this point I still had never seen the e-mail when Mr. Mosley said, I'm going to put you in touch with the right people at corporate.  He did not do that.  I made an attempt to call a couple of people at Guaranteed Rate and left a voicemail or two.  I didn't hear from anybody, and then at some point I had a conversation with Shauna that said, do you

have the check or did you deposit it in the operating account? And she said there was no check. And I said, was it overnighted? And she said it was not overnighted. It was e-mailed.

And, so then I went and researched and found out that Ms. Gore had not sent me the stuff that had been sent to her, you know, and then it was only eight or nine days after this that they ever e-mailed me. So this was my letter to them saying, your termination notice is not compliant with your language. And, so it's ineffective. And, so the lease continues until you provide the proper termination notice with the payment.

Q   Okay. Let's look to Plaintiff's Exhibit 11, please. What is this that we're looking at, James?

A   This is a letter that they sent, I guess, 13 days after my letter where they did this time send it overnight to me per the lease, and it did include a check, but they tried to relate it back to the prior January notice. This payment is associated with the termination notice sent in January of this year.

Q   In the subject line there, what does it say, the -- in all caps?

A   Termination, fee payment, the address of the property, the premises.

Q   It doesn't say, termination notice and termination fee?

A   Correct. Their notice requires both simultaneously.

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

You've got to give a notice with the payment, and this was just a payment, and they referenced back to the notice, you know, a little less than three months before.

**Q**   And here, the reference to the payment is just to the three months' gross rent; correct?

**A**   Correct.

**Q**   There's no reference to unamortized costs?

**A**   Correct.

**Q**   Now, they do reference it below --

**A**   It is on the second paragraph, I'm sorry.

**Q**   Correct.  As far as the payment was concerned, it was only allocated to the three months' rent?

**A**   Correct.

**Q**   They asked -- you know, they said, we've been trying to reach you regarding this matter, but we've been unable to confirm the amount of the fee associated with the unamortized landlord cost associated with the lease.

James, please tell Judge why at this point you have not provided that to them.

**A**   I had not provided it because it appeared to me that this was all just a business negotiation.  They were trying to terminate without really doing it the right way, without paying the -- the money with the letter like they were supposed to. They sent something that said it was overnighted with a check. It wasn't.  I felt like I was dealing with their people that

reached out to me -- I didn't reach out to them -- to negotiate in good faith to keep them to stay.  It's important to me and my family for -- to have somebody in that space.  There's still nobody in that space.  And, so, you know, I was not angry.  I was hurt.  I was -- didn't appreciate that they had done that to me.  And, so, you know, I was holding them to the strict letter of the lease.

Now, I had started looking into the amortization type stuff, and it's a moving target.  I mean, we started working on pulling that together.  You know, I had reached out a couple times via phone without a return call where I was -- you know, we could have talked about some of those things.  So, you know, when they sent this again, it was deficient.  And, so I pointed that out to them, you know, a few weeks later.

Q   Okay.  James, will you please turn to the next page of Exhibit 11, please?

A   Yes.

Q   What are we looking at here?

A   This is my letter back to them, you know, the -- the -- the one that was overnighted on April 3rd was sent by Mr. Lewis.

THE COURT:  Which exhibit are you looking at now?

THE WITNESS:  I'm sorry, Judge.  It's 11.

MR. PATTI:  We're still on 11, Judge.  It's just the second page.

THE WITNESS:  So, you know, this is my letter letting

them know that once again you didn't comply with your -- your termination notice and that I expect you to continue to operate under the lease until you do what your language requires you to do, and then I returned the check.  It had not been deposited. So it had been held by, I think, Ms. Gore, and like I said, she left shortly after that April 3rd -- that February 13th dialog I was having with Mr. Mosley and Ms. Reville.  So we returned their check that they sent on April 3rd.

**BY MR. PATTI:**

**Q**   So they sent you a check on April 3rd for three months' gross rent that you returned.  So my question to you, Mr. Pittman, is, did Pinnacle Properties receive rent from Guaranteed Rate in February of 2023?

**A**   No.

**Q**   What about March?

**A**   No.

**Q**   What about April?

**A**   No.

**Q**   So aside from this check that you did return, because it was improperly issued to you in an attempt to exercise their termination option, you didn't receive monthly rent for February, March or April?

**A**   I misspoke.  I think I did receive rent for February, March, and a part of April.  And then also the termination check of three months' gross rent that I sent back with this

letter.

**Q**   Okay.

**A**   Of course, I had questioned and -- and challenged them on the validity of the prior notice, and then the subsequent payment trying to relate it back.  So I told them I expect you to pay the rest of this month, and then keep paying the rent until the lease terminates or you terminate it properly.

**Q**   Okay.  Let's flip to Plaintiff's Exhibit 12, please.  This looks like an internal e-mail that was sent about a phone call that the office received from Joe Mosley.  What were some of the move-out items that needed to be discussed?

**A**   Well, first off, I apologize to the Court because this is out of -- I was trying to be chronological.  And, so this is out of whack, chronologically.

But after the train left the tracks, so to speak, they -- you know, Ms. Reville said, how about $1,500?  Don't mean to insult you.  I had this message from another lady in my office that was -- you know, would fill that void from time to time from Mr. Mosley.  I called him.  I went to the space and met with Mr. Mosley, you know, and -- and for the first time ever -- I had not been to the space during their tenancy -- I realized that the interior was painted the burgundy and a grey-black color and another grey color and all of their furnishings were there.  The signage was on the wall, and you know, I had told him weeks before, when we talked on the phone,

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

like, you all don't need to move out until we figure out what's going on, but I told him that day -- you know, I asked.  I assume -- and he told me that the movers were coming.  I'm assuming you're going to have all of your stuff out and that you're going to repaint and put it back per the lease.  And he said yes.

Q   Okay.  Let's --

A   So he was going to give me the keys, but I said, well, you've got to have the keys to move out, and you've got the movers coming.  If you would, just drop them by the office whenever you're all are done, and I think he dropped them through the drop slot.

Q   Okay.  Let's flip to Plaintiff's Exhibit 13.  At the bottom of that first page in Exhibit 13, there's the e-mail from Jamie Bauer to the RE manager e-mail address, and the second sentence says, according to Joe, the furniture that we are keeping has been moved out, and the landlord is good with keeping the leftover furniture in his building.

    Mr. Pittman, as the manager of the landlord, were you okay with them keeping the furniture in the building?

A   I was not.  It's been a hindrance to try to release the space.

Q   Okay.  And it also goes on to say that the signage was removed on Friday.  Was all of Guaranteed Rate's signage removed from the property before it vacated and surrendered the

property back over to you?

**A**   The exterior signage was.  They left the penetrations in the -- in the wall.  They had not removed the -- the interior signage, and I remember very vividly because I was standing with Mr. Mosley at the door to the space, and it was open, and I pointed to that, and I said, you guys are going to put this all back; right?  And I don't know that I said specifically, you're going to take the sign, but get all your stuff out, repaint the premises; correct?  And he said, yes, sir, we will.

**Q**   Okay.  All right.  Let's look at Plaintiff's Exhibit 15, please.  Mr. Pittman, this looks like it's a batch of photographs.  Will you just briefly tell the Court, you know, when you took these photographs and -- when these photographs were taken, and who took them?

**A**   I took these photographs.  This would have been at some point during 2024 after they left.  You see it's pretty dark in there in some of these.  I think I got photos two different times because some of them are -- they turned the power off when they left.  So this was while it was dark, but I took these photos showing the lion's share of all of their personal items and the furniture there, the paint there, their interior signage still there.

THE COURT:  That's Exhibit 13?

MR. PATTI:  15, Your Honor.

THE COURT:  15, rather.

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

THE WITNESS:  Yes, sir.

MR. PATTI:  Yes, sir.

**BY MR. PATTI:**

**Q**   So while we may not be able to pin down a specific date, is it fair to say that these photographs were taken sometime after April 24th of 2023 when Guaranteed Rate vacated and surrendered the property?

**A**   Correct.  I think -- you know, it was after this lawsuit was pending, and, you know -- it would have been, you know, a -- a few months of there, I would have taken the photos.

**Q**   Let's start on this first picture.  I'm going to go through this pretty quickly, but, Mr. Pittman, is there a Guaranteed Rate sign in this picture?

**A**   There is.  All their -- this was kind of their waiting room.  You can't see Ms. Reville's office on the right, but the credenza -- I think it's still got some of the coffee, you know, accoutrements on it.

**Q**   And the chairs that we see on the left side of that photograph, were those Guaranteed Rate's furniture?

**A**   They were, and then that desk in the back was like where their receptionist was at.

**Q**   And when Guaranteed Rate took possession of the property, were the walls painted red like we see here on the left-hand side?

**A**   No.  They were oyster white.  That's the color.

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

Sherwin-Williams something.

Q   If you flip to the second picture of this batch of photographs, this is kind of just a different angle.  Same area, though.

A   Correct.

Q   Okay.  And then let's look to the third picture. Mr. Pittman, what are you trying to show here with this photograph?

A   You know, there's -- there's ways you can put pictures and stuff on the wall where it doesn't damage it.  And I was hoping that's what it was.  This is my hand in the photo, you know, where I was trying to see if you could get it off of there without damaging the wall, and when I did, it started to tear the paper off of the Sheetrock, so I took the picture.  I didn't tear it off because, you know, maybe there's some way to get it, but I think it's going to tear the paper off.  Either I'll have to cut out the Sheetrock and replace it or maybe able to skin it and sand it and do all that and fix it.  I'm just not sure.

Q   And in doing that, could that not account for an amount to unamortized cost?

A   It could, if we paid for that, yes.  We have not paid for that yet, but we've got a prospective tenant that either wants us to do that or wants a pretty significant lease break if they're going to have to do it.

**Q**   Let's look at the next page.  What are we looking at in this picture?

**A**   This is that facade, not a good picture.  The sun was bright because I was trying to get where you weren't looking at sunshine, but this shows the damage to the exterior wall, the wires sticking out of the building.  I've since had somebody go and patch it.  It still doesn't look much better, but I was really just trying to hopefully keep the pen -- seal the penetrations.  I think we put, you know, some kind of sealer, something.  I forget the name.  The clear silicone, excuse me.

**Q**   Let's just quickly flip through the next couple of pages here.  This looks like more furniture that's left on the next page?

**A**   The credenza --

**Q**   The table, credenza --

**A**   -- with stuff on it.

**Q**   -- a mirror left on the next page?

**A**   All stuff that's still there.

**Q**   Office furniture, like a desk?

**A**   You know, desk -- and I guess, this is their proprietary color scheme, but their desk, computer monitor, computer monitor, some computer equipment.  And, so even like within their offices, they got different colors, so that -- it looks black.  It's really like a really dark grey and a light grey, you know, where they left most of their stuff.  They just took

their personal effects and left.

Q   If you'll flip about four pages, it's a photograph of a bathroom.  What are we looking at here, Mr. Pittman?

A   That's just -- you know, it shows various stuff in all of the various offices, filing cabinets, and this is -- looks like cleaning products and various things that were left behind after they abandoned the premises.

Q   Left in a sink?

A   Correct.

Q   Okay.  The next page, there's a bunch of boxes and wiring on the wall.  Were those there before Guaranteed Rate moved in?

A   No, they were not.  I mean, at one point I think there's -- one of the e-mails I've seen that says, we're going to get our computer stuff or our servers.  But this is all stuff that's still there.  It's all kinds of computer equipment.  I'm not a computer guy, but it's still a bunch of stuff that's still there that wasn't there before.

Q   Okay.

A   There's partitions and all kinds of things that were -- that were left that are still there.

Q   All right.  Mr. Pittman, will you please turn to Plaintiff's Exhibit 16, please?

A   Yes.

        THE COURT:  Hang on for a second.

        MR. PATTI:  Yes, sir.

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

THE WITNESS:  I think one of the pictures in there is -- the last one is a York air conditioner.  It was a brand new air conditioner we put in about a year or two -- I think I took a picture of that because there weren't problems with the air conditioner at all, but we kept trying to do things to it to get it to cool more up front where she -- where Ms. Reville's office was.

**BY MR. PATTI:**

Q   You're referencing the complaints from Ms. Shannon Reville about the HVAC and the fact that the front of the building was a lot hotter than the back of the building; is that what you're talking about, Mr. Pittman?

A   Yeah.  The front -- the afternoon sun in the back didn't -- so when the air conditioner technician said to turn the air down, she said, well, the people in the back of the office are cold.  And, so I'm the right temperature, but they're cold, so.

Q   Okay.

THE COURT:  All right.  I'm on 16 now.

**BY MR. PATTI:**

Q   Mr. Pittman, what is this spreadsheet that we're looking at here on Plaintiff's Exhibit 16?

A   So we talked about amortized or unamortized cost.  This was a -- our efforts to try to come up with those items.  You know, I never dealt with that issue before or since.  I didn't think much of it at the time of the lease, but there -- there's more

to it than we thought.  You know, at some point before I sent some of those letters, we started working on it.  You know, I tasked Shauna with it.  We were trying to get bank records from the partner and start really building the information to go through the historical data for this building and separated out from some of the other stuff.

So this shows -- it's not a very good spreadsheet, but it's mine.  It shows various vendors that we paid this amount owed in full by Guaranteed Rate.  It doesn't -- it's not all of it, but it's 130-dollar charge -- 232-dollar charge to the air conditioning company.

Told you that I talked to Ms. Bauer, and she was going to pay $1,500 of the additional light reflective solar shade things that Ms. Reville wants.  We never got that.  So we paid the full invoice, but per the lease, that $1,500 there, so the 1,862 is stuff that they were supposed to be paying for under the lease but didn't.

Q    In full, not prorated?

A    They were supposed to pay up to $1,500 of any ticket item associated with their lease space.

Q    Now, turning to kind of the right -- second right-hand column, the prorated portion, explain to Judge Moorer what that is.

A    So that is a -- total invoices for things that would have been for the benefit of the -- the whole center that their, you

know, one out of five spaces would have received the benefit of.  So I told you about the grinder pump.  Lots of charges to Roto-Rooter.  I think we since -- you know, this only goes through October of '23.

So to really get the accurate unamortized cost, we've got to go to December 31st of 2024.  We wouldn't know about all of that until January or February of this year.  But it picked up what we produced at the time through discovery.  So various items.  Roto-Rooter was the grinder pump.  SERVPRO, we, in August of '23, had a huge flood event where a tenant had gotten Mediacom cable service, and they left a jumble of cable by the storm drain, and the cable washed into the storm drain -- you can't make this stuff up -- and caught a bunch of sticks and pine straw and stuff, and it did some flooding to the back of the building.  So SERVPRO had to come in and just -- they were kind of in the rear area and -- and, you know, dry it all out. That was a big invoice we gotten.

T Construction Systems, I think, were some -- maybe some roof work, you know, in the area above them and adjacent to them for some various things.  Can't remember what Smith Industrial Services was.  If I look at it, I can probably tell. Advanced Metal Systems, we had some issues with the -- the downspouts and the gutters, I think, in the back of the building.  So these were all things that we had to try to find, find out when they were, and then the prorated portion owed,

and then the date would, of course, been when we would have either gotten the service done or paid the invoice, more likely, and then the prorated portion would have been their one-fifth of those costs.

Q   And is this list that we are looking at here in Exhibit 16, is it an exhaustive list or are there additional unamortized costs that could have and should have been included in this?

A   They are, but I mean, this is what we produced through discovery to Mr. Premo.  It also goes on -- you know, we got a quote to repaint, if they didn't do the work.  So this was, you know, the time, I think, that we -- we wanted -- hoped they would do that.  And, so that's the $6,500 that either we're still going to have to pay or the tenant's going to want a rent reduction to compensate them for having done, and then at the time I didn't know what the cost to remove the furnishings were, but I think we've gotten a quote for $1,500 and some change to haul off all of the furniture.  We've got a church that wants the space, but they don't -- they're going to have a congregation in that long area.  So they're wanting all that stuff out of it, all the office furniture out, because I think they're going to use some as maybe a nursery or some things.  Maybe you have one office for their pastor.

Q   Okay.  Now, as we sit here today, has Guaranteed Rate issued Pinnacle Properties a termination notice simultaneously with any termination fee?

**A**    No.

**Q**    Okay.  Now, Mr. Pittman, if the Court were to rule in Pinnacle's favor, what would you ask the Court to award Pinnacle?

**A**    Yeah.  I would ask Judge Moorer to consider, you know, the monthly rent for the balance of the -- the lease.  If they didn't properly terminate it, then they would have paid for almost -- almost 16 months of rent.  They paid partial in April '23.  So I would say for the balance of that.

THE COURT:  May of '23 on --

THE WITNESS:  Yes, sir.  Yes, sir.  Yes.

Now -- and I recognize, when I filed this lawsuit, I was just trying to get them to abide by the lease, either stay or -- or give proper termination notice.

So, you know, if Judge Moorer thinks that that's -- that somehow the April 3rd payment related back to the January 20th, '23rd {sic} e-mail or the letter, then that would be six months' rent that would be owed plus these costs, the cost to repaint, the cost to remove and dispose of their items.  I think that's $1,540, and it says currently unknown, and I saw last night that I told Mr. Premo that we're going to get that and supplement, and I never did.  So I hadn't produced that to him before today.  And, so that's -- he didn't know that figure.

And then, you know, again, I -- I defer to Judge Moorer,

but I would say a component of attorney's fees would be appropriate.

THE COURT:  Okay.  Hang on for a second.  Go ahead. I'm sorry.

**BY MR. PATTI:**

Q    Mr. Pittman, let me just make sure that I follow along.  So you kind of explained two different scenarios.  One, where if Judge Moorer found that the April 3rd fee related back to the termination notice that you would ask the Court to award you six months' rent at the total gross amount of $4,363 and I believe it's 12 cents plus the additional cost that Pinnacle Properties would incur to put the property back into the as-is position that it was when Guaranteed Rate took possession of it?

A    Correct.  Plus those expenses on that spreadsheet, and then the cost to repaint, and the cost to remove their -- and dispose of their furniture.

Q    Okay.  So just to make sure I got that, you're referring to the amount that's owed in full by Guaranteed Rate which is $1,862?

A    Correct.

Q    Plus the prorated amount for Guaranteed Rate rate which totals $9,965?

A    Correct.  That was through October of '23.  Though, there are some additional expenses through the end of December '24,

unfortunately, mostly to Roto-Rooter.

**Q**   And then there was the cost of the $6,500 to repaint the property?

**A**   Right.

**Q**   Okay.  Plus the $1,500, I think you said, to remove the -- fill the holes for the signage and remove the furniture that you talked about earlier?

**A**   Removing and disposing of the furniture.  I think it's a -- Morgan Contracting, I think it's $1,540.  I don't know what we spent on plugging the holes on the facade.  I don't have that, so I'm fine not to get the -- recoup that.

**Q**   Plus you referenced attorney's fees; correct?

**A**   Right.

**Q**   Now, in prosecution and defending of this case, how much has Pinnacle incurred with respect to attorney's fees?

**A**   So I got it together last night.  We've got, prior to today, 65.5 hours of attorney time.  By standard rate on federal court matters is $175 an hour, so that would come out to be 11 thousand and change.  $11,462.50.

**Q**   11 what?

**A**   11,462.50.

**Q**   And then the second scenario which was if Judge Moorer finds that the termination was improper in its entirety, what would you ask the Court in that scenario?

**A**   So again, I get confused.  There's a 90-day termination

notice with a three-month penalty, but they paid January, February, March, and part of April rent for 2023.  So what's that?  Eight plus -- 20 months?

Q   20 months?

A   20 months that would be to the -- the balance of the lease. Bear in mind, we have a damage deposit.  Our e-mail, you know, after the fact about that, so.  But we still have that and that would need to be accredited back because we never returned their damage deposit because, obviously, that would go part of the way to fix the paint and stuff.

Q   The security deposit that you have, that's --

A   Just a base rent.  It was --

Q   Correct.

A   -- $37,039 -- 3,739.58.

        MR. PATTI:  Pass the witness, Judge.

        THE WITNESS:  Would you do me a favor and bring me that other water?

        THE COURT:  I'm going to take about a 15-minute recess.

        THE WITNESS:  Yes, sir.

    (Short recess.)

        THE COURT:  All right.  You may inquire.

                **CROSS-EXAMINATION**

**BY MR. PREMO:**

Q   Mr. Pittman, I have a -- some follow-up questions for you.

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

Do you have an official title as it relates to Pinnacle Properties?

A   My wife would say chief cook and bottle washer, I think. Technically, it's co-manager with -- or manager or co-manager.

Q   The only members of Pinnacle Properties are you and your wife; is that correct?

A   Correct.

Q   Now I've seen a lot of references to an entity called Southland Properties, LLC.  What is Southland Properties?

A   As I said earlier, I have a real estate broker's license. Years ago, I had a little brokerage company, like with real estate agents and stuff, and after the downturn in '7, '8, '9, that kind of went away.  They all went back to other things where they were making money.  So it's just an entity that that we have that, I guess, is kind of the management company.  You know, it just -- it really doesn't do anything.  It doesn't have any assets.  It's a -- my former brokerage company, that's the management company, I guess, of the real estate owned by Pinnacle.

Q   And I want to make sure I have this right about how your employees for your law firm help out with Pinnacle Properties. I think you testified that Pinnacle Properties itself doesn't pay any employees; is that right?

A   Correct.

Q   Okay.  And instead, you use your law firm employees to help

out with some of the operations of Pinnacle Properties?

**A**   Yes.  Pinnacle doesn't have enough business to hire somebody full-time or part-time, for that matter, so.  I've hired people through my law firm that do some of the real estate management stuff for Pinnacle, but their paycheck comes from the -- the law firm.

**Q**   Okay.  And would it be the same arrangement for any -- any of the employees who had in their, you know, e-mail signature block that it also says, Southland Properties, same sort of arrangement as with Pinnacle Properties that those employees are maybe helping out with whatever Southland Properties' issues come arise?

**A**   Yeah.  Correct.  Yeah.  I mean, the -- the firm signs their paycheck, and you know, does that through an ADP payroll service.  So they're either part-time real estate folks or they're full-time people that are doing mostly law firm stuff and helping with the real estate stuff as needed.

**Q**   Employed by your law firm?

**A**   Correct.

**Q**   Now, Michele Gore was an employee of your law firm who assisted with some of the real estate dealings that you had through Pinnacle Properties; right?

**A**   Correct.  Most people want full-time employment.  So they have to do law firm stuff.  Michele didn't want but work two or three days a week.  So she would come in part-time and do

mostly real estate stuff.  Though, she did help, you know, with law firm overflow and various things.

Q   Okay.  So fair to say that Michele's job was primarily dealing with the real estate --

A   Yes.

Q   -- issues?  What were Michele's duties with -- as it relates to the real estate duties?

A   She would help, you know, try to market vacant space.  You know, we have, from time to time, hired somebody that's like a third party.  Like, right now that vacant space is listed by White-Spunner because they've got resources, and they, you know, bring all kinds of access to platforms that get the word out more.  But she would help field calls from prospective tenants, follow up on unpaid rent, facilitate rent payments, and then she would also help field calls from somebody like Ms. Reville that would say, it's hot in my office.  You know, can you send somebody out to take a look at it.

Q   And you would have been Michele's boss?

A   Yes.

Q   Now, I want to talk about the e-mail address remgr@jbplaw.com.  Is that an e-mail address that would have been used by Michele Gore?

A   Yes, along with the other ladies that you've seen in some of the e-mails.  You know, it comes to a computer that's not manned all the time.  So Ms. Gore, when she would have been in

the office, would have been sitting there and had access to it, you know, and then if she was gone or something, then somebody else may or may not check it, depending on how busy the law firm is.

Q   And who all has access to that e-mail account?

A   You've seen some of the names.  Lindsey Gilthorpe was working at the time that, you know, we were working with Mr. Brant negotiating the lease, and then Ms. Gore was there. She left, I think, shortly after February 14th, 15th, and then there's some other ladies that have part-time positions.  A lady named Stephanie Vordermark, a lady named Jamie Valaski.  A lot of those people are receptionists in our waiting room.  So they go up and take a look at the computer when they have time.

Q   And you, of course, would have access to that e-mail account; right?

A   I do not.  I don't have -- I mean, there's a way, I think, where e-mails can get copied to somebody.  But, no, I never have looked at that e-mail address.  I guess, I could go to the desk and look at it, but I have never reviewed that e-mail or gone on and looked at it or accessed those e-mails.  I would look to one of the people in the office to print it for me or forward it to me or whatever the case may be.

Q   And, so you've never looked at that e-mail inbox to see what's in there?

A   Not that I recall, no.

Q   But if you wanted to, you could because you, as the owner, can go and access that computer that has the e-mail address on it?

A   I'm sure I can.  It may be password protected, but if it was, if I wanted to get into it, I could find out from somebody, I would hope, with the password.

Q   Surely someone would give you the password to get in?

A   Correct.

Q   Okay.  If you would turn to Plaintiff's Exhibit 1.

A   Okay.

Q   And this is an e-mail dated Wednesday, December 8th, 2021, from Noah Brant with Guaranteed Rate to that real estate manager.  That's the R-E-M-G-R e-mail address; right?

A   Yes.  @jbplaw.com.

Q   Okay.  And this is a e-mail that you produced; right?

A   Correct.

Q   Okay.  So you have access and ability to obtain e-mails that are in there and produce them in this action; right?

A   Yes.  Yeah.  You know, obviously, when the thing went into litigation mode, and we -- you know, I had my staff go and pull all this stuff, so.  Yes, we have access to it.

Q   Okay.  And this e-mail is dated December 8th, 2021.  I think you testified earlier that it was around that time that the relationship started with Guaranteed Rate as it relates to this lease; right?

**A**   Right.

**Q**   Okay.  And you don't dispute that as seen in Exhibit 1 and Exhibit 2 and Exhibit 3 Pinnacle was communicating pretty extensively with Guaranteed Rate through that remgr@jbplaw e-mail address as it related to originating this lease; right?

**A**   Agree.  So when Mr. Brant e-mailed that e-mail address to Ms. Gilthorpe, she would have either -- I'm old fashion.  So I'm a paper guy.  She probably would have printed this for me because she would have known I would want to look at it.  She might have forwarded it to me, but she most likely would have printed it.  I would have looked at the language, and then probably made handwritten notes that would have been thrown away that would have added the reciprocal, and this -- this reciprocal in nature or whatever we saw or whatever, given it back to her to incorporate into our standard form lease, and send back to Guaranteed Rate.

**Q**   Well, and that's kind of the -- the question that I was going to have after that.  You -- I want to make sure I'm clear on this.  You were the one who reviewed the lease to approve the final terms; right?

**A**   I was the one that reviewed this termination language, was fine with it, but added the reciprocal language, and then she would have incorporated that into our standard lease, sent it to Mr. Brant, and then she would have taken what he forwarded back to her, printed it, and then I would have gone through the

red line version, and communicated back to her that that was acceptable to make those changes, and send it back to him to finalize before the new year.

Q   There never would have been a time between December of 2021, and let's say, April of 2023, that you, as the owner, managing member of Pinnacle Properties, as the owner of your law firm, would not have the ability to access the e-mails for them -- from that remgr@jbplaw e-mail address; right?

A   I never have, but I certainly think I could access anything in my office, and I was involved on the e-mail thread with Mr. Brant and the gentleman from River Bank & Trust.  I was involved on the e-mail thread, I think, with Ms. Bauer at some point.  Yeah.  I was copied in on some and others, obviously, I was not.

Q   Okay.  I want to talk a little bit about the terms of the lease.  So if you would turn to Exhibit 6, Plaintiff's Exhibit 6.  Now, looking at the lease termination provision, I want to talk a little bit about your understanding of the -- what constitutes unamortized landlord cost and -- and how that works in relation to this termination provision.  Because I think you testified earlier that there are things that -- unamortized costs that could still potentially be coming up right now; is that right?

A   Not right now.  But until the space was released to another -- somebody behind Guaranteed Rate, and then it would

be their obligation or until the balance of the original lease term, which was December 31st, 2024.  There's still expenses associated with the building that would benefit the Guaranteed Rate space whether they're there or not.

Q   Okay.  So I don't understand how that would work in relation to this provision.  If we take your argument that those amounts can accrue later, because this says, and as you testified a lot, that the fee, the termination fee, is supposed to be submitted with the three months' written notice.  That would be before the tenant would vacate; right?

A   Yes.

Q   How could they make a payment of unamortized landlord cost before they -- before they vacate if some of those costs might arise after they vacate?

A   Well, it's a good question.  Again, it's their language. But they could have -- like they said, in their January 20th letter that said it was overnighted with the check said, enclosed is the termination payment of three months' rent.  If there any unamortized costs, then please let us know.  They could have written it to say, we give a termination notice, and you have 30 days to give us unamortized costs, if any, and then we'll write you a check for the whole amount or whatever.  You know, it's their language.  It just says they have to give the notice overnight to me simultaneously with the payment of three months' gross rent plus unamortized costs.

**Q**   Yeah.  And really, what I'm talking about right now is how do we interpret that language --

**A**   Okay.

**Q**   -- of unamortized landlord cost?  Wouldn't you agree with me that it's a more reasonable interpretation of this language given that that amount has to be paid three months before they could vacate the premises, that that unamortized landlord cost could not possibly include amounts that would accrue after that payment is supposed to be made?

**A**   I would disagree because the cost that benefit the space are still incurred whether Guaranteed Rate is there or not.

**Q**   So...

**A**   I'm anticipating getting their rent to pay for that, but as we saw, after they left, the grinder pump still went out.  And, so I still got to send Roto-Rooter and that -- that benefits all five spaces, but I'm not getting their rent.  I know it's not the answer you want, but I'm trying to explain my thought process at the time and -- and now.

**Q**   But wouldn't that -- wouldn't, under your interpretation, it render this whole termination illusory that no one could ever terminate if there are costs that can't be paid -- that can't be determined until later?

**A**   Well, I -- I disagree because, again, it's their language. They could have said, we want to terminate per that provision. Please provide us unamortized costs at -- as soon as you can or

10 days or some reasonable period of time, and when we have that, then we'll write the check.

Q   Mr. Pittman, that's what they did; isn't it?

A   No.  They said, enclosed is our check for the three months' gross rent plus unamortized costs.  So per their own letter, they represented that they knew what the unamortized costs were.

Q   Mr. Pittman --

A   That's the January 20 letter.

Q   Mr. Pittman, please turn to Plaintiff's Exhibit 8.

A   8?

Q   Yes.

A   Yes.  Got it.

Q   And turn to the second page of that exhibit.

A   Okay.

Q   Can you read the bolded text in this e-mail?

A   Yes.  Again, I never got this e-mail, but it says, could you please, one, confirm the total amount of the termination fee owed including any unamortized costs, and two, confirm the best address for us to mail the check for this fee.

Q   Okay.  And you just said, they could have asked us for what the amount was, and then paid it.  Is that not exactly what they're trying to do here through this e-mail?

A   The problem is, is I didn't see this e-mail.  They sent a letter that says, we are overnighting it and enclosed is our

check.  So, you know, again, had I gotten this, then I would have started working towards that, but again, it was February 3rd, and then all I saw was their letter, then I thought they had overnighted it to me.  One of my staff opened up the FedEx package, pulled out the check, and had it.  I found out much later that that wasn't the case.  I think even my affidavit attached to our motion for summary judgment even during the pendency of this case, I still thought they had overnighted the January 20th letter.  I say it in my affidavit.  Now I realize it was just attached to this mail to Michele Gore.

**Q**   All right.  Let's talk about on -- on February 3rd.  You said on February 3rd, I think it was your testimony, that your assistant, Shauna Mosley, is the one who obtained a copy of that January 20th letter for you; is that right?

**A**   Correct.  I got the e-mail from Ms. Reville saying, you know, can you renegotiate a lower rate, so we're not having to vacate?  And that was the first I heard of it.  So I would have gone out and gone to Shauna's office and said, hey, I just got an e-mail from Shannon Reville at Guaranteed Rate saying that they're moving out.  Have you heard anything about this?  No. See what you can find.  And then she brought me a copy of the January 20th letter that was signed, reportedly, by Mr. Ubersox, overnighted, and enclosed the 13,000-dollar and change check.  So I thought we already had it.

**Q**   So we've already established that letter was -- was not

mailed; right?

**A**   Correct.

**Q**   So the only way --

**A**   It was attached to an e-mail sent three days later.

**Q**   Yes.  And the only way Shauna Mosley could have gotten that e-mail on February 3rd was by getting that e-mail with the letter; right?

**A**   Perhaps.  But if she would have seen the e-mail, Shauna would have brought me a copy of the e-mail and the letter. She's been with me for too long.  She found a copy of it, alone.  Not the e-mail.  She brought me the letter.  I wished -- trust me, I wish I would have seen the e-mail.

**Q**   How -- how could Shauna have gotten a copy of that letter, if not through that e-mail?

**A**   I'm assuming Ms. Gore printed it off and had it somewhere. Or maybe she -- maybe she would have -- Michele was still there at the time.  So she might have called her and said, hey, James is talking about this.  He doesn't know what they're talking about.  Can you bring me whatever it is, and she would have brought a copy of the January 20 letter that really was not ever sent.  That's what I saw.

**Q**   But, clearly, someone at Pinnacle Properties received that e-mail.  They had to have it for you to have that letter?

**A**   Correct.  Absolutely.

**Q**   And whether it was Michele, who just didn't tell you about

it or maybe Shauna, who saw it and didn't tell you about it, somebody saw it who works for Pinnacle Properties or does work for Pinnacle Properties through your law firm.  They would have seen that before February 3rd; right?

**A**   Yes.  I'm sure that Michele Gore would have seen it.  I know in my heart of hearts that Shauna would not have seen that e-mail and not shared that with me because she's been with me -- or we've been working together for too long.

You know, I guess, I would say this is why you have notice provisions in a lease is to make sure the important stuff gets to the right person, not e-mailed to a part-time, you know, personnel.

**Q**   Was Michele Gore fired?

**A**   We had a mutual parting of ways.  Between this, some other things, and something that came up with the space next door on February 15th, 16th, 17th.  You know, when Shauna brought me the letter, you know, at some point subsequent there was -- you know, Michele, what in the world?  I mean -- and, hey, listen, I'm -- I know you think I'm trying to split hairs.  If I'm Guaranteed Rate, I assume that it's gotten to the right people.  Unfortunately, it didn't.  She didn't share with me those e-mails and the follow ups.  She didn't forward it to the owner like she said.  I wasn't out of town like she said.  All I can figure is, she was trying to save the day.  She misrepresented something that was going on with the people that moved in next

door, and I realized that she was dishonest, and you know, we had a conversation.  And, so I said, this isn't working.  So, you know, you can either leave or I'm going to let you go, and she said, then I'll just -- you know, consider this my resignation.

Q   So it sounds like you had multiple problems with Michele, not just relating to this?

A   Yeah.  There were small things.  Obviously, when I found out on February 3rd that she had not given me that January 20 letter, I was upset, and then when she told me that the tenant next door was going to be an escape room and a birthday place for children, and I got a draft of a lease, and it said, Shattered, LLC, and I found out it was going to be one of those destruction rooms where you smash TVs and stuff, I said, Michele, I mean, that's huge.  You know, I can't have people smashing televisions next to tenants that need quiet space.  So I just said, this isn't working out, and she left.

Q   After Michele left, other law firm employees took over that R-E-M-G-R e-mail address; right?

A   There was a few weeks of a space.  I mean, you know, obviously, she left, and then we would have started running advertisements for someone.  We hired somebody behind her, but I just can't remember what the -- the time frame was.  I think the e-mails were kind of wired out.

Q   But somebody eventually would have gone in and been kind of

assigned to use that e-mail address; right?

**A**   Yes.  At some point subsequent to that.

**Q**   Now, after you --

**A**   Probably would have been sometime middle to late March, I think, that somebody would have, you know, been hired into that position.

**Q**   Given, as you say, Michele's dishonesty, did you go back behind her after she left your employment and try to ascertain what she was doing?  Go back and review e-mails, go back and review some of her work to figure out what was going on?

**A**   I didn't.  And let me tell you why.  I got a letter that said, overnighted to James Pittman via FedEx.  Enclosed is the check.  So at the time I believed that they had given proper termination notice and given the termination payment.  My first knowledge about it was communication from Shannon Reville, and she and Mr. Mosley said, hey, this is part of -- you know, our business negotiations are done.  We want to stay.  Don't -- you know, don't worry about that.  What can we do to stay?  And, so we immediately went into a dialog with them that I thought, you know, they kept saying, you know, let us know.  We're, you know, following directives from corporate.  Tell us what we can tell corporate to stay.  All of that stuff.  So I was immediately trying to do damage control and talk with Ms. Reville and Mr. Mosley to keep those guys in the space.

**Q**   Now, Ms. Reville and Mr. Mosley, they weren't involved in

the original negotiation of the lease; right?

**A**   No.   They were -- you know, I can't remember.   I'd have to look at some of the e-mails.   It was Mr. Brant, and then Ms. Gilthorpe, and then me that were involved in the lease negotiations.

**Q**   And you said earlier you were copied on some of those e-mails maybe with Mr. Brant or some of those other people --

**A**   Yeah.

**Q**   -- at corporate; right?

**A**   I was copied on the e-mails, I think, between Mr. Brant and Doug Thomas and Lindsey about them wanting to buy the furniture, and then I was having e-mail communications with Ms. Reville, I think Mr. Mosley and Ms. Bauer or Boyer -- sorry, if I'm not saying it right -- at the home office about, you know, tenant improvement type stuff.

**Q**   Did you ever e-mail Mr. Brant or Ms. Bauer about the termination?

**A**   I didn't e-mail Ms. Bauer.   I know that at some point we got a communication -- I think the first time I was ever e-mailed on anything was March 29th or 28th.   It was eight or nine days after I sent the letter, you know, when I found out that we didn't have the check that I was copied on something, and then I think -- I was out of the office.   Shauna forwarded her my March 20th letter.   And, so I was in an e-mail exchange between her and Mr. Mosley, I think, and they speak for

themselves, and Mr. Brant and Mr. Lewis --

Q   Okay.

A   -- they had -- they had my e-mail address, but for whatever reason, they never sent me anything until March 29th.  And, hey, I mean, they assumed that Michele Gore was forwarding it to me.  She didn't.  You know, but that's why the notice provision says they've got to communicate with me.

Q   You also had their e-mail addresses for Noah Brant and Jamie Bauer; right?

A   Yes.

Q   You didn't contact them as it related to these negotiations that Shannon and Joe were having with you?

A   No.  I mean, Shannon and Joe were saying, we've been dispatched -- dispatch is not the word.  That's another word.  We've been told by corporate to try to renegotiate this lease.  They sent you a letter, but that's part of this process.  What can you do to -- to reduce the rent so we can stay and hopefully stay longer?

And, so, you know, I -- I was true to my word.  You know, I -- hindsight is 20/20.  I probably should have reached out sooner.  I did reach out at, you know, some point after Mr. Mosley said, I'm going to put you in touch with the right people at corporate.  And then he never did put me in touch with those people.

Q   I want to go back to the -- to the lease.  And talk about

the notification provision that you've been referencing.  So if you would turn to Plaintiff's Exhibit 6.

A   Okay.

Q   And the notice provision is on page 3, if you would to turn to that.

A   Got it.

THE COURT:  This is exhibit what?

MR. PREMO:  Exhibit 6.  Plaintiff's Exhibit 6.

**BY MR. PREMO:**

Q   All right.  In this notice provision, the first line says, any notice, demand, communication or election to exercise any option, hereunder -- and I'll stop there.  I read that correctly; right?

A   You did.

Q   Okay.  So it's not your contention that every single communication between Guaranteed Rate and Pinnacle had to be pursuant to this notice provision; right?

A   Yeah.  I mean, again, to me, it -- it's simple as this.  If it's important, you know, really important like the lease termination or extension or whatever, it's got to come per the notice provision.  If it's calling about the air conditioner not working good or it being hot in the afternoon sun, then, you know, I -- then -- then by all means try to get in touch with whoever you can to get some quick relief.

Q   Well, the lease doesn't say important, if it's important.

It says, a notice, demand, communication or election to exercise any option, hereunder.

So would you agree with me that this provision only applies to when one of the parties is exercising some sort of option under the contract?

A   I would disagree.  Option is not a capitalized defined term.  And there's no option in the contract.  You're also reading just a snippet.  You know, whether -- it goes on to say, whether intended for lessor or lessee shall be in writing and may be served in person, prepaid U.S. mail or by overnight courier service, which was the language that Guaranteed Rate's legal team, they said, added the or by overnight courier service is a legal means of notice.

So I mean, I guess, to your point, I mean, we can say, oh, send -- Ms. Reville needs to send us a written notice about the air conditioner, but I mean, you know, again, we're trying to solve the problem quickly and move on.

Q   That's not the way the parties acted prior -- or during the course of the lease.  You never sent any written mail about anything up until the termination; right?

A   That's correct.  It was e-mailed, but there's also the nonwaiver provision that says we can send an e-mail 10,000 times, and it still does not waive their obligation to provide notice as it states in the lease.

Q   I want you to look at Plaintiff's Exhibit 8 again.  And

look at the second page, the e-mail from Michael Lewis.

**A**   All right.

**Q**   Michael, in this e-mail, is very clearly and unequivocally stating that they haven't sent the termination fee; right?

**A**   Definitely.  And then attached is a letter that unequivocally says, they are sending the termination fee overnight delivery.

**Q**   But this e-mail, which we all say is how this letter got delivered, this cover e-mail is not trying to hide the ball. It's not trying to trick anyone about the termination fee; is it?  It's being up front and expressed that they haven't sent the termination fee; right?

**A**   I agree.  They just didn't send it to the right person, which was me.  Even though Mr. Brant had my e-mail.  He could have forwarded it or copied me, but he didn't.

**Q**   You reference this e-mail earlier.  So I want to take a look at it quickly.  Looking at defendant's exhibits, so we'll have to look at a different binder now.  Would you open up and turn to Defendant's Exhibit G?

**A**   Yes.

**Q**   All right.  In the middle of the page, there's an e-mail on February 13th, and I think you referenced this e-mail earlier, that Michele Gore responded back to Michael Lewis about the termination, that initial termination e-mail; right?

**A**   Yes.

**Q**   And I think you said earlier, she said, I forwarded this e-mail to the owner, which is out of town this week, and those are two lies; is that what you're saying?

**A**   Yes.  That --

**Q**   Okay.

**A**   She did not forward it to me.  I was not out of town that week because I was communicating with Ms. Reville and Mr. Mosley at the exact same time, and Michele's last day was the 16th or the 17th, which would have been that Wednesday or Thursday.

**Q**   She also says, as soon as I have confirmation on the amount, I will forward to you.  Do you see that?

**A**   Correct.

**Q**   But of course, she never forwarded anything to Guaranteed Rate?

**A**   Correct.  And at this time all I had was the January 20th letter, so I thought that they had overnighted the letter and it enclosed the check for $13,000 and change.  So I was trying to keep them.  And I thought they had terminated properly, and I wanted desperately for Guaranteed Rate to stay because it's, you know, come -- it matters to me and my family.

**Q**   You'd already -- this is February 13th.  So you'd already been put on notice that there was some issues with Michele Gore hiding things from you; right?  You found that out on February 3rd?

**A**   Yes, I found out on February 3rd.

**Q**   And on February 3rd --

**A**   Another issue that was going on kind of simultaneously with the -- with that because, I mean, I think one of the Shannon Reville e-mails says, if you don't want two vacant spaces, you need to reduce the rate.  And, you know, so we were still trying to negotiate this other tenant into the next space next door at the same time.

**Q**   And February 13th, though, it appears that your employee, Michele Gore, is still apparently hiding things from you?

**A**   Well, I mean, you know, Mr. Lewis, I think, you know, took her at her word.  I get it.  She -- he assumed that she had done exactly what she said.  And again, I -- you know, I don't blame him, but unfortunately, she had not sent me the prior correspondence.  She had not forwarded anything to me.  I wasn't out of town, and she wasn't telling me they need some other unamortized figures or whatever, you know, the language is.

**Q**   Yeah.  In Michael's response e-mail a little bit later, he says, thank you for getting back to me.  This termination is simply the result of employees relocating, and we simply do not need the space anymore.  So there are no adjustments that would change these plans unfortunately.  Do you see that?

**A**   I do.

**Q**   And you see that on February 13th, the corporate employees

of Guaranteed Rate were making statements that were very, very different from what maybe Shannon or Joe were saying to you; right?

A   Yeah.  And I -- and -- and Michele was telling them something different than what she was doing, and all I can figure is she wanted to be the one to save the day.  And you know, I wish they would have overnighted it, you know, to -- to my attention, and then we -- you know, we wouldn't have gone through all of this.

Q   All right.  I want to turn to Defendant's Exhibit D, if you would.

A   Yeah.  I would point out -- I mean, Michele Gore did lie to your people and lie to me, but Guaranteed Rate lied to us.  I mean, they sent a letter that purportedly was overnighted on the 20th that said, enclosed is a check, and it just wasn't true.

Q   But Mr. Pittman, we've already seen that they sent that with an e-mail expressly acknowledging that they -- they can't send the fee because you haven't told them what the -- they don't know what the unamortized costs are; right?

A   I understand.  But I don't know why they would attach the letter that says the direct opposite of their e-mail.  I just -- you know, at the time I didn't think that they would -- would say they'd overnighted a letter with a check that wasn't, and I didn't see the e-mail.  So I thought that they had done

everything right at that point in time.

Q   I understand you haven't seen -- or your testimony is you haven't seen that e-mail, but from Guaranteed Rate's perspective, they had sent an e-mail saying, we need the unamortized cost so we can send a check along with sending that letter; right?  Those two are -- they are intertwined from Guaranteed Rate's perspective; right?  Because that's how they send it; you would agree with that?

A   Yes.  From their perspective.  And from mine, if they had just followed the notice provision, then we never would be here.

Q   If you would turn to Defendant's Exhibit E.

A   Okay.  Got it.

Q   This is an e-mail February 24th, 2023 from -- from Joe Mosley to you, copying Shannon as well.  And it says, hi, James.  Thanks so much for offering to help us stay.  It appears we are stuck with having to move.  I have movers scheduled for March 23rd.  I will get with you the first of the week and make sure you're in touch with the right people at corporate.

A   Correct.

Q   You see that e-mail?

A   Yes.

Q   Okay.  It was clear to you by February 24th, Guaranteed Rate, even through Shannon or Joe, was not interested in

renegotiating the lease; right?

**A**   Well, no, because then she sends an e-mail two hours later that says -- to paraphrase -- per corporate, if you'll reduce it two-thirds to $1,500, we're still going to stay.

**Q**   Did you do anything to follow up on that $1,500?

**A**   I didn't.  Mr. Mosley had said, you know, at some point, you know, through this -- you know, I don't know exactly when it was -- you need to get in touch with the right people at corporate.  You know, I didn't know what that meant.  You know, he never sent me -- he said, I will get with you the first of the week and make sure you're in touch with the right people at corporate.  He never did that.

And then I got Ms. Reville's e-mail that was -- you know, that kind of made me realize that the whole -- in my opinion, the whole thing about the -- the inaccurate letter -- I'm trying to use my words carefully -- saying it was overnighted and enclosed is a check, and their communications to me was that it gave the appearance that Guaranteed Rate was trying to force me to reduce the rate to $1,500 a month.

So at that point I did not respond to her.  And then, ultimately, I did follow back, and I figured out that they did not overnight -- well, excuse me.  They -- I thought they overnighted the letter, but they didn't enclose the check, and then that's when I wrote my March 20th letter.

**Q**   Okay.  If you would turn to Plaintiff's Exhibit 10.

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

**A**   Okay.

**Q**   Okay.  And before -- I'm trying to understand kind of how you came to understand that the -- that you hadn't received the check yet.  Can you explain to me -- it looks like by March 20th you -- you understood that you didn't have the check.  How did you come to understand that?

**A**   I would have asked Shauna, most likely, is the check -- do we still hold the check or was it deposited into the account or I would have followed up, and she would have said, here's the check -- or excuse me, we never got the check.  And, so then that's what would have prompted my March 20th letter where I point out that despite it being required to be paying -- paid simultaneously and despite your letter saying it was being paid simultaneously, it wasn't.

**Q**   And you also said you found out that Michele Gore wasn't forwarding you those e-mails that we looked at earlier; right?

**A**   Correct.

**Q**   How did you find that out?

**A**   I think it was -- it was -- you know, there was an e-mail at some point, I think, on March 29th, that I was sent a copy of or it might have been directly to me, you know, with all the people that had my e-mail address from the beginning where they mentioned, hey, we're trying to get this or what-have-you. And, so then I would have -- would have tracked that down.  I still believed even until I submitted my affidavit in June, I

think, of last year, that the letter had been overnighted.  It just didn't enclose the check that it said was enclosed.  It was only really until, I think, I saw Mr. Ubersox's affidavit where he said, it was e-mailed on March 23rd, and I realized, no, it wasn't.  It was overnighted on -- it was e-mailed on January -- I'm getting my date -- 23rd.  And I said, no, it wasn't.  It was overnighted on January 20th and realized that it had not even been overnighted like the letter said it was being.

**Q**   And you said on March 29th you were copied on some e-mail that led you to see that there were other e-mails that maybe you hadn't been forwarded by Michele?

**A**   I think that's right.  Yes.  My letter -- so I sent my letter on March 20th, and then nine days later, Mr. Lewis sent his e-mail to me and other people in the office, law firm staff.  It said, we've been trying to get in touch with somebody.  Found out Michele Gore's no longer there, and then, you know, can you please confirm the total amount of the termination fee.  The same thing they put in the -- you know, prior correspondence to Michele.

**Q**   All right.  Please turn to -- since we're talking about this, please turn to Defendant's Exhibit K.

**A**   Okay.  Okay.

**Q**   Do you have that?

**A**   Yes, sir.

**Q**   Okay.  This is an e-mail dated March 29th.  I think this is the one you were referring to because you're copied on this e-mail; right?

**A**   Correct.

**Q**   And this is, as you testified, Mr. Lewis was informing you and other employees at Pinnacle that he had been trying to get the amount from -- of the unamortized cost from Michele Gore, found out that she's no longer there, and then it had been unanswered.  And you saw this e-mail.  You received this e-mail; right?

**A**   Yes.

**Q**   Okay.  At that point did you not go to Michele Gore's e-mail inbox, remgr@jbplaw and see, wait a second, what's going on?

**A**   Yeah.  I mean, at some point we did.  I just can't remember when it was, Mr. Premo, but if you read that e-mail, it still maintains the charade in -- in my mind's eye, per our records, current gross rent is 4,362 bringing the total for three months to 13,089 before unamortized costs.  So I thought that -- you know, that they had sent -- you know, they -- they knew that.  Could you please confirm the total -- the total amount of the termination fee owed including any unamortized cost and confirm the best address for us to mail the check to for this fee, which they already -- they had that.

   You know, interestingly, they knew there were no pre-lease

expenses, so.  They at least knew that there were no unamortized costs, you know, what per Mr. Ubersox said earlier.

Q   Why didn't you respond to this e-mail?

A   Well, I mean, at this point, you know, we were already, you know, at loggerheads.  I did -- I think -- well, I say that. They sent -- they sent the check -- I'm sorry, I'm getting the timeline -- the documents say.  I know at some point Shauna forwarded a prior e-mail or my letter.  I think within a few days I got their April 3rd letter.  I had not responded before I got their April 3rd letter enclosing the check and saying it related back to the January 20th, so I just hadn't responded to this.

I think I told you earlier at some point we -- we did start drilling down.  You know, we were trying to start to find out what these unamortized costs were.  So we did start working on that, but ultimately, we didn't get to that.  They've got to provide the termination notice via overnight with the check simultaneously, you know, before we even get to any unamortized costs, if there are any.

Q   Well, Mr. Pittman, you testified when we were looking at the lease that you said, why didn't they reach out and ask for the unamortized costs?  That's what they should have done first before sending the check.  Even if it's your contention that they needed to send the check simultaneously, and so the termination was ineffective, wouldn't it be proper of them to

ask for your -- for this amount, and then you provide that to them, so they can send the check?

**A**   I think the proper way would be for them to say, here's three months' gross rent.  If there's any unamortized costs, let us know, and we'll write you another check.  You know, they said, enclosed is our check.  And, so I thought that they had performed per that provision -- I ultimately learned they didn't.  They attached it to an e-mail three days later and no check had been sent.

**Q**   But to be clear, you never told them what the amount of the unamortized costs were; did you?

**A**   No.  Because at that point I was trying -- I know you believe I was splitting hairs or whatever, but ultimately, when they -- they sent the check, but not a new termination notice, and I think the reason why they did that is they were trying to -- it's got to be simultaneously.  So I think they were doing that to try to relate it back to the January 20th letter to save themselves three months of rent.

I realized they weren't going to comply.  And, so I think I could have filed a suit for damage -- what I tried to do was a declaratory judgment, because I realized, hey, there's this issue there.  The language is their language.  To me, it wasn't confusing, but obviously, it's confusing.  So I'm asking a Court to determine what it means, who's right, who's wrong, and if I'm right that they keep paying the rent until they properly

terminate, and then they'd have to give it simultaneously or if they're right, then they're out of the lease.  You know, so that's why I filed a declaratory judgment, not a breach of lease lawsuit.

Q   Yeah.  You -- you filed a lawsuit instead of responding to this and telling them what the amount of the termination fee was; right?

A   I responded in -- in -- before I could respond, I got their April 3rd letter, again, not abiding by the lease.  You know, between their original false letter saying, enclosed is the lease, between Reville and Mosley telling me, this is Guaranteed Rate.  They're sending us to beat you down to a lower rent rate.  You know, at this point I realized, you know, it's -- the threshold question of them providing termination properly is -- is not going to happen.  They're not going to do it right.  Let's just go ahead and -- and let a court decide.

Q   Well, whether they were renegotiating -- even if Joe and Shannon were -- were authorized to renegotiate the lease, that wouldn't have had any impact on how the lease is terminated pursuant to the provision in the lease; right?

A   Right.  They had not abided by the provision in the lease, and then at the same time they're telling me, we want to stay, you just got to, you know, reduce your rent, which I did by 20 percent.  So to me --

Q   My question was just about the lease language.  It wasn't

about that other stuff.

A   Okay.  I apologize.

Q   Please turn to Plaintiff's Exhibit 10.

A   Okay.

Q   And this is the letter that you sent on March 20th, 2023; right?

A   Correct.

Q   And in this, you claim that the termination is ineffective because the -- the payment wasn't sent simultaneously with the notice; right?

A   Yes.  Your letter acknowledges the termination fee payment requirement, however, that termination fee did not accompany your letter.  Therefore, your termination notice is invalid and ineffective, and the lease continues, and then I go on --

Q   Mr. Pittman --

A   -- to say, hey, you know, if we -- let's try to work through this.

Q   Okay.  I'm not trying to cut you off.  I'm just trying to --

A   That's okay.

Q   -- get through the questions --

A   I want to be responsive to your questions.

Q   -- so we can move forward.

A   Sorry.  The lawyer in me sometimes takes over.  I'm trying not to.

**Q**   I understand.  Nowhere in this do you say that the termination's invalid because there were requests for the unamortized costs through e-mail and not through regular mail; right?

**A**   Correct.  Though, again, it -- I understood that the letter -- if you read my letter, I understood that the letter at this point in time had still been overnighted.  It just hadn't been overnighted with the termination fee that it says is enclosed, and it even says, per the termination language, it must be paid simultaneously, and we enclose our check for that amount.

So to me, at that point it was just as simple as, you overnighted a letter, but you didn't pay the fee with it, and that's what the letter says is that you've got to do it as you said you had to do it.

**Q**   You didn't include the amount of the unamortized costs in this letter; right?

**A**   Right.  And I didn't know them at the time because, again, it's a moving target.  You know, so.  Yeah, I didn't know it then.  We were working on it, but I didn't know, and again, we don't get there because you didn't -- you didn't give the termination notice the way you said you would do it.

**Q**   Okay.  And this letter goes on to suggest or you suggest a lot of alternatives to termination here.  You suggest a lump sum buyout, a modification of the lease for a longer term or a

novation with Guaranteed Rate making up the difference in price; right?

**A**   Correct.

**Q**   Okay.  But Pinnacle and Guaranteed Rate had already negotiated what the exit -- the early exit, the early termination to the lease would be; right?  That was the termination clause?

**A**   Yes.  But I was -- had had conversations where the local people say, we want to stay.  Mosley was saying, I'm in charge. I don't want to consolidate.  This was all a subterfuge -- that's a legal word, but -- to get you to reduce the rate.  I was still trying to find some middle ground because, I mean, for them to move out, they were -- they hadn't paid rent. There's been no rent for that space for almost, you know, two years.  And it's a lot of money to -- to me and my family.  So I was trying still to find a way to keep them there.  And I thought I was trying to deal in good faith is what I was trying to do.

**Q**   But all these alternatives you're suggesting would be much more advantageous to Pinnacle Properties than following the terms of the termination clause in the lease; right?

**A**   I don't know that I quite understand.

**Q**   Okay.

**A**   Yeah.  Anything would -- any middle ground that we could have reached where Guaranteed Rate would stay and pay some

reduced rent would have been much, much better than them having been gone and not paid a dime since April 20th of 2023.

Q   Exactly.  It would have been better for Pinnacle for them to agree to a lump sum payout or to have a modified lease or for them to do a novation than it would be for Pinnacle for them to terminate and just pay the three months' gross rent; right?

A   Yeah.  I mean, ideally, I just wanted them to stay and honor their commitments in the lease, but if not, then, yes, I would have loved to find anything that would have allowed me and my family to continue to generate some rent from that space.

Q   Please turn to Plaintiff's Exhibit 13.

A   Okay.

Q   Now, this is an e-mail chain that you discussed earlier with Mr. Patti regarding some of the furniture and the move-out procedures around March 29th; right?

A   Correct.

Q   And you're copied on this e-mail from Jamie Bauer on Wednesday, March 29th, 2023 or at least you're forwarded the e-mail or copied on it, I'm sorry, on this e-mail, March 29th; right?

A   Yeah.  I'm a little -- I got -- this is about her wanting us to put new tint.  I found Mr. Pittman's e-mail -- okay.  I'm sorry.  I found Mr. Pittman's e-mail from when we were looking

to install new tint in that office.  Okay.

Q  Okay.  If you look at the e-mail from Jamie Bauer that's at 11:08 --

A  Yes, I do.

Q  -- a.m., it's the bottom one on this page.

A  Yes, sir.

Q  Do you see that?

A  Yes, I do.

Q  The middle paragraph of that said -- or I'm sorry.  The second sentence of that first paragraph says, according to Joe, the furniture that we were keeping has been moved out, and the landlord is good with keeping the leftover furniture in his building.  Do you see that?

A  Yes, sir.

Q  Now, you testified earlier that you said you didn't agree to that; do I have that right?

A  Correct.

Q  Okay.

A  We -- I'd originally agreed to it when I first talked to Mr. Mosley around February 14th, I think it was or maybe it was later, and I said, while we're working on keeping you guys in there, you don't need to start moving out.  It was whenever the e-mail from Jamie Valaski said, you know, somebody's going to come by, and we talked about it in person and told they need, you know, to get their belongings out and repaint the space.

**Q**   Okay.  But you didn't respond to this e-mail and correct Jamie about the furniture; did you?

**A**   No, I did not.  And we had another e-mail, I think, before I responded.  I think they sent their April 3rd letter.  And it kind of mooted that.

**Q**   In what way did it moot it?

**A**   Well, they -- they tried to repair the termination option. Again, I'm sorry, I'm forgetting the timeline, but I already told Mr. Mosley to -- you know, to do that, and he assured me they would, so.

**Q**   Well, I guess, my question here is, there's an e-mail in here where, according to you, Jamie had a misunderstanding about the furniture being left behind with your permission.

**A**   Right.

**Q**   Why didn't you correct her ever and tell her, no, I did not agree to that, move the furniture out?

**A**   You know, I don't know, Mr. Premo.  There's lots of things I wish I would have done differently in hindsight.  You know, I could have been in court for a few days or been busy.  You know, I wouldn't have -- have never responded, but you know, before I could respond, then I got their April 3rd letter.  So it's probably not the answer you want, but it's the truth.

**Q**   All right.  Based on the prior e-mails that we saw, you also knew in March that Guaranteed Rate was still trying to get the amount of the unamortized landlord costs; right?

**A**    They were, but they hadn't exercised the termination notice properly, so.  You know, at that point that's what I was concentrating on, the fact that they said the check is in the mail, and it wasn't in the mail.

**Q**    Please turn to Plaintiff's Exhibit 11.

**A**    Okay.

**Q**    In this -- this e-mail or this letter is dated April 3rd, 2023 is the letter you're referring to moments ago; right?

**A**    Yes.

**Q**    Okay.  And the -- the middle paragraph of this says, we have been trying to reach you regarding this matter but have been unable to confirm the amount of the fee associated with the unamortized landlord costs associated with the lease. Right?

**A**    Yes.

**Q**    And then it goes on to say, please contact us to confirm the remaining amount of the fee and confirm that the final day of our lease is indeed April 24th, 2023, as outlined in the January notice.  Do you see that?

**A**    Yes.

**Q**    You did not confirm the amount of the unamortized landlord costs associated with the lease, though; did you?

**A**    No.

**Q**    And you did not respond to this by instructing them of an amount to pay so that they could make that termination fee;

right?

**A**   Right.  I had already told them, they've got to be simultaneously.  Done simultaneously.  And you've got to do that.  So this was them trying to relate the payment that should have come with the January 20th letter back to that.  They made it, you know, almost three months' late.

**Q**   You received a check on April 3rd, 2023 for the $13,000 and some change for the rent; correct?

**A**   It would have been within a day or two.  It was sent overnight.  I think there was a confirmation thing that Mr. Patti had, but yes, within a day or two I would have received that check.

**Q**   And at that point you had a copy of the letter, the January 20th letter; right?

**A**   Yes.

**Q**   And you had a copy of the check; right?

**A**   Yes.  I had a copy of the January 20th letter referencing a check that wasn't sent with it, and then I had the April 3rd or April 4th, 5th check sent three months after.

**Q**   But as of that day, you had -- you had notice of termination, you had a check, you knew they were trying to get the amount of the unamortized landlord costs, and they were offering to still pay that, but you didn't tell them the amount.  And, so your contention, though, is that it was invalid, and you didn't have to tell them the amount because

they didn't send the check simultaneously, even though you had the notice and the check at the same time, at least, by sometime after April 3rd; right?

**A**   What I was trying to say is, you've got to send the notice overnight to me with the check.  They sent a letter in January.  Well, they didn't really send it.  I thought that they had overnighted it without the check.  And then three months later, they sent just the check.  In my opinion that with the April 3rd letter, they had to give the termination notice and send the check for it to be valid, and that's why I said to Mr. Patti that if Judge Moorer believes that -- that the April 3rd delivery of the check cured the prior deficiency and related back and they still owed another three months of termination fee, they still owed -- they still had to pay 90 days of rent.  So then they would owe the 13,000 and change that I returned plus another three months' rent plus the other expenses we talked about.

**Q**   Please turn to Plaintiff's Exhibit 16.  And turn to the chart.

**A**   Yes, sir.  I created it.

**Q**   When did you create this chart?

**A**   I can't remember, Mr. Premo.  I mean, I can tell you exactly.  I know that through discovery, you know, we had discovery responses done.  And, so I know we produced this in conjunction with discovery.  You know, I know it took my staff

a long time to put it together.

**Q**   Mr. Pittman, you didn't produce this chart until last Thursday; right?

**A**   I believe that this was attached to our supplemental discovery responses.  There -- I got them in the box over there.  Yeah.  I produced it to you, this one, back in last year, I believe.

**Q**   Okay.  If you'll look at the next page, you'll see that the next page is marked with a Bate stamp, Pinnacle RFP001; do you see that?

**A**   Yes.

**Q**   The chart isn't marked with any Bate stamp; right?

**A**   Yeah.  So we produced the invoices to your initial discovery, and then I think you wrote a deficiency letter, and then my recollection is, we filed a supplement discovery response with that.

**Q**   With this chart?

**A**   Yeah, I believe so.  Nick, it should be in the bottom of that box.

**Q**   How was this chart created?

**A**   Ms. Mosley would have gone through all the stuff I told you we had to go look through.  She would have gotten those invoices together, and then in our first round of discovery, we sent you all those invoices.  I remember you wrote a deficiency letter where you said, you know, some of these appear to not be

related to the space and asked for a supplement, and then we filed a supplement in where we said, you're right about a few. I think one of them was to another space, but there was some invoices from Roto-Rooter to Paradise Nails. So I think you questioned those, and I said, well, the contractor goes to the grinder pump outside -- outside of Paradise Nails, but it's for the whole center. So those would have been correct.

**Q** Well, let's talk about some of these exhibits that the invoices that are attached to this.

**A** Okay.

**Q** The first one is marked Pinnacle --

THE COURT: Which exhibit is this one?

THE WITNESS: 16, Your Honor.

MR. PREMO: I'm sorry. We're still on Plaintiff's Exhibit 16.

**BY MR. PREMO:**

**Q** And I guess, before I ask you these questions on the specific invoices, it's your contention that these are the amounts that make up the unamortized landlord cost; is that right?

**A** Based on my understanding of what that means, yes, sir.

**Q** Okay.

**A** Well, let me say that this was an invoice that they were responsible for under the lease. So I think from the spreadsheet, they should have had -- they were responsible for

any air conditioning maintenance and service up to $1,500 a time, so.  But we paid this.  So this is totally their responsibility.

Q   Okay.  So the -- the first one is for work on the air conditioner?

A   Yes.

Q   Turning to the next page, that's another invoice for work on the air conditioner.

A   Correct.  That it was their responsibility under the lease that we did.

Q   Let's turn to the -- the third invoice marked at the bottom, Pinnacle RFP003.

A   Yes, sir.

Q   I'll note on here that it says, job address, Paradise Nails.  What is Paradise Nails?

A   That's the space next door, and that's the one that I told you is a little confusing.  The grinder pump isn't in Paradise Nails' leased space.  It is directly outside on the ground.  So when we called out, Roto-Rooter went and did the work.  They said it was for Paradise Nails.  It's immediately adjacent to Paradise Nails, but it's the grind pump that pumps the sewage out of the entire building including Guaranteed Rate's space.

Q   Well, the date of this invoice is October 5th, 2021; right?

A   It was.

Q   That's months before --

**A**   So then that would probably be one of the ones that I said, you're right, Mr. Premo, that should not have been attributable to -- to you because, again, you've questioned some of these in a letter, and I know we responded and said, yeah, you're right about some of them, and we think you're wrong about some of them.

**Q**   Is this amount, though, still reflected on your chart?

**A**   It shouldn't be, but if it is, then it's incorrect.

**Q**   Well, it looks like the third listing down on the chart on the first page is Roto-Rooter for $140.  You have the date as 10/5/23, but looks like you got the date wrong.

**A**   Yeah.  Then that should not be on there because that would have predated their lease.

**Q**   Okay.

**A**   So that should be taken off.

**Q**   That one should be excluded?

**A**   Yeah.  And I think that's probably one of the -- one of the ones that maybe you called into question, and I think our supplemental response said, yeah, you're right.

**Q**   Okay.  The next invoice, if you turn two pages over to RFP005, that's for a date of May 9th, 2023; right?

**A**   Correct.

**Q**   Okay.  But we know that Guaranteed Rate had already vacated the premises by the end of April 2023; right?

**A**   Correct.

**Q**   So why is it your contention that they would be responsible for payment of some plumbing work that was done after they had already moved out?

**A**   So I -- I may not have said it very clearly.  Unamortized costs are making the landlord whole for the money they spent prior to and during the lease term expecting the tenant to stay and pay rent for the full term.  So I agree, they had moved out, but if -- if we're -- if I'm correct, and that's obviously Judge Moorer's decision, not mine, but this was during the lease term, a month or two after they -- the following month afterwards.  So we still had to do the repair work that we counted on their rent to help pay the cost of it we didn't get.  So unamortized costs, that's what I was trying to explain, and I probably didn't do a good job.  It's not easy calculation because it could include things long after Guaranteed Rate left up until either we get a new tenant in the space, which unfortunately, we had not or their original lease term expired on December 21st, 2024.

**Q**   This was for work done on the pump because somebody who was there, I guess, clogged it up by flushing something they shouldn't have; is that right?

**A**   Yeah.  That's what I learned is that unfortunately these grinder pumps, I think, if you -- if you -- you know, people flush refuge or feminine products down there, then they can seize up.

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

**Q**   Turn over a couple more pages.  It's Bates labeled Pinnacle RFP017.

**A**   Okay.

**Q**   This is another Roto-Rooter invoice.  This one's dated June 22nd, 2021.  That shouldn't be in there; right?

**A**   Correct.  If it's before January 1, 2022, it should not be in there, and again, this is stuff we produced with the first discovery that you called us out on some of it being incorrect, and we supplemented and said, you're right.  If it's not between January 1, 2022 and December 31st, 2024, it should not be on the spreadsheet.

**Q**   Okay.  If you turn to the next invoice from SERVPRO, it's Pinnacle RFP019.

**A**   Yes.

**Q**   This is related to that flooding situation that you mentioned?

**A**   It did.  It got in the back of Guaranteed Rate space.  Fortunately, the way back is, like, that commercial vinyl tile.  So it's -- but they got water in their space that we had to squeegee and dry out.  So that -- it got into all the spaces at the rear of the building.

**Q**   Now, you include on your chart a prorated portion of this that you're attributing $7,000 to Guaranteed Rate for the prorated portion that you contend they're responsible for of this invoice.

**A**   It should be a fifth of that invoice.  So if it's a different amount, then it should be corrected.  And if so, I take responsibility.  I would have had somebody do it.  But at the end of the day, I produced it.  It's my responsibility.

**Q**   I'm not really questioning your math on that, Mr. Pittman.  I'm -- I point you to the -- the lease terms.  It says that Guaranteed Rate's only responsible for $1,500 payment on any one item; isn't that right?

**A**   It's a great question, and that's why we grapple with it so much.  If it's a repair item in their space, in their four corners of their walls, they're responsible for any cost for the systems up to $1,500.  If it's outside their spacing, something that takes place outside or the roof or the gutters or the grinder pump, then they would share.  So that's one provision related to the lessee's additional duties inside their space.  The unamortized cost is stuff outside of their space.  And -- and we've grappled with trying to figure out.  It's a complicated calculation, and I didn't anticipate it would be.

**Q**   Okay.  So it's your contention that the additional lessee's duties provision that says, lessee will not be responsible for any single tenant item in excess of $1,500 in regard to HVAC replacement or repair or other maintenance and repair items.  Your contention that that only applies to things that are indoors?

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

**A**   Yeah.  That additional lessee's duties says that they're responsible for all the systems inside, HVAC, electrical, plumbing.  So if something goes wrong on -- with air conditioner or what-have-you, under that provision three, then they would be responsible for that.  The unamortized costs, in my understanding, is different than that.  That would be something that would be for the benefit of the whole center, you know, like a cleanup of Guaranteed Rate space, and all the other people that got water in, then that would be an amortized cost, the one I absorbed that I didn't have their rent down the road to help offset.

**Q**   Well, this references HVAC unit.  Surely, parts of the HVAC unit are not inside their unit; right?  There are components of it that are not inside their unit?

**A**   I may be looking at the wrong -- I'm looking at the SERVPRO thing that says water restoration.

**Q**   I'm sorry.  I'm talking about the additional lessee's duties --

**A**   Okay.

**Q**   -- provision.  You said that only applies to things in their unit, but components of the HVAC unit are not -- there are components of that that are outside of their unit; right?

**A**   I -- I guess so.  I wouldn't -- yeah.  There's an inside and an outside unit.  You make a good point, but it says, the HVAC system is their responsibility, up to $1,500.  So if it's

1,500 or less, they're supposed to pay for it.  If it's 1,800, they pay 1,500.  I pay 300.

**Q**   Okay.  Turn to -- there's an invoice from Certa-Pro Painters.  It's RFP22.

**A**   Sorry, Mr. Premo.  Can you remind me back where we are, please, sir?

**Q**   I'm sorry.  We're on Plaintiff's 16, Pinnacle RFP22.

**A**   Okay.  Thank you.  Sorry.  I flipped back to the additional lessee's duties.  Okay.  Go ahead.

**Q**   All right.  This references pressure walking sidewalk in front of habitat restore.  It appears that this is related to some construction that was done to a -- a different unit.  Why would Guaranteed Rate be responsible for this?

**A**   I don't know -- I know it's every year or two we get the whole front of the building pressure washed.  So if -- if it was for the whole building, then it would be, they'd be responsible for a fifth of it.  If it was just for a portion of it, then I would agree it shouldn't be --

**Q**   Well, is this for the whole building or just a portion of it?

**A**   Is it -- you said 32, Mr. Premo?

**Q**   22.

**A**   22.  I'm trying to see where you are.  I see the Certa-Pro Painters.  Where is the reference to the --

**Q**   It says in the notes, Certa-Pro will also pressure wash the

sidewalk in front of habitat restore, and it's talking about the left front facade and vertical columns and sign band in front of the habitat restore.  It appears this is for painting on a different unit.

A   Well, it says they will pressure wash -- for $2,500, that would be for the whole building.  That wouldn't just be for a fifth of the space.

Now, contractors will sometimes -- they don't know the address.  So they just sometimes will put the name of -- of one of the tenants on it, like they did Paradise Nails.  But for $2,500, that would not have just been to power wash one out of five spaces.

Q   Well, this is talking about painting, not power washing.

A   It says Certa-Pro -- it's a quote.  Pressure wash areas to be painted before applying two coats of premium masonry paint. We ended up -- I think we ended up power washing, I guess, and painting.

Q   Yes.  So this is for power washing and painting.  $2,500 seems maybe low for the whole -- for the whole building if it's going to be the whole building; right?

A   I agree.  That would -- I just -- it's been a while.  And, so I apologize.  If it was for just Habitat For Humanity, then, absolutely, that would not be your all's responsibility.

Q   Okay.  So you agree that one should be stricken, the $500 off of that one; right?

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

**A**   Yeah.  And I think our supplemental discovery we -- if there were errors there, we would have acknowledged them in that.

**Q**   But this chart, I'm still confused about the supplemental discovery.  I'll represent to you, Mr. Pittman, I've -- I never saw this chart until last Thursday.  And maybe I missed it in some supplemental discovery that was produced, but I never saw this.  But even it is, is this what you contend what's fixed through the supplemental discovery, the chart?

**A**   Here's my recollection.  We produced all of these invoices. And you then question some of those things, and then we filed a supplement in response to your deficiency letter or whatever -- whatever you want to call it, where we said, we agree with you on some, we disagree with you on others.  My recollection is that this chart was sent with the supplemental discovery. Perhaps, it was sent with the original discovery, but I agree with you that if there's something on this chart that was a recitation of the original stuff, some of which was wrong, then there's items on here like we just discussed that are incorrect, and I apologize to you because I certainly want to get it right.

**Q**   Well, Mr. Pittman, you indicated in your -- in your interrogatory responses, there was a question asking you to identify and describe with particularity each cost that comprises the unamortized landlord cost estimated to be

approximately $20,000 as you had included in your Rule 26(a) disclosure. And this response does not include the amount that is stated here of $9,965. It doesn't include any amount. So it --

A   Realizing our initial disclosures, that would have been right at the very beginning of the case.

Q   Well, this is interrogatories I'm talking about.

A   Okay. So we would have -- we would have shot high because I wouldn't want it to go up. And, so then in the interrogatory responses, we may have referred back to that, but we attached all the invoices. So we thought we were providing you correct stuff. And obviously, missed some of the things. And that you called us out on that, and we said, you're right about some of them, Mr. Premo. You're incorrect about others. But if there's still, you know, discrepancies, I think we've dealt with them here today.

Q   Under the term of the lease, you're responsible for ensuring that the roof is in good repair; right?

A   Yes. Probably so.

Q   Okay. But you've included several invoices in here for damage to the roof, repairs to the roof. Aren't those Pinnacle's responsibility to take care of since the lease imposes on them the duty to keep the roof in good repair?

A   Yes, as long as all of the tenants are there and paid rent for the balance of the lease term. We didn't get the rent, but

we still had to fix the problem.  So that's my understanding of unamortized cost is that if Guaranteed Rate doesn't stay, we don't get the rent to offset the expenses.  But you may be correct.  Again, unamortized cost is Guaranteed Rate's language.  I've never seen it before or since.  So this is my first time.  Hopefully, it'll be all our last.

Q   In January of 2023, you could have compiled a list of the unamortized landlord cost like you have here in this Exhibit 16; right?

A   Had I known about the request, I could have started on it. It would have been incomplete because it -- I wouldn't be able to finish it until the beginning of 2025.

Q   But you did know about the request, at least by a couple of months later, even if you didn't get those e-mails, even if you didn't look on the computer that had the e-mails on them from -- from your employee, at least by later in March, you did know about the request for unamortized cost, and you could have at that point come up with this list of unamortized cost and sent it to Guaranteed Rate; right?

A   I could have, and I ultimately would have, if they had kept their promise under the lease.

Q   But you didn't; right?

A   I didn't because they hadn't terminated properly.

MR. PREMO:  That's all I have for now.

THE COURT:  All right.

MR. PATTI:  Judge, I think I'll be pretty brief here.

THE COURT:  All right.

MR. PATTI:  Famous last words with a trial lawyer.  I do mean it.  Judge, may I approach Mr. Premo and the witness?

THE COURT:  Certainly.

MR. PATTI:  Thank you.

### REDIRECT EXAMINATION

### BY MR. PATTI:

Q   Mr. Pittman, you were just asked about some supplemental responses that Pinnacle Properties provided in this case.

A   Correct.

Q   I just handed you and Mr. Premo a copy of those supplemental responses.  For starters, is the first page of that document a cover letter?

A   Yes.

Q   And is the date on that cover letter March 1st of 2023?

A   It's May 1st, 2023.

Q   May 1st of 2023.  Now, that's not the right date; correct?

A   No.  This was, I think, May 1st, 2024.

Q   I believe --

A   Because the lawsuit was already pending, so.

Q   Right.  And if you flip to the back page, it'll show the date that this was served on.  And what's that date?

A   Oh, sorry.  That's the certificate of service.

Q   Yes.

**A**   May 1st, 2024.

**Q**   Now, if you go back to interrogatory 5 --

**A**   Yes, sir.

**Q**   -- do you see where it says, see spreadsheet attached?

**A**   Response to interrogatory number 5 where he would have asked for the compilation.  See attached spreadsheet which was the one page attached to the supplement, other than our answers to the follow-ups where we say -- talk about the Paradise Nails and all of that stuff, and then it says -- let's see -- however, documents 9 through 16 were included in error. Similarly, documents 22 through 26 provided service that was provided to the entire building, so.

THE COURT:  Mr. Pittman?

THE WITNESS:  Yes.

THE COURT:  You're reading quite fast.  What are you reading from?

THE WITNESS:  I've been admonished so many times for that, Judge.  And I should know better.

LAW CLERK:  I'm sorry to interrupt.  Is this something you're going to put on the Elmo, because we don't have it?

MR. PATTI:  I can.  I just had two copies, and I've given them both away, so.

THE COURT:  Can you put it on the Elmo?

MR. PATTI:  Yes, sir.

LAW CLERK:  Thank you.

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

MR. PATTI:  Sorry about that.

THE WITNESS:  I'm sorry, madam court reporter, for talking so fast.

**BY MR. PATTI:**

Q   Okay.  So Mr. Pittman, I'll try and go back through that real quick.  On the cover letter, it says, May 1st, 2023.

A   That's the right date, wrong year.

Q   Okay.  And we just talked about how, on the back page, the certificate of service actually says, May 1st of 2024?

A   That's correct.

Q   I asked you about interrogatory number 5.  Do you see the response there?

A   I do.  See attached spreadsheet.

Q   And attached to the back of this supplemental response, is that the spreadsheet that we've talked about?

A   Yes.

Q   And you're not going to ask this Court to award for damages associated with stuff that wasn't from the right time frame, and you admitted that there are some issues.  I think the amount is about $588; correct?

A   Of course.

Q   And anything else that Mr. Premo pointed out as well?

A   Absolutely.  And I think in the body of those responses I've said that, you're right about this one, this one, you're not, et cetera.

**Q**   Quickly, will you turn to Plaintiff's Exhibit 6, please? And it's the third page of the lease agreement.

**A**   Page -- Exhibit 6.

**Q**   Plaintiff's Exhibit 6.  It's the third page of the lease.

**A**   Okay.

**Q**   Specifically, the notices provision.

**A**   Okay.

**Q**   Mr. Pittman, will you read just the first part until the election to exercise any option?

**A**   Any notice, demand, communication or election to exercise any option, hereunder?

**Q**   Yes, sir.  So will you flip back with me to the lease termination provision on the first page?

**A**   Yes, sir.

**Q**   Is this lease termination not referred to as a termination option?

**A**   It is.

**Q**   Such that it should have been properly noticed to your attention as defined in the addressee for notification section at the end of the lease?

**A**   It did -- it does.  Good catch.  I was thinking it was like an option to extend, but it is defined as a termination option.

MR. PATTI:  Nothing further, Your Honor.

THE COURT:  All right.  Anything further?

MR. PREMO:  Just -- just one quick follow-up question

on that.

COURTROOM DEPUTY:  Mr. Patti, do we need to admit that?

MR. PATTI:  Yes.  Can we admit this supplemental discovery response evidence?  Should be Plaintiff's Exhibit 17.

MR. PREMO:  No objection.

THE COURT:  It's admitted.

(Plaintiff's Exhibit 17 was admitted.)

**RECROSS-EXAMINATION**

**BY MR. PREMO:**

**Q**   Mr. Pittman, you were just talking about the lease termination being an option; right?

**A**   Right.  That was their language, but yes.

**Q**   Under the notices provisions.  So exercising the actual termination itself would be an option; right?  The notice itself saying, we're exercising this option.  You would agree that's -- that's an option under this notice provision; right?

**A**   It's a termination option that they've got to give notice of per the notices provision.

**Q**   But not every communication related to the termination would fall under that notices provision; right?

**A**   Their language.  I read it to say, yes, that -- that, yes, anything related to the termination in any way has got to be overnighted to me at the physical address with the payment.

**Q**   So it's your contention that when they're asking you for

the amount of the unamortized costs, they needed to physically mail you a copy of a letter and say, what are the amortized costs?

A   I think that they could have simply in the letter said, here's the -- we're exercising our termination option.  Here's the payment.  If there are unamortized costs, let us know, and we'll pay them, and we wouldn't have been here.  They would have properly exercised it.  Lease terminated.

Q   Now, you noted when you were talking to Mr. Patti about this lease termination provision that it doesn't say that you're required to provide the amount of unamortized costs in some specific way; right?

A   It doesn't get into that.  It's a sentence or two.  It doesn't, you're right.

Q   Exactly.  But you'd agree that you have a -- a duty, under the duty of good faith and fair dealing, to provide that information to Guaranteed Rate; right?

A   If they properly exercised the termination option with the simultaneous overnight notice and payment.

Q   How can they do that if they don't have the amount of the unamortized costs?

A   Well, they didn't have the amount of the unamortized costs on April 3rd when they sent the check.  They could have done it by sending the check that the letter says, it's enclosed.  They just sent the three months' payment.  And if there was

termination -- if there was amor -- unamortized expenses, then we would have worked to provide them.  They didn't.  They --

Q    The termination fee is not just the rent.  It is rent plus the unamortized cost.  It has to be both of them; right?

A    It does, but it's -- you know, it's -- again, it's their language.  It's not well written.  At the time I -- I didn't think anything of it, but.  You know, it's their option that -- it's their language that says, shall be paid and done, given simultaneously.

Q    You keep saying it's their language, but both parties agreed to this lease; right?

A    That was their language that they provided to us that we incorporated along with all of their other changes.

Q    And you signed the lease?

A    All the changes.  I did, as did Mr. Elias.

Q    So you'd agree, Pinnacle had a duty under the implied duty of good faith and fair dealing to provide the amount of unamortized cost.  Pinnacle could not withhold that amount and keep Guaranteed Rate from terminating; right?

A    I think per Judge Moorer's prior order, there is no independent duty of that.  The duty is that you've got to abide by the contract.  And I believe then and I believe now that I did that, but that Guaranteed Rate did not.

Q    So is it your position that you could have refused to ever provide the amount of unamortized costs and prevent them from

ever terminating and that would not be a breach of the contract?

**A**   Absolutely not that -- my position is, is they had to pay the three months' gross rent.  If I never provided them any unamortized costs, they never would have to pay them.  The lease would have been terminated, when they said it would.  Period.

MR. PREMO:  No further questions, Your Honor.

THE COURT:  Anything further?

MR. PATTI:  Nothing further.  We rest, Your Honor.

THE COURT:  Do you have anything else to present?  In your matter or do you rest as well?

MR. PREMO:  Nothing further to present, Your Honor.  We'll rest as well on our counterclaim.  Although, if Your Honor would like closing statements, we're prepared to make a closing statement.  If you would like us to submit proposed conclusions of facts -- or conclusions of law -- findings of fact and conclusions of law, we can do that.  We're happy to do whatever Your Honor would like.

THE COURT:  I'm going to have you all submit findings of fact and conclusions of law.  I think I understand and follow the facts of the case, and I'm going to make the findings of fact and conclusions of law due on September the 2nd, and what I would ask is that to the extent that you all agree, and I understood from some of the testimony that there

is some agreement, like in this chart as to, perhaps, some of the figures should be adjusted, but I would suggest that in your findings of fact that to whatever extent you believe you're due some unamortized cost and anything else, that you go ahead and lay that out, perhaps, in a chart form.  Likewise, for you, so that I have a clear understanding as to what my ruling should be as to any unamortized cost and any other cost that may be due to your client, and I will let you submit your attorney's fee argument.  I believe that's something that I pretty much believe that I will be able to handle on whatever the paper is that's submitted put by -- I'm going to take under advisement my ruling as to the ultimate case, and then after that, I'll set a date and time for debriefing and that type of thing, and if I need argument on it, I will also do that.  All right.  Anything else?

MR. PATTI:  May I say one thing, Your Honor?

THE COURT:  Yes, sir.

MR. PATTI:  My first child is due to be born on September 2nd.  Do you mind if we get an additional seven days just to get out of the trenches?  About a week or so?  I hate to prolong this case any longer than it's already been, but.

THE COURT:  That's fine.

MR. PATTI:  I respectfully would ask for one more week just to give me --

THE COURT:  Since it's your first --

MR. PATTI:  It is my first.

MR. PREMO:  We object.  If the hospital has Wifi.  No.  No objection to that, Your Honor.  Of course.

THE COURT:  All right.  Well, then, we'll go to the 9th.

MR. PATTI:  Perfect.  Thank you.

THE COURT:  And I hope all goes well with that process.

MR. PATTI:  Thank you, Judge.

THE COURT:  All right.  Well, thank you.  It has been a pleasure to have you try this case.

(Discussion off the record.)

THE COURT:  I will get you a decision out to you as quickly as I can.

MR. PATTI:  Thank you.

(The Proceedings were concluded at approximately 4:35 p.m. on August 13, 2025.)

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov

C E R T I F I C A T E

I, the undersigned, hereby certify that the foregoing pages contain a true and correct transcript of the aforementioned proceedings as is hereinabove set out, as the same was taken down by me in stenotype and later transcribed utilizing computer-aided transcription.

This is the 5th day of September of 2025.

_____
Melissa J. Eicken, RPR, FCRR
Federal Certified Realtime Reporter

*MELISSA J. EICKEN, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3085/missy_eicken@alsd.uscourts.gov