IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| **PINNACLE PROPERTIES, LLC,** | ) |
| | ) |
| Plaintiff/Counterclaim Defendant, | ) |
| | ) |
| v. | ) CIV. ACT. NO. 1:23-cv-198-TFM-MU |
| | ) |
| **GUARANTEED RATE, INC.,** | ) |
| | ) |
| Defendant/Counterclaim Plaintiff. | ) |

### MEMORANDUM OPINION, ORDER, AND JUDGMENT

This matter came before the Court for a non-jury trial held on August 13, 2025, after which the Court took the matters at issue under advisement. Pursuant to Fed. R. Civ. P. 52(a)(1) the Court issues this opinion with its findings of fact and conclusions of law.[1]

### I.     NATURE OF THE CASE

This case arose from a dispute regarding the termination of a commercial lease. Plaintiff/Counterclaim Defendant Pinnacle Properties, LLC ("Plaintiff" or "Pinnacle") sought declaratory judgment and injunctive relief against Defendant/Counterclaimant Guaranteed Rate, Inc. ("Defendant" or "Guaranteed").[2] Guaranteed asserted four (4) counterclaims against Pinnacle, including breach of contract, breach of the covenant of good faith and fair dealing, wantonness, and declaratory judgment. After summary judgment, the only claims remaining to be addressed at the bench trial were the parties' declaratory judgment claims, Defendant's breach of

---

[1] "'[T]he judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts.'" *Stock Equip. Co., a Unit of Gen. Signal Corp. v. Tenn. Valley Auth.*, 906 F.2d 583, 592 (11th Cir. 1990) (quoting FED. R. CIV. P. 52 advisory committee's note to 1946 amendment).

[2] The Court acknowledges the claim and counterclaim status for each party. However, for simplicity, the Court merely states Plaintiff and Defendant rather than the lengthy "Plaintiff/Counterclaim Defendant" and "Defendant / Counterclaimant".

contract claim, and damages. This Court has subject matter jurisdiction and venue over this matter pursuant to 28 U.S.C. § 1332. The parties do not contest jurisdiction or venue, and the Court finds sufficient support exists for both.

## II.   PROCDEDURAL HISTORY

Pinnacle originally filed this action on April 20, 2023, in the Circuit Court of Baldwin County requesting a declaratory judgment (Count I) and injunctive relief (Count II) relating to a commercial lease of property located in Baldwin County. *See* Doc. 1-1. Guaranteed timely removed this action to this Court on May 26, 2023.

On September 14, 2023, Guaranteed filed its counterclaim against Pinnacle, which included four counts. Doc. 17. Count I asserted a breach of contract claim for Pinnacle's refusal to provide the amount of unamortized Landlord costs and refusal to accept Guaranteed's termination. *Id.* at 5. Count II asserted a breach of the covenant of good faith and fair dealing, alleging that Pinnacle failed to act in good faith by "refus[ing] to provide or confirm the amount of the termination fee [and] interfer[ing] with Defendant's ability to exercise its termination right in the Lease[.]" *Id.* at 6. Count III asserted a claim of wantonness, alleging that "Plaintiff knowingly rejected Defendant's termination and breached its duty to act in good faith, knowing that its actions would cause Defendant harm and in attempt to extract additional sums of money from Defendant that it was not entitled to under the lease. *Id*. at 6-7. Count IV asserted a claim for declaratory judgment, requesting that the Court find Defendant exercised its right to terminate the lease by providing written notice of its intent to terminate the lease. *Id.* at 7.

In May and June 2024, the parties filed motions for summary judgment, each asserting that they were entitled to summary judgment in their respective favors on all claims. *See* Docs. 44, 48. On March 6, 2025, the Court issued its Memorandum Opinion and Order on the motions for

summary judgment which denied both motions. Doc. 54. The Court noted that Defendant's wantonness claim and breach of the covenant of good faith and fair dealing are not standalone claims, but rather are subsumed by the breach of contract claim. *Id.* Thus, the Court set a bench trial to address both parties' declaratory judgment claims, Defendant's breach of contract counterclaim, and any damages. *Id.*

The bench trial was held on August 13, 2026. The Court heard from two witnesses and the trial lasted one day.

### III.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having carefully considered evidence submitted at trial, and having studied the exhibits, pleadings, and arguments of counsel, the Court now enters the following Findings of Fact and Conclusions of Law.

**A.   Findings of Fact**

On December 30, 2021, Plaintiff and Defendant entered into a commercial lease, with Plaintiff as the lessor and Defendant as the lessee, for a storefront in the Baypointe Shopping Center in Daphne, Alabama. Doc. 73 at 1. Both parties contributed to the drafting of the Lease, with Plaintiff providing the initial terms from its stock form lease agreement and Defendant offering revisions to the form language. Trial Tr. at 83:17-85:3. The Lease contained the following provisions:

> **LEASE TERMINATION**: Lease shall terminate on the 31st day of December 2024. Tenant shall have an ongoing right to terminate this Lease effective any time after the conclusion of the twelfth (12th) month of the Lease Term by providing Landlord with ninety (90) days prior written notice (the "Termination Option"). If Tenant exercises its Termination Option it shall simultaneously issue Landlord with a termination fee (the "Termination Fee") equal to three (3) month of Tenant's then in effect Gross Rent plus unamortized Landlord costs associated with this Lease. This option shall be reciprocal in nature.
> . . .

>**NOTICES**: Any notice, demand, communication, or election to exercise any option hereunder, whether intended for the Lessor [Pinnacle] or for the Lessee [Guaranteed], shall be in writing, and may be served or delivered in person, or by prepaid U.S. Registered or Certified mail, or by overnight courier service, to the address of the party intended as the recipient thereof as such address is herein stated, or to such other address as the parties hereto may at any time, and from time to time, designate in writing, (and as to notice to Lessor, a copy thereof shall be mailed or delivered to the Agent).
>
>. . .
>
>**LESSOR'S RIGHTS CUMULATIVE**: The failure of the Lessor to insist, in any one or more instances, upon a strict performance of any of the covenants of this lease, or to exercise any option herein contained, shall not be construed as a waiver, or a relinquishment for the future, of such covenant or option, but the same shall continue and remain in full force and effect.
>
>**SURRENDER**: At the expiration of the tenancy herein created Lessee shall surrender the Premises in the same condition of cleanliness, repair and sightliness as the Premises were in as of the commencement of this lease unless meanwhile repaired or improved, in which event, from the time of such repairs or improvements as to that portion so repaired or improved, reasonable wear and tear and damage by unavoidable casualty excepted, and shall surrender all keys for the Premises to Lessor at the place then fixed for payment of rent and shall inform Lessor of all combination locks, safes and vaults, if any, in the premises. Lessee's obligations to observe or perform this covenant shall survive the expiration or other termination of the term of this lease.

Doc. 73 at 1-4. The addresses for notifications for the parties are identified in the Lease as follows:

| Lessor: | PINNACLE PROPERTIES, LLC & PRITCHETT MOORE<br>ATTN: James Pittman, Jr.<br>Address: 2206 Main Street.<br>Daphne, AL 36526<br>Phone: 251-626-7704 | Lessee: | Guaranteed Rate, Inc<br>Guaranteed Rate, Inc., a Delaware Corporation<br>Attn: Scott Ubersox<br>3940N . Ravenswood Ave<br>Chicago, IL 60613 |
|---|---|---|---|

*Id.* at 7. The proposed lease termination option provision was initially drafted by Defendant. Trial Tr. at 20:16-21:22; *see also* Trial Tr. at 45:2-12. Plaintiff added language to the termination option provision to make it reciprocal in nature. Trial Tr. at 87:18-257. The lease term was for 36 months, and was set to terminate on December 31, 2024 unless either party exercised the termination

option. Doc. 73 at 1.

In the course of negotiations leading to the creation of the lease, Plaintiff communicated with Defendant via the email address "remgr@jbplaw.com." Doc. 72 at 1. Additionally, the email address "remgr@jbplaw.com" was used to communicate about issues related to the Lease. Trial Tr. at 76:5-77:9, 145:2-16. This email address was monitored by a few different employees at Mr. Pittman's law firm. Trial Tr. at 118:21-23, 142:20-25, 143:1-13.

During the first year of the lease, Plaintiff paid for various improvements that were made to the property. *See* Doc. 72 at 108. Namely, Plaintiff paid for a window tint job at Defendant's request that cost $1,750. *See* Doc. 72 at 33- 42; Trial Tr. at 181:23-25, 182:1-10. The lease provides that the Lessee is responsible for maintenance and repair costs up to $1,500 per single ticket item. *See id.* at 5. Specifically, the lease states "Lessee will not be responsible for any single tenant item in excess of $1,500.00 in regard to HVAC replacement or repair or other maintenance and repair items. Should ticket item be in excess of $1,500.00, then tenant will be responsible for the initial $1,500.00." *Id.*

On January 23, 2023, Defendant attempted to exercise the termination option by sending a written termination notice to Plaintiff via email at "remgr@jbplawcom." Trial Tr. at 24:2-12, Doc. 73 at 9-10. Though the attempted termination notice stated that a check for the termination fee was enclosed, Defendant did not send the termination fee at that time. Trial Tr. at 16:23-17:7. Rather, Defendant noted in the email including the termination notice that it needed confirmation of the unamortized costs portion of the termination fee from Plaintiff before it could provide the accurate termination fee. Doc. 73 at 9. Defendant had no way of determining the amount of Plaintiff's unamortized landlord costs without Plaintiff providing that amount. Trial Tr. at 22:19-23:6, 24:22-25:8. The termination notice also stated that it had been sent via "Electronic and

Overnight Delivery" to 2206 Main Street Daphne, AL 36526, Attn: James Pittman, Jr.  Doc. 72 at 43.  Despite the notice stating as such, the termination notice was not sent via overnight delivery.  Trial Tr. at 55:4-9.  After not receiving a response, Defendant sent a follow up email on January 31, 2023, asking Plaintiff again to confirm receipt and advise on the unamortized costs amount.  Doc. 73 at 11.

Beginning of February 3, 2023, Plaintiff communicated with Defendant's local employees, Shannon Reville and Joe Mosley, about a potential renegotiation of the lease.  Doc. 73 at 12-20.  Shannon Reville and Joe Mosley were not authorized by Defendant to renegotiate the lease, and Defendant's corporate employees were unaware that these negotiations were taking place.  Trial Tr. at 12:18-23, 41:12-21.  Shannon Reville emailed Mr. Pittman directly on February 3, 2023, and that was when Mr. Pittman learned, for the first time, that Defendant intended to terminate the lease.  Trial Tr. at 108:3-24. Mr. Pittman engaged in negotiations with Defendant's local employees, and he was unaware during those negotiations that the termination notice was not received by mail and was not accompanied by the termination fee.  Trial Tr. at 112:12-25, 113:1-21.

On February 10, 2023, Defendant sent a second follow up email to Plaintiff at "remgr@jbplaw.com" asking Plaintiff to confirm the amount of the unamortized landlord costs.  Doc. 73 at 21.  On February 13, 2023, Plaintiff responded to Guaranteed through the "remgr@jbplaw.com" email address and stated that the termination notice was "forwarded . . . to the owner ([who] is out of town this week)."  Doc. 73 at 23-24.  Plaintiff further advised that it would provide the amount of the unamortized landlord costs "as soon as [it had] confirmation of the amount."  *Id.*  Despite the statement above, the termination notice was not forwarded to Mr. Pittman and the employee communicating with Defendant via the "remgr@jbplaw.com" email

address did not inform Mr. Pittman of the notice, nor did she communicate with him about the unamortized landlord costs. Trial Tr. at 156:5-7, 159:23-160:21.

After still not receiving the amount of unamortized landlord costs from Plaintiff, Defendant sent another follow up email on February 24, 2023. Doc. 73 at 26. That same day, local employee Joe Mosley informed Mr. Pittman that they "have movers scheduled for March 23" to vacate the premises. *Id.* at 19.

On March 7, 2023, after still not hearing from Plaintiff as to the unamortized costs, Defendant sent another email to "remgr@jbplaw.com" requesting the amount of the unamortized costs. *Id.* at 29. On March 20, 2023, Mr. Pittman sent a letter to Defendant informing Defendant that the termination notice was not valid because the termination fee was not sent simultaneously with the termination notice. *Id.* at 32. The letter did not provide the amount for the unamortized landlord costs. *Id.* at 32-33.

On March 29, 2023, Defendant sent an email to Plaintiff—directed specifically to Mr. Pittman at james@jbplaw.com, remgr@jbplaw.com, lindsey@jbplaw.com, and amelia@jbplaw.com—in response to the letter. *Id.* at 35. Defendant's response noted that "[its] attempts to obtain confirmation of the termination fee went unanswered for some time, and [it has] yet to obtain a confirmation of the amount owed for termination of the lease" and therefore could not issue the fee simultaneously with the notice. *Id.* Defendant again requested the amount of unamortized costs. *Id.* Plaintiff did not respond. On March 31, 2023, Defendant sent another follow up email to Plaintiff, noting that "it still requires a confirmation of the fee amount to proceed with any payment." *Id.* at 40. Plaintiff did not respond. Trial Tr. at 39:17-19; 169:10-12.

On April 3, 2023, Defendant sent a check to Plaintiff in the amount of $13,089.36, representing the rent due under the termination provision in the lease. Doc. 72 at 61-63. In the

cover letter accompanying the check, Defendant referenced the termination notice it sent to Plaintiff via email in January. *Id.* Defendant also noted: "We have been trying to reach you regarding this matter but have been unable to confirm the amount of the fee associated with the 'unamortized Landlord costs associated with this Lease." *Id.* Defendant again requested that Plaintiff confirm the remaining amount of the fee, and further stated that the final day of the lease would be April 24, 2023. *Id.* Plaintiff received the check on April 7, 2023. Trial Tr. at 67:21-68:2.

On April 7, 2023, Defendant emailed Plaintiff requesting that Plaintiff confirm the check had been delivered and to let them know what more was needed. Doc. 73 at 46-47. On April 10 and 11, 2023, Defendant called Plaintiff and left voicemails regarding a return of the security deposit. *Id.* at 53. On April 11, 2023, Defendant emailed Pinnacle requesting a response to Defendant's inquiries about the security deposit. *Id.* On April 13, 2023, Plaintiff responded via email, stating that the "Termination Notice was invalid and the lease remains in effect until December 31, 2024." *Id.* at 52. Plaintiff never provided or confirmed the amount of the termination fee in response to Defendant's requests. Trial Tr. at 39:17-19, 169:10-12.

On April 20, 2023, Plaintiff filed this action. *See* Doc. 1. On April 25, 2023, Plaintiff mailed the check back to Defendant and reiterated that it deemed Defendant's termination notice invalid and that the lease was in effect until December 31, 2024. Trial Tr. at 123:19-124:8.

Defendant vacated the property by April 24, 2023. Trial Tr. at 37:16-20, 39:1-12. Upon vacating the property, Defendant left behind furniture, equipment, and signage, and did not restore the premises back to its original condition, notably leaving the walls painted red and grey. Doc. 72 at 79-107.

B.   **Conclusions of Law**

   i.   **Declaratory Judgment Claims**

Under Alabama law, if the terms of a contract are unambiguous, then the court will enforce the contract as written. *Homes of Legend, Inc. v. McCollugh*, 776 So. 2d 741, 746 (Ala. 2000). If the terms are ambiguous, or susceptible to more than one reasonable meaning, then the court must use established rules of contract construction. *Id.* Under those established rules of contract construction, where there is a valid construction and an invalid construction the court has a duty to accept the construction that will uphold, rather than destroy, the contract and that will give effect and meaning to all of its terms. *Id.* If all other rules of contract construction fail to resolve the ambiguity, then, under the rule of *contra proferentem*, any ambiguity must be construed against the drafter of the contract. *Id.* (citing *Lackey v. Central Bank of the South*, 710 So. 2d 419, 422 (Ala. 1998)). However, "'[i]t is well settled that where there is uncertainty and ambiguity in a contract, it is the duty of the court to construe the contract so as to express the intent of the parties.'" *BellSouth Mobility Co. v. Cellulink, Inc.*, 814 So. 2d 203, 216 (Ala. 2001) (quoting *Weathers v. Weathers*, 508 So. 2d 272, 274 (Ala. Civ. App. 1987)). If the rules of contract construction are insufficient to resolve the ambiguity, factual issues arise:

> "If one must go beyond the four corners of the agreement in construing an ambiguous agreement, the surrounding circumstances, including the practical construction out on the language of the agreement by the parties to the agreement, are controlling in resolving the ambiguity."

*Voyager Life Ins. v. Whitson*, 703 So.2d 944, 949 (Ala. 1997).

Additionally, "there is an implied covenant that neither party [to a contract] shall do anything which will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract" and "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Hunter v. Wilshire Credit Corp.*, 927 So. 2d

810, 813 n. 5 (Ala. 2005) (quoting *Lloyd Noland Found., Inc. v. City of Fairfield Healthcare Auth.*, 837 So. 2d 253, 267 (Ala. 2002)).

The Court notes one ambiguity as it relates to the "unamortized Landlord costs associated with the Lease." First, the unamortized landlord costs are not defined anywhere in the lease. See Doc. 72 at 4-11; *see also* Trial Tr. at 85:7-10. Additionally, the parties testimony at trial indicates that neither party seemed to understand what the unamortized landlord costs actually meant. For example, Mr. Ubersox testified that he understood unamortized landlord costs to be costs associated with getting the tenant into the space, such as legal fees in structuring the lease, work done to the space prior to move in, or finding a tenant for the space. Trial Tr. at 57:24-25, 58:1-11. Meanwhile, Mr. Pittman insisted that unamortized landlord costs includes costs that accrue throughout the entire lease term, even after termination. Trial Tr. at 134:5-6; *see also* Trial Tr. at 148:1-22, 106:13-25, 107:1-4.

At trial, both parties agreed that they collaborated in drafting the lease agreement. *See* Trial Tr. at 83:17-85:3. Trial testimony further clarified that while Defendant drafted the initial language in the termination provision, Plaintiff added language to the termination option to make it reciprocal in nature. Trial Tr. at 20:16-21:22; *see also* Trial Tr. at 45:2-12. Thus, the Court finds both parties are the "drafter" for purposes of the rules of contract construction. Under Mr. Pittman's definition, exercise of the termination option would be impossible because the termination option requires Defendant to issue a check for the termination fee simultaneously with the termination notice, and the termination fee includes the unamortized landlord costs. But if the costs continue accruing as long as Mr. Pittman claims they do, a termination fee could never be issued simultaneously with the notice. Because it would be impossible for Defendant to exercise the termination option if the unamortized costs are defined as Mr. Pittman claims they are, the

Court finds that the unamortized costs are those costs described at trial by Mr. Pittman, but only up until the lease is terminated. The Court declines to adopt a definition that would make exercise of the termination option impossible. Further, because the lease terminates ninety days after the termination notice is issued, the Court finds that the unamortized landlord costs do not need to be included in the initial check accompanying the termination notice—particularly where, as here, Plaintiff refused to provide that information. Rather, a second check may be issued after the termination of the lease, covering the unamortized landlord costs. It is clear that the parties intent was to have an option for the contract to be terminated, should either party choose to exercise it. The Court finds that this definition and interpretation best reflects that intent.

With the exception of the "unamortized Landlord costs," the plain language of the lease agreement unambiguously states "[i]f Tenant exercises its Termination Option it shall simultaneously issue Landlord with a termination fee (the "Termination Fee") equal to three (3) month of Tenant's then in effect Gross Rent plus unamortized Landlord costs associated with this Lease." It also unambiguously states that notice "shall be in writing, and may be served or delivered in person, or by prepaid U.S. Registered or Certified mail, or by overnight courier service, to the address of the party intended as the recipient thereof [. . .]" and provided the necessary addresses for notice to both parties.

Oftentimes, parties include such notice provisions in their contracts to ensure that important communications are received by the proper person to address them. As evidenced in this case, Defendant's failure to utilize the contractually designated channels for notice resulted in the January 23, 2023 notice not being delivered to the appropriate person. While it may have been delivered to an employee of Mr. Pittman at his law firm, the Court will not attribute her knowledge to Mr. Pittman, just like the Court will not attribute knowledge to Defendant that its subordinate

employees were attempting to renegotiate the lease.

However, on April 3, 2023, Defendant sent a contractually sufficient termination notice to Plaintiff when it mailed Plaintiff a check for three months' rent as part of the termination fee along with a request the amount for the unamortized landlord fees owed. Despite Plaintiff's contention that there was no termination notice issued simultaneously with the check, the April check arrived with a copy of the previous termination notice issued in January. Thus, while the late check does not "relate back" so as to make the termination notice effective in January, it is sufficient to amount to an exercise of the termination option in April. The lease agreement does not specify what information or language must be included in a "termination notice." The Court finds it was incredibly obvious from the check, cover letter, and mention of the previous termination notice that Defendant was notifying Plaintiff of its intent to exercise the termination option, despite Mr. Pittman's contention that the check was not simultaneously issued with a termination notice.

As noted above, the check included only the amount for three months' rent, and did not include any amount for the unamortized landlord costs as required by the contract. Rather, in the letter accompanying the check, Defendant asked Plaintiff to provide the amount for the unamortized landlord costs so Defendant could send another check for that amount. Instead of providing that amount so that Defendant could issue another check, Plaintiff sent the check back and claimed it was ineffective. At trial, however, even Mr. Pittman asserted that Defendant "could have said, we want to terminate per that provision. Please provide us unamortized costs at – as soon as you can [ . . .] then we'll write the check." Trial Tr. at 148:24-25, 149:1-2. Yet, when Defendant did exactly that, Plaintiff sent the check back and instead of providing the amount for unamortized costs, asserted that the termination was ineffective. Plaintiff cannot have it both ways. Furthermore, Plaintiff was aware **at least** as of March 20, 2023, when he sent a letter to Defendant

stating that the January termination notice was ineffective, that he would need to provide Defendant with the amount for the unamortized landlord fees in order for Defendant to provide Plaintiff with an accurate check. Yet, Plaintiff did not provide that amount to Defendant. At the time of trial, Plaintiff still had not provided that amount to Defendant. Without a doubt, by the time Plaintiff received the check on April 3, 2023, it should have been abundantly clear that Defendant intended to exercise the termination option. While the Court will not allow Defendant to benefit from its failure to utilize the proper channels for notice in January, nor can it allow Plaintiff to benefit from its failure to provide the necessary information to Defendant. Further, as the Court already noted above, the amount unamortized landlord costs could not be finalized until the termination of the lease, which is ninety days after the termination option was exercised.

The Court therefore finds that Defendant's termination was effective as of the date that it sent the termination fee check to Plaintiff, on April 3, 2023. At that point, it was obvious to Mr. Pittman that Defendant was exercising its termination option. The Court notes that it very well could have found the termination may have been effective at an earlier date, as Mr. Pittman engaged in some discussions with Defendant's local employees during which it appears he was aware of the termination notice. Ultimately, the deciding factor for the Court in this case was that there was some confusion about the termination notice up until Defendant sent a check in the mail. During the time before the check was sent, it was reasonable for Mr. Pittman to believe they were still in negotiations. The mailed check, however, complied with the termination provision of the lease and without a doubt there could, at that point, no longer be any confusion that Defendant was exercising the termination option.

    **ii.**    **Breach of Contract Claim**

To prevail on a breach of contract claim under Alabama law, a party must establish: (1) the

existence of a valid contract binding the parties in the action, (2) its own performance under the contract, (3) the [other party's] non-performance, and (4) damages. *Ex parte American Heritage Life Ins. Co.*, 46 So.3d 474, 477 (Ala. 2010) (citing *Congress Life Ins. Co. v. Barstow*, 799 So. 2d 931, 937 (Ala. 2001)); *Shaffer v. Regions Fin. Corp.*, 29 So. 3d 872, 880 (Ala. 2009) (quoting *Reynolds Metals Co. v. Hill*, 825 So.2d 100, 105 (Ala. 2002)).

Additionally, "there is an implied covenant that neither party [to a contract] shall do anything which will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract" and "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Hunter v. Wilshire Credit Corp.*, 927 So. 2d 810, 813 n. 5 (Ala. 2005) (quoting *Lloyd Noland Found., Inc. v. City of Fairfield Healthcare Auth.*, 837 So. 2d 253, 267 (Ala. 2002)). "A [party] breaches a contract when he or she prevents performance of the contract without the fault of the [other party] whose duty it was to perform and who is ready, willing, and able to perform." *Baldwin v. Panetta*, 4 So. 3d 555, 561 (Ala. Civ. App. 2008).

Further, a party to a contract need not show full performance but only substantial performance. *See Miles v. Moore*, 79 SO. 2d 432, 435 (Ala. 1955); *Bentley Sys., Inc. v. Intergraph Corp.*, 922 So. 2d 61, 90, 93 (Ala. 2005). "Substantial performance does not contemplate a full or exact performance of every slight or unimportant detail, but performance of all important parts." *Miles*, 79 So. 2d at 435.

Plaintiff would have this Court believe that, had Defendant mailed a letter to Mr. Pittman requesting the unamortized costs, Plaintiff would have provided the amount and Defendant could have been on its way. But Plaintiff's conduct proves otherwise. The record is a bit unclear about when *exactly* Mr. Pittman knew or should have known that Defendant requested the unamortized

landlord fees amount. On March 20, 2023, Plaintiff sent a letter to Defendant contending that the termination was invalid because it was not accompanied by a termination fee. The letter did not provide the unamortized landlord costs, even though Plaintiff should have known that Defendant could not provide Plaintiff with the full termination fee without the unamortized landlord costs. However, at the very least, Mr. Pittman knew when Defendant mailed a check for three months' rent on April 3, 2023, accompanied by a letter which specifically requested the unamortized landlord fees amount, that Defendant needed to know that amount per the lease to terminate.[3] Rather than provide an amount for the unamortized costs, or even let Defendant know that he could not provide an amount until the end of the lease term, Plaintiff altogether refused to accept that Defendant was exercising the termination option and returned the check, telling Defendant that the lease was still in effect until December 2024. The Court will not allow Plaintiff to hold Defendant hostage to a lease agreement where both parties clearly intended to include an option for early termination.

When Defendant mailed the termination fee to Plaintiff on April 3, 2023, it substantially performed the exercise of the termination option. Plaintiff breached the lease agreement when it refused to allow Defendant to exercise the termination option. While Plaintiff was correct that Defendant's attempted termination in January was deficient, it is clear that the receipt of the check in April was an effective exercise of the termination option. Defendant was ready, willing, and able to provide the remainder of the termination fee to Plaintiff, and Plaintiff continued to withhold that information.

As previously noted, Alabama law recognizes an implied duty of good faith and fair dealing

---

[3] The Court has already noted above that it would have been impossible for a termination fee simultaneously with a termination notice and to have that termination fee include the unamortized landlord fees.

in every contract. "This duty provides that neither party will interfere with the rights of the others to receive the benefits of the agreement." *Hilley*, 562 So. 2d at 190. Despite informing Defendant that the termination notice was ineffective because it was not accompanied by the termination fee, Plaintiff never provided the amount of said termination fee to Defendant. It is abundantly clear from the facts that Plaintiff never was going to provide Defendant with the unamortized costs amount, and without that amount it was impossible for Defendant to properly execute the termination option. Plaintiff's conduct interfered with Defendant's ability to exercise its rights under the termination option. Thus, Plaintiff's conduct was a violation of the duty of good faith and fair dealing, and amounts to a breach of contract.

The Court notes that Defendant is not a completely innocent party in all of this. Defendant's attempt to exercise the termination option in January was not effective, and the fee sent in April does not relate back to the January notice, as Defendant claims it does. Notice provisions exist in contracts for a reason – namely to avoid exactly the situation that occurred here. Rather, the termination option was executed on April 3, 2023. Thus, Defendant was still on the hook for rent 90 days from its April 3, 2023 exercise of the termination option.

Accordingly, the Court finds that the termination option was effective on April 3, 2023, and that Plaintiff breached the lease by returning the termination fee check and insisting that the lease was still in effect until December 31, 2024.

## IV.   DAMAGES

As noted above, the Court found that Defendant's termination notice was effectively sent on April 3, 2023. Thus, the lease did not terminate until 90 days later, on July 2, 2023. Defendant therefore was on the hook for rent until July 2, 2023. Testimony at trial indicated that the monthly gross rent for the property was $4,363.12. Trial Tr. at 137:9-10. Testimony at trial also indicated

that Defendant paid rent through April 24, 2023. Thus, the total amount of rent still owed by Defendant is $9,880.35. This amount includes the prorated rent for the remainder of April and the first two days of July, along with May and June rent.

The lease agreement also required Defendant to return the premises to the condition that they were in when Defendant moved in. From testimony and photographs at trial, it is abundantly clear that Defendant failed to do so, and that Plaintiff incurred costs as a result. The Court finds that the costs noted by Plaintiff to repaint ($6,500) and to remove furniture ($1,500) are reasonable. Trial Tr. at 135:8-17; Doc. 72 at 108. Additionally, the Court finds that Plaintiff's listed costs for the unamortized landlord costs are reasonable, minus a cost listed from 10/5/2023, which was outside of the effective lease term. Thus, the unamortized landlord costs still owed to Plaintiff are $9,937. Doc. 72 at 108.

The parties both made arguments for attorney's fees at trial. However, it is evident that neither party here is the "prevailing party." Defendant's contention was that the lease agreement was effectively terminated by the notice sent in January. Plaintiff's contention was that Defendant never effectively terminated the lease agreement. The Court found that, while the lease agreement was not effectively terminated by the notice in January, the letter and check sent on April 3, 2023 was an effective exercise of the termination provision. Additionally, while the Court found that Plaintiff breached the lease agreement by failing to provide the amount for the unamortized landlord costs to Defendant, the contract very clearly only provides attorney's fees for the Lessor due to a default by the Lessee. There is no provision that allows for attorney's fees for the Lessee. Thus, no attorney's fees are warranted for either party in this case.

Accordingly, the total damages owed by Defendant to Plaintiff, as indicated above, are $27,817.35. Subtracting the $3,739.58 security deposit from this total, Defendant owes Plaintiff

$24,077.77.

## V.   JUDGMENT

Accordingly, the Court issues declaratory judgment that Defendant's termination notice was effectively sent on April 3, 2023. The Court further finds that judgment on Counter-Plaintiff/Defendant's breach of contract counterclaim is granted in part and denied in part. It is granted to the extent that, hyper technically, there was a breach when Plaintiff/Counter-Defendant returned the check and stated that the lease was still in effect until December 2024. It is denied to the extent that the breach did not occur when Counter-Plaintiff/Defendant claims it did, and no damages are warranted. Based off of these findings, neither party is a prevailing party and no attorney's fees will be awarded. In accordance with the damages section, judgment is **ENTERED** in favor of the Plaintiff in the amount of **$24,077.77**.

**DONE** and **ORDERED** this the 10th day of February 2026.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE